# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

       v.                                            CR NO.  07-153 (ESH/JMF)

LONNELL G. GLOVER,
VELMA WILLIAMS,
JOHN SMITH,[1]
HERBERT FRANCIS YOUNG,
CORNELL ANTHONY GLOVER,
COOLERIDGE BELL,[2]
CHARLES GLADDEN,
DANIEL MAURICE THOMPSON,
HENRY BROWN,
LESLIE WOOD,
CHRISTIAN DONALDSON,
DIANE HOLMES,
JAMES TAYLOR,
JEROME HAMPTON,[3]
JOE BROWN, JR.,
JOHN WASHINGTON,
RONALD COOK,
LENA BROWN,
JOHN FRANKLIN CRUM,

       Defendants.

## DETENTION MEMORANDUM

This matter comes before me upon the application of the United States that the

defendants be detained pending trial.  After multiple hearings, the government's motions were

granted as to all defendants appearing before me except for Hampton and L. Brown, and this

---

[1] The detention hearing for this defendant is scheduled for July 2, 2007 at 9:30 a.m. before Magistrate Judge Deborah Robinson.
[2] Defendants Bell, Gladden, H. Brown, J. Brown, and Washington have not yet been arrested.

1

memorandum is submitted to comply with the statutory obligation that "the judicial officer shall—include written findings of fact and a written statement of the reasons for the detention." 18 U.S.C. § 3142(i)(1).

## FINDINGS OF FACT

### Overview of the Conspiracy

On June 12, 2007, the Grand Jury returned an indictment against the defendants in this case, alleging their participation in a conspiracy to distribute phencyclidine in the District of Columbia and elsewhere, from on or about August 1, 2005 to at least June 11, 2007.

### Lonnell G. Glover

1.    In the Fall of 2005, the police learned that L. Glover was engaged in the sale of large quantities of PCP, through various intermediaries.  Thereafter, the police obtained a warrant to wiretap L. Glover's cell phone and they also placed a bug in L. Glover's truck.

As a result, numerous conversations between L. Glover and the other co-conspirators    were recorded.  Generally speaking, when L. Glover spoke on his cell phone he and his    co-conspirators spoke in coded language.  When the conversations took place in L.    Glover's pick up truck, the individuals spoke frankly and did not use code words.

2.    From recorded conversations on Suggs' telephone, the police learned that L. Glover was Suggs' primary supplier of PCP.

3.    In one such recorded telephone call, L. Glover instructed C. Glover to purchase eight ounce bottles of lemon juice, which were often used for the repackaging and distribution of the PCP.

---

[3] Defendants Hampton and L. Brown were not held.

2

4.      On March 27, 2007, the FBI searched 4000 10th Street, N.E., where Suggs and Joy

resided.  The FBI recovered two gallons of PCP stored in eight ounce bottles of lemon

juice.

5.      In another recorded telephone call, L. Glover instructed C. Glover to provide Diane

Holmes with money in order for Holmes to purchase twenty to thirty kilograms of

cocaine in Miami, Florida.

6.      L. Glover was also recorded informing Young that he "got new shit" that did not have the

"medical smell."  L. Glover also stated that he purchased heroin from a person named

"Twin" in New York City.

7.      In another recorded telephone call, Smith informed L. Glover that Smith was arrested in

front of his residence while returning from a meeting with Twin in New York.  During

the arrest Smith's girlfriend flushed $12,000 worth of narcotics down the toilet.  L.

Glover told Smith that his girlfriend should have called him prior to flushing the

narcotics.

8.      In another recorded telephone call, L. Glover asked Smith for directions to a restaurant in

New York, where L. Glover was to meet with Twin.

9.      In a recorded conversation that took place in L. Glover's truck, L. Glover informed

Thompson that the cost of the PCP was $15,000 per gallon.  L. Glover also stated that the

quality of the PCP was not very good and that he was not making much of a profit.

10.     In March of 2007, in a recorded conversation that took place in L. Glover's truck, L.

Glover boasted that it was his "twentieth anniversary of selling drugs" and that he was

"arrest free."

11.    Between August 6 and August 8, 2007, FedEx delivered a five gallon shipment of PCP to 9626 Pennsylvania Ave., Washington, D.C.  A second shipment that was not received returned safely to Los Angeles, California.

12.    In a recorded conversation that took place in L. Glover's truck, L. Glover informed Donaldson that all of the "water" in Washington, D.C. "comes through" him.  After Donaldson stated that "Ju" also sold, L. Glover replied "Ju gets it from my man."

13.    In another recorded conversation that took place in L. Glover's truck, he stated that he sold 3,000 quarter-gram bags of heroin per day.  He also stated that he had sold twenty-five gallons of PCP in two weeks time.

14.    In a telephone call, recorded by the FBI on May 7, 2007, L. Glover agreed to meet John Franklin Crum.  After conducting surveillance of Crum entering and exiting L. Glover's truck, FBI agents observed L. Glover place a plastic bag in a public garbage can.  When police later retrieved the bag, it contained fluid, vitamin water bottles, and vacuum sealed bags and had the strong odor of PCP.

15.    Upon executing a search warrant at L. Glover's residence at 9002 Old Palmer Rd., Ft. Washington, MD on June 19, 2007, the FBI recovered 200 grams of PCP, $200,000 in cash, scales, masks, gloves, funnels, body armor, two unaltered firearms, and one firearm without a serial number.

**Velma Williams**

1.    In early March of 2007, Lonnell Glover and Velma Williams arranged to meet in Atlanta, where Williams was to provide L. Glover with PCP.

2.    In wiretapped phone conversations, Williams was overheard giving L. Glover and Diane

Holmes directions to a residence in Atlanta owned by Williams' daughter Keshia Coleman. There, surveillance revealed items being loaded into L. Glover's truck. In a follow-up telephone conversation, Williams was overheard inquiring whether the items were of good quality.

3.     On or about March 12, 2007, Williams flew from St. Louis to BWI Airport. She was met by L. Glover, who carried a large, heavy piece of luggage for her and transported her to his home, where she stayed overnight.

4.     At the end of March of 2007, Williams stayed at L. Glover's residence for between five and seven days. During this period, Flintard Coleman, Williams' son, met with Williams and L. Glover. L. Glover offered Coleman $300,000 to buy chemicals to mix to make PCP. L. Glover and Coleman agreed to split the anticipated profits of approximately $1.5 million.

5.     Williams orchestrated an April 9, 2007 delivery of PCP to Jerome Hampton via a commercial packaging service from California. In an intercepted telephone conversation between L. Glover and Williams, L. Glover asked Williams if she wanted to have some coffee, to which Williams responded "No, the Easter egg hunt is going to be two doors down," meaning that the packages were going to be delivered not at 9620 but at 9626 on a certain street. L. Glover was then heard asking Williams, "Was it five or ten?" Williams replied, "Ten," referring to the 10 gallons of PCP that were shipped in two separate packages of 5 gallons each. When the second package did not arrive, Williams tried to track it. She told L. Glover via telephone that they were sending the package back to Los Angeles. Later, she telephoned him again to advise him that the

package arrived safely in Los Angeles.

### Herbert Francis Young

1.      In a telephone call recorded by the FBI on April 6, 2007, Young agreed to meet L.

Glover          at 1375 Fairmont St., N.W., Apartment 809, Washington, D.C.

2.      On April 25, 2007, the FBI recorded a conversation in L. Glover's vehicle between

Young and L. Glover.  L. Glover informed Young that he was trying to switch from

selling PCP to selling cocaine.  Young asked whether L. Glover was "gonna see Twin"

and inquired whether he had "ever asked Twin about 'cane."  L. Glover informed Young

that Twin's family only deals with heroin and has never sold cocaine.  Twin is L.

Glover's supplier of heroin and lives in New York.

3.      On May 25, 2007, FBI officers recorded a conversation between L. Glover and Twin

arranging a time to meet in New York City.  The FBI then recorded a telephone call from

L. Glover to Young, which was made immediately upon L. Glover's returning from New

York City.

4.      On June 19, 2007, while executing a search warrant on Young's home at 2518 Q St.,

S.E., Washington, D.C., the FBI recovered $25,000 cash, 300 grams of heroin, PCP, a

shotgun, and a pistol.  While executing a search warrant at 1375 Fairmont St., N.W.,

Apartment 809, Washington, D.C. on the same day, the FBI recovered $7,500 in cash,

two fully loaded .38 caliber pistols, heroin, PCP, cocaine, and marijuana.

### Cornell Anthony Glover

1.      Cornell Glover is the nephew of Lonnell Glover and acts as his lieutenant.

2.      The government intercepted numerous conversations between C. Glover and L. Glover, both via cell phone and via the transmitter placed in L. Glover's pickup truck.

3.      On or about March 6, 2007, L. Glover and Diane Holmes traveled to Atlanta to purchase PCP to sell in the D.C. metropolitan area.  L. Glover began packaging PCP for various customers upon his return to D.C.  L. Glover then placed a call to C. Glover, instructing him to buy four bottles of lemon juice.[4]

4.      On March 27, 2007, officers executed a search warrant at 4000 10th St., the residence of Anthony Suggs, lead defendant in the related case 07-152.  Officers recovered almost 2.5 gallons of PCP, much of it stored in lemon juice bottles.

5.      On April 10, 2007, L. Glover and James Washington had a discussion in L. Glover's pickup truck about the "darkness" of the heroin being sold in D.C.  The two men also spoke openly about "water," a street term for PCP.

6.      On May 23, 2007, L. Glover had a conversation with John Franklin Crum about PCP and heroin.  Crum asked L. Glover who he should deal with when L. Glover was gone.  L. Glover told Crum to deal with C. Glover.

7.      On May 24, 2007, L. Glover told C. Glover that one of his customers wanted "an ounce."  L. Glover also told C. Glover that hiding cash in a car would give the police "probable cause."

8.      On May 26, 2007, C. Glover had a conversation with L. Glover in L. Glover's truck.  Christian Donaldson was also present.  L. Glover expressed concern that Donaldson had sold 42 ounces of PCP at too high of a price and worried that the PCP had been sold to a

---

[4] Such tinted glass bottles are frequently used to disguise PCP and avoid deterioration of the container due to the

cop.  L. Glover and C. Glover discussed the market price per gallon of PCP, and L. Glover indicated that according to "Ap" (Anthony Suggs), the price was $25,000 per gallon.  L. Glover also discussed with C. Glover his plans to travel to Florida to purchase multiple kilos of cocaine.

9.  C. Glover was in jail at the time of the June 19, 2007 takedown, as a result of a firearms charge.  A search of C. Glover's residence at that time yielded 20 ounces of PCP, unidentified amounts of marijuana and heroin, and three long guns.

10.  When interviewed while incarcerated, C. Glover said he was employed at 1820 M St. SE at a company called "Chances Are."  Pre-Trial Services discovered that this was a business owned by L. Glover and located at the home of L. Glover's mother.  C. Glover, not knowing that L. Glover had been arrested at the time, gave L. Glover's name as a reference for his employment.

### Daniel Maurice Thompson

1.  Thompson was supplied PCP and heroin by L. Glover.

2.  Surveillance of a meeting between Thompson and L. Glover yielded a recorded conversation between the two in which Thompson asked, "Where am I at with you?" and L. Glover replied, "Two."

3.  In a later recorded conversation, L. Glover indicated that Thompson was "not too good" with PCP.

4.  A June 19, 2007 search of Thompson's residence yielded 145 grams of heroin, divided by color into two portions of 88 grams and 33 grams.  The remainder of the heroin was

---

chemical's caustic nature.

bagged in small quantities.  Officers also recovered $9,400 cash from Thompson's
residence.

### Leslie Wood

1.    On one occasion, Wood agreed to meet L. Glover at a Home Depot parking lot.  In a
separate wiretapped phone conversation, L. Glover stated that a good way to conduct
business is in shopping center parking lots.

2.    On April 11, 2007, Wood sought to buy drugs from L. Glover.  L. Glover replied that he
would "be back on Friday."  Upon Glover's return, Wood stated, in a wiretapped
conversation, that he would "take that with him."

3.    On June 19, 2007, a search of Wood's home at 2009 Marbury St. recovered one-eighth of
a kilo of heroin, quinine, caffeine, scales and packaging equipment, and two guns.

### Christian Donaldson

1.    L. Glover provided Donaldson with PCP on numerous occasions and had provided
her with heroin in the past.

2.    In February of 2007, during a known PCP drought, several of Donaldson's conversations
with L. Glover were intercepted.  On one occasion, Donaldson asked L. Glover if there
was "any news yet," to which L. Glover responded, "Next week."  Similar conversations
continued until March 5, 2007, the day before L. Glover and Diane Holmes traveled to
Atlanta to purchase PCP.

3.    On March 13, 2007, the FBI intercepted a conversation between L. Glover and
Donaldson    in which Donaldson said she was "ready."  L. Glover was then observed traveling

to      Donaldson's residence.  Several hours later, Donaldson called L. Glover and said, "Come

         pick this up."

4.      In early May of 2007, in a conversation in L. Glover's truck, Daniel Thompson explained

         to Donaldson the best way to package heroin for sale.

5.      At one point, Donaldson asked L. Glover how best to package heroin to sell it.

6.      In another conversation in May of 2007, L. Glover and C. Glover had a conversation in

L.      Glover's truck about Donaldson in which they expressed concern that Donaldson had

         sold 32 ounces of PCP to a customer for an unusually high price.  L. Glover worried

         that the purchaser might have been an undercover officer.

7.      Donaldson was unemployed and on welfare at the time of the June 19, 2007, takedown.

         A search of her residence yielded a digital scale with drug residue and approximately

         $1000 in cash.

**Diane Holmes**

1.      Holmes was a courier for the conspiracy.  In taped phone conversations between Holmes

         and L. Glover, the two are heard discussing the possibility of taking trips together for the

         purpose of buying PCP to bring back to the Washington area.

2.      On March 6, 2007, Holmes drove to Atlanta with L. Glover to purchase PCP.  A wiretap

         installed prior to this trip revealed that L. Glover and Suggs were low on PCP.  After the

         trip, frequent sales of PCP resumed.

3.      In later wiretaps, L. Glover says that money is to be given to "Diane" and at one point,

         Suggs is said to have given $1,000 to "Diane."

4.      In May of 2007, L. Glover planned a trip to Florida to purchase kilos of cocaine, though

none were actually obtained on the trip.  Holmes drove with L. Glover to Florida to

purchase the drugs and rented the minivan that they used for the trip.

**James Taylor**

1.      Taylor purchased heroin from L. Glover for redistribution.

2.      On April 10, 2007, while inside L. Glover's truck, Taylor told L. Glover he gave what he

had to "people who like to snort it," and reported that these customers were unhappy with

the quality.  L. Glover replied that his current supply was of better quality.

3.      On April 26, 2007, L. Glover, C. Glover, and Taylor spoke inside L. Glover's truck.  L.

Glover told Taylor that "Herb sells about 500 grams a week."  Immediately after Taylor

exited the truck, L. Glover told C. Glover, "I need this money.  I got about fifty.  I can get

twenty later."

4.      On June 19, 2007, a search of Taylor's home yielded Ziploc bags containing white

powder, a bottle of quinine, caffeine powder, a bottle that tested positive for cocaine, 3

ounces total of cocaine, 2 ounces total of heroin, baggies containing marijuana, and

$10,000 cash.

**Ronald Cook**

1.      L. Glover supplied PCP to Cook.

2.      Telephone conversations between Cook and L. Glover were intercepted.  During one of

these, Cook told L. Glover that he wanted to purchase "those dark tennis sneakers."

During another conversation, Cook told L. Glover that everything turned out right, which

the government indicates that Cook's customers were satisfied with the drugs Cook sold

them.

3.      A June 19, 2007 search of Defendant's home yielded $28,167 in cash, a 9-millimeter

handgun, over 200 ounces of PCP in 8-ounce bottles, body armor, and ammunition.

### John Franklin Crum

1.      On May 9, 2007, at approximately 4:30 PM, wiretapped phone conversations indicate

that     Crum and L. Glover had made arrangements to meet at Branch Avenue. At 8:24 PM,

Crum asked to meet L. Glover. At 9:22 PM, Crum entered L. Glover's truck. Crum then

said, "Give me the joint for 22 to 24 a gallon." L. Glover said he could give Crum "32

for six or 55." Crum replied that 55 was all he could charge. L. Glover talked to Crum

about profit margins and said he had no gallons. L. Glover also told Crum he was

avoiding selling smaller amounts. Crum agreed to purchase "32."

2.      On May 16, 2007, wiretapped phone conversations indicate that Crum planned another

meeting with L. Glover. L. Glover drove to Branch Avenue and deposited a white plastic

bag in a trashcan. FBI agents recovered the bag and discovered a large bleach bottle and

four 32-ounce Vitamin Water bottles.

3.      On June 19, 2007, a search of Crum's residence yielded 210 grams of cocaine, a 9-

millimeter handgun, and cutting and processing tools.

### REASONS FOR DETENTION

An examination of the factors required to be considered by 18 U.S.C. § 3142(g) compels

the conclusion that there is clear and convincing evidence that the defendants' release on any

condition or combination of conditions will not reasonably assure the safety of the community

and their detention is, therefore, appropriate.

### The Statutory Standard

Defendants who are charged with an offense for which a term of imprisonment of 10 years is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801 *et seq.*), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951 *et seq.*), or the Maritime Drug Law Enforcement Act (46 U.S.C. §§ 1901 *et seq.*) are eligible for pretrial detention. 18 U.S.C. § 3142(f)(1)(C).  If there is probable cause to believe that the defendant committed an offense for which a maximum term of imprisonment of 10 years or more is prescribed in those three statutes, it is presumed that there is no condition or combination of conditions which will reasonably assure the appearance of the defendant and the safety of the community. 18 U.S.C. § 3142(e).  In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, the judicial officer is to consider:

1.    The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

2.    The weight of the evidence;

3.    The history and characteristics of the person, including

     a.    His character, physical and mental condition, family ties, employment, financial resources, length of residence in the community and community ties;

     b.    Past conduct, history relating to drug or alcohol abuse;

     c.    Criminal history;

     d.    Record concerning appearance at court proceedings;

     e.    Whether, at the time of the current offense or arrest, the person was on

probation, parole, or on other release pending trial, sentencing, appeal or completion of sentence for an offense under Federal, State or local law;

4.    The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142.

An examination of these factors compels the conclusion that there is clear and convincing evidence that the defendants' release on any condition or combination of conditions will not reasonably assure the safety of the community and their detention is, therefore, appropriate.

**The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug.** The offenses charged involve these defendants' participation in a conspiracy to distribute phencyclidine, an extremely dangerous narcotic drug.

**Defendants' character, physical and mental condition, family ties, employment, financial resources, and length of residence in the community.** See attached chart.

**The weight of the evidence.** The weight of the evidence is substantial. Many of the transactions were captured on audio tape. In addition, there were numerous searches of the defendants' residences, which yielded vast quantities of narcotics, firearms, and U.S. currency.

**History relating to drug or alcohol abuse.** See attached chart.

**Record concerning appearance at court proceedings and prior criminal record.** See attached chart.

**Whether on probation or parole at the time of the present offense.** See attached chart.

**CONCLUSION**

14

As indicated in the attached chart, several of these defendants have prior convictions for the same or similar offenses involving narcotic drugs.  Several of these, in turn, were on some form of judicially supervised release when the Grand Jury found probable cause to believe that they committed the crimes charged.  Remarkably, some were on supervised release in this very court.  Given this history, and their obvious recidivism, I can have no confidence that they will be faithful to the conditions that I would set, including the most significant condition - that they commit no new crime on release.

There are other defendants who have no prior criminal records and who have unquestionably strong roots in the community.  But, their participation in the conspiracy cannot be viewed atomistically, as if the court were dealing with a single fall from grace in an otherwise exemplary life.  To the contrary, the government's evidence presented to the Grand Jury showed intense involvement over an extended period of time in a conspiracy that must have brought hundred of gallons of PCP into their very communities, culminating in the seizure of large quantities of the drug and otherwise inexplicably large amounts of money.  I therefore must conclude that on this record, they participated at high levels of a wholesale conspiracy to introduce large quantities of PCP into the community, yielding equally large profits.  The sale of that drug on the streets is attributable to their participation in this conspiracy.  In the most obvious sense, the risk that they will resume that activity truly endangers this community.

Thus, I will order defendants L. Glover, Williams, Young, C. Glover, Thompson, Wood, Donaldson, Holmes, Taylor, Cook, and Crum detained without bond pending trial.

__/s/_____

**JOHN M. FACCIOLA**
**UNITED STATES MAGISTRATE JUDGE**

**June 29, 2007**

| DEFENDANT | CRIMES CHARGED | CRIMINAL HISTORY | PROBATION OR PAROLE AT TIME OF OFFENSE | COMMUNITY TIES |
|---|---|---|---|---|
| Lonnell G. Glover | - Conspiracy to possess with intent to distribute and to distribute one kilogram or more of phencyclidine and one kilogram or more of heroin | <u>8/8/79</u><br>- Robbery<br>- 2-10 years confinement<br><br><u>8/8/79</u><br>- Assault with a dangerous<br>- 2-10 years confinement<br><br><u>11/12/79</u><br>- Possession of prohibited weapons (NJ)<br>- 5 years confinement<br><br><u>9/26/84</u><br>- Possession of a handgun (VA)<br>- 4 years confinement | - N/A | - Lifelong D.C. resident<br>- Single<br>- 2 children (who live with defendant)<br>- Lives with a friend in a private home (for past 15 years)<br>- Employed by Chances Enterprises (for past 15 years)<br>- Current drug use indicated |
| Velma Williams | - Conspiracy to possess with intent to distribute and to distribute one kilogram or more of phencyclidine and one kilogram or more of heroin | - N/A | - N/A | - Separated<br>- 3 children (who do not live with defendant)<br>- Lives alone in a private home (for past 18 months)<br>- Retired and receives Social Security (for past 8 years)<br>- No substance abuse information is available |
| Herbert Francis | - Conspiracy to | - N/A | - N/A | - Lifelong D.C. resident |

| | | | | |
|---|---|---|---|---|
| Young | possess with intent to distribute and to distribute one kilogram or more of phencyclidine and one kilogram or more of heroin | | | - Married<br>- 7 children (2 children live with defendant)<br>- Lives with spouse in a private home (for past 32 years)<br>- Unemployed but does odd jobs (for past 6 years)<br>- No substance abuse information is available |
| Cornell Anthony Glover | - Conspiracy to possess with intent to distribute and to distribute one kilogram or more of phencyclidine and one kilogram or more of heroin | 1/16/06<br>- Possession of marijuana (VA)<br>- 30 days incarceration / confinement | - Defendant has a pending charge of carrying a pistol without a license in D.C. Superior Court. | - Lifelong D.C. resident<br>- Single<br>- No children<br>Lives with mother in a private home (for past 9 years)<br>- Employed as a Manager by Chance Enterprises<br>- No substance abuse information is available |
| Daniel Maurice Thompson | - Conspiracy to possess with intent to distribute and to distribute one kilogram or more of phencyclidine and one kilogram or more of heroin | 10/12/70<br>- Narcotics possession (DC)<br>- 1 year probation<br><br>2/29/76<br>- Embezzlement<br>- 5 years incarceration / confinement | | - Lifelong D.C. resident<br>- Single<br>- 2 children (who live with defendant)<br>- Lives alone in a private apartment (for past 8 years)<br>- Unemployed and on disability (for past 5 |

| | | | | |
|---|---|---|---|---|
| | | 10/15/80<br>- Forgery<br>- 6 months – 3 years confinement<br>- Supervision was closed administratively<br><br>4/16/81<br>- Receiving stolen goods<br>- 300 days confinement | | years)<br>- No substance abuse information is available |
| Leslie Wood | - Conspiracy to possess with intent to distribute and to distribute one kilogram or more of phencyclidine and one kilogram or more of heroin | 12/9/78<br>- Armed robbery<br>9 years – 35 years incarceration / confinement<br><br>12/1/71<br>- Robbery<br>- 60 days incarceration / confinement<br><br>5/19/07<br>- Possession of an open container of alcohol<br>- $25 court fine | - Defendant was on inactive parole status for this offense but has not been in compliance due to the 5/19/07 conviction | - Lifelong D.C. resident<br>- Married<br>- 4 children (1 lives with defendant)<br>- Lives with spouse in private home (for past 15 years)<br>- Self-employed as a barber (for past 12 years) and works for Water's Lawn Service (past 3 years)<br>- No substance abuse information is available |
| Christian Donaldson | - Conspiracy to possess with intent to distribute and to distribute one kilogram or more of phencyclidine and one kilogram or more of heroin | 5/19/00<br>- Misdemeanor Petty Larceny (VA)<br>- 90 days confinement with 90 days suspended<br>- $122 court fine<br><br>1/12/01 | | - D.C. resident (for past 10 years)<br>- Single<br>- 2 children (who live with defendant)<br>- Lives with grandfather in a private home (for past 6 months) |

| | | | | |
|---|---|---|---|---|
| | | - Theft – 2nd degree<br>- 180 days confinement with 175 days suspended<br>- 1 year supervised probation<br><br><u>1/12/01</u><br>- Attempted theft – 2nd degree<br>- 90 days confinement with 85 days suspended<br>- 1 year supervised probation | | - Unemployed and on welfare<br>- No substance abuse information available |
| Diane Holmes | - Conspiracy to possess with intent to distribute and to distribute one kilogram or more of phencyclidine and one kilogram or more of heroin | <u>10/7/93</u><br>- Possession with intent to distribute PCP (CA)<br>- 4 years confinement | - N/A | - Lifelong D.C. resident<br>- Single<br>- 1 child (who does not live with defendant)<br>- Lives with a friend in a private home (for past 2 years)<br>- Employed as a consultant for I C U Need Me (for past 5 years)<br>- No substance abuse information is available |
| James Taylor | - Conspiracy to possess with intent to distribute and to distribute one kilogram or more of phencyclidine and one kilogram or more of heroin | <u>12/23/80</u><br>- Possession of a controlled substance<br>- 1 year confinement with 1 year suspended<br>- 3 years probation revoked<br><br><u>3/16/82</u> | | - Lifelong D.C. resident<br>- Married<br>- 7 children (3 live with defendant)<br>- Lives with spouse in a private home (for past 12 years)<br>- Employed as a motor |

| | | | | |
|---|---|---|---|---|
| | | - Possession with intent to distribute heroin<br>- 1 year confinement<br><br>6/30/84<br>- Possession of cocaine<br>- 18 months confinement<br><br>12/13/84<br>- Possession of cocaine<br>- 24 months confinement<br><br>12/13/84<br>- Possession of drug paraphernalia with intent to use<br>- 30 days confinement<br><br>12/13/84<br>- Contempt<br>- 30 days confinement<br><br>12/20/01<br>- Possession of marijuana (MD)<br>- 9 months probation | | vehicle operator (for past 7 years)<br>- No substance abuse information is available |
| Ronald Cook | - Conspiracy to possess with intent to distribute and to distribute one kilogram or more of phencyclidine and one kilogram or more of | 7/6/95<br>- Attempted possession with intent to distribute heroin<br>- 8 – 24 months confinement with 8 – 24 months suspended<br>- 15 months probation<br>- $800 and $100 court fines | | - Lifelong D.C. resident<br>- Single<br>- Lives alone in a private home (for past 6 years)<br>- Employed as a supervisor at Costco warehouse (for past 10 |

| | | | |
|---|---|---|---|
| | heroin | | years<br>- No substance abuse information is available |
| John Franklin Crum | - Conspiracy to possess with intent to distribute and to distribute one kilogram or more of phencyclidine and one kilogram or more of heroin | 8/6/80<br>- Robbery<br>- 10 years incarceration / confinement<br><br>8/29/89<br>- Possession of a dangerous weapon (felony)<br>- 1 year confinement<br><br>3/7/92<br>- Unlawful possession of cocaine<br>- 1 year confinement with 1 year suspended<br>- 18 months supervised probation<br><br>7/21/04<br>- Possession of heroin (misdemeanor)<br>- 180 days confinement with 180 days suspended<br>- 1 year supervised probation<br>- $50 court fine | - Probation for the 3/7/92 charge closed unsatisfactorily on 10/24/95 | - Lifelong D.C. resident<br>- Married<br>- 6 children (3 live with defendant)<br>-Lives with spouse and children in an apartment (for past 4 years)<br>- Employed as a driver by D.C. Dept. of Public Works (for past 4 years)<br>- No substance abuse information is available |