UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,      : | |
| : | |
| v.      : | Criminal No. 07-153-19 (ESH) |
| : | |
| JOHN FRANKLIN CRUM,      : | |
| Defendant.      : | |

## GOVERNMENT'S OPPOSITION TO MOTION FOR REVOCATION OR AMENDMENT OF DETENTION ORDER AND TO SET RELEASE CONDITIONS

The United States of America, by and through its Attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's Motion for Revocation or Amendment of Detention Order and to Set Release Conditions ("Def. Motion") in this matter. As Magistrate Judge John M. Facciola determined on June 22, 2007, the record establishes that no condition or combination of conditions for defendant's release can reasonably assure the safety of the community. Thus, we ask this Court to deny defendant's motion for bond pending trial. In support of this pleading, the government states as follows:

### BACKGROUND

1.      In the fall of 2005, law enforcement developed information that Anthony Maurice Suggs was distributing large quantities of Phencyclidine (PCP) in the Washington, D.C. area. Law enforcement officers collected substantial evidence that Suggs was actively distributing gallons of PCP and cocaine. After obtaining credible evidence of Suggs' drug trafficking, the government prepared an affidavit in support of wire interceptions over the cellular telephone used by Suggs, and

on January 8, 2007, the Honorable Rosemary M. Collyer, United States District Court Judge for the District of Columbia, found probable cause for the interceptions of Suggs' telephone, and approved the interceptions. Interceptions commenced on January 9, 2007. Within two weeks of intercepting Suggs' telephone, law enforcement officers determined that Suggs' supplier of PCP was Lonnell George Glover. The government prepared an affidavit in support of wire interceptions over the cellular telephone used by Glover, and on February 9, 2007, Judge Collyer found probable cause for interceptions over Glover's telephone, and approved the interceptions. Shortly thereafter, when probable cause was developed to show that Glover used his pickup truck in transporting drugs and as a meeting place for drug trafficking, the government prepared an affidavit in support of an application for authority to intercept oral communications in and within the vicinity of Glover's pickup truck. On March 19, 2007, Judge Collyer found probable cause for interceptions in and in the vicinity of Glover's pickup truck, and approved the interception of oral communications. A summary of some of those interceptions follows.

2.  Glover's relationship with Suggs centered around the phencyclidine that Glover supplied to Suggs and this was evident in the interceptions over Suggs' cellular telephone. However, in monitoring Glover's cellular telephone and later in monitoring conversations inside Glover's pick up truck, it became clear that Glover was a source of supply for both phencyclidine and heroin.[1] It was as a supplier of heroin and phencyclidine that Glover dealt with the defendant. After law

---

[1] While conversations over the cellular telephones monitored in this case display the usual aversion of drug traffickers to directly discuss the narcotics they traffic and the same use of clumsy codes, conversations inside Glover's pick up truck were open and outrageous because the conspirators did not believe they were subject to interception there.

enforcement began intercepting communications over Glover's cellular telephone, beginning in March of 2007, they intercepted calls from the defendant and thereafter defendant was intercepted in conversation with Glover inside Glover's pick up truck as well.  When he was initially intercepted, defendant's identity was unconfirmed and he was referred to by monitors as Tony Jones because he utilized a cellular telephone, telephone number 202-292-7179, which service provider records showed was subscribed to Tony Jones, 2900 14th Street, N.W., apartment 409, Washington, D.C.  Subsequently, defendant was identified in FBI surveillance of meetings with Lonnell Glover as John Franklin Crum, 5705 Woodland Gable Drive, apartment B, Alexandria, Virginia.  The arrangements for those meetings were made over the telephone bearing number 202-292-7179.  During those surveillances Crum was observed driving a vehicle registered to him.  Based upon the registration information law enforcement identified defendant and had his criminal record identification photograph pulled.  Agents involved in the surveillance positively identified the defendant's photograph as the person they had observed meeting with Glover.

     3.    Through out the course of electronic surveillance, beginning in March and through the close out of the wiretap on June 19, 2007 when defendant and others indicted in this investigation were arrested, defendant was intercepted at increasingly shorter intervals arranging to meet Glover.  There would be a series of brief telephone calls arranging such a meeting followed by an interval before another series of calls surrounding a meeting.  A representative example of this is found in telephone calls on April 13, 2007.  At 5:38 p.m. Crum called Glover and they discussed their current locations and destinations.  Glover said that he was getting ready to go to East Capitol and Benning Road and Crum asked if Glover wanted him to go there.  Glover agreed and Crum asked if they

would meet by the Shrimp Boat (a restaurant at that location) "like we did." They agreed to meet there. At 11:36 p.m. Crum called Glover and they agreed to meet at the Navy Yard. The evidence will disclose that this is a frequent pattern in the dealings between Glover and Crum, consistent with a meeting in which drugs are "fronted" to Crum and paid for after Crum sells the drugs. Crum obtains drugs from Glover to fill "orders" outstanding. Indeed, on April 21, 2007, 9:24 p.m., Crum called Glover to say he had a customer. When Glover told Crum that he was in Alabama and would not return until the following evening, they agreed to meet the morning after Glover returned and Crum said he would "hold them off," meaning delay the customers. On another occasion, April 29, 2007, when Glover and Crum had scheduling problems, Crum told Glover that "the peoples couldn't wait that long so they did something else," meaning the customers Crum had went to another supplier.

4. During the afternoon of May 9, 2007, there was a series of telephone calls that were intercepted between GLOVER and JOHN FRANKLIN CRUM, wherein they arranged to meet in the 4000 block of Branch Avenue. The FBI conducted surveillance in the 4000 block of Branch Avenue and GLOVER was observed meeting with CRUM at 4:30 p.m. At 8:24 p.m., CRUM called GLOVER and the call was intercepted. CRUM advised that he was going to be in southwest Washington, D.C., and GLOVER instructed CRUM to call him when he arrived in southwest. The FBI conducted surveillance and at 9:13 p.m. GLOVER arrived at 1st and M Streets, S.W., Washington. There was a series of calls that were intercepted between GLOVER and CRUM in which they located one another. At approximately 9:22 p.m., CRUM entered GLOVER's green Chevrolet pick-up truck, the target vehicle, and their conversation was recorded. CRUM stated

"Like, if you, you, you give me the joint for twenty-four right, I'm talking about, I mean twenty-two right, the water right, so the thirty-two wasn't supposed to be six." GLOVER explained "I'll give you a whole joint for that, but now if, if I'm gonna give you like a, quarters and shit, I'm gonna give em, I, I, I'm still gonna give 'em to you cheaper, but I ain't gonna charge you that much more, because see normally for the quarters I charge seven, but for you, I give em to you for like six or fifty-five, you know I can play with that." CRUM advised that "Fifty-five would be better because that's all I, that's, that's all I can charge." GLOVER agreed that he would sell CRUM the quarter for fifty-five. GLOVER stated that he sells the gallons for twenty-two so the profit margin is greater for his customers. CRUM advised "The people I'm fucking with they ain't getting no motherfucking gallon, you know, no gallons. They getting little you know, 'cause I got, you know, I got, I got a dude now wants, you know, a sixteen joint [a reference to 16 ounces of PCP]." GLOVER told CRUM that he has been trying to avoid selling the smaller quantities. CRUM agreed that he would take "the thirty-two," sell his customer the sixteen ounces and hold the other sixteen ounces until he finds another customer. CRUM advised that his customer could buy the sixteen ounces the following day and they made arrangements to meet the next day. At the end of the conversation GLOVER said "That one there, I'll give it to you for fifty-five." CRUM responded "I'm gonna give half of it and then, and then you know, when it, when it, when somebody is ready for the other sixteen you know what I'm saying." The evidence in this matter will show that GLOVER met with CRUM in southwest, Washington, D.C., and provided CRUM with thirty-two ounce of PCP for a price of $5,500.00, to be paid when CRUM sold the PCP. Early in the conversation CRUM advised that if the price for a gallon of PCP is $22,000.00, he should not be charged $6,000.00 for thirty-two

ounces. GLOVER explained that he normally charges $22,000.00 for a whole gallon, but more when a customer wants smaller quantities or portions of a gallon. Ultimately GLOVER agreed to charge CRUM $5,500.00 for thirty-two ounces of PCP. CRUM indicated that he would be able to pay GLOVER half of the money the following day after he met with a customer who wanted sixteen ounces of PCP, and that he would pay the second half after he sold the remaining sixteen ounces of PCP.

5.  On May 16, 2007, law enforcement conducted surveillance of LONNELL GLOVER meeting with JOHN CRUM. After a series of phone calls setting up the meeting, GLOVER and CRUM were observed meeting by FBI surveillance. CRUM entered GLOVER's Yukon Denali, a vehicle registered to GLOVER. After CRUM exited the vehicle and departed the area, GLOVER was observed entering a liquor store after which he started to drive from the area. At 9:52 pm, GLOVER was then observed parking next to a trash can in front of 4229 Branch Avenue, Marlow Heights, MD. GLOVER retrieved a white bag from the back seat of his vehicle and placed it in the trash can. GLOVER then returned to his vehicle and departed the area. At 9:54 p.m. the white bag was retrieved by law enforcement. The contents of the white bag included a bleach bottle, four 32 ounce clear plastic VitaminWater bottles with a chemical smell consistent with PCP, and four vacuum seal type bags with a chemical smell consistent with PCP.

6.  On May 19, 2007 at 3:11 p.m. Crum called Glover and told him he needed a "fifty joint," that is, 50 grams of heroin. They made arrangements to meet at the Marlow Heights Shopping Center and Crum said he was coming from Virginia. Shortly thereafter Glover called Crum and announced he was there (the shopping center) by the Macys and minutes later Crum called

Glover to say he was at the Taco Bell (at the shopping center) and could see Glover by the Macys. That night at 11:06 p.m. Crum called Glover to tell him he was just coming back and because of the lateness of the hour the agreed to meet the next morning. On may 20, 2007 there were a series of calls in which Glover and Crum arranged a meeting.

7.      On May 23, 2007, Glover and Crum were intercepted in a series of telephones arranging a meeting near the "big chair" on Martin Luther King Boulevard where Glover was getting something to eat. At approximately 2:30 p.m. Crum entered Glover's truck and announced that he needed a gallon of "water" (PCP) and wanted to be sure that Glover had it. Glover assured him he did and they agreed to meet later that day. Shortly after 6:00 p.m. that evening Glover and defendant were observed by law enforcement meeting again at which time Glover, who was sitting in his truck, handed a package out the window to Crum. At approximately 6:40 p.m. that evening Crum again entered Glover's truck and they conversed. There ensued a long conversation in which Glover said that the "water" is not that strong so customers could not "cut it" (dilute it for sale to increase the profit margin), but it is still selling in gallons and half gallons. Crum asked who he should deal with when Glover was out of town and Glover said his nephew, Cornell "Tony" Glover, and gave Crum Tony's telephone number. They discussed the various properties where they were investing their narcotics profits and Glover discussed using an apple juice bottle as a container for PCP to disguise the contents.[2]

---

[2] During the course of this conversation Glover asked Crum how many children he had and Crum responded six. See PSA Report, p. 3.

8. On June 12, 2007, a grand jury of this court returned an Indictment charging the defendant and others with conspiracy to distribute and possess with intent to distribute more than one kilogram of PCP and more than one kilogram of heroin. The Indictment was returned under seal and pursuant to Rule 9 of the Federal Rules of Criminal Procedure, the presiding magistrate issued warrants for the arrest of each of the indicted defendants. On June 19, 2007, law enforcement conducted a coordinated operation in which the defendant and others were arrested upon those warrants. When defendant was arrested at his home at 5705 Woodland Gable Drive, apartment B, Alexandria Virginia, a search of his residence pursuant to a duly authorized search warrant resulted in the recovery of approximately 210 grams of cocaine, as well as cutting and packaging paraphernalia. The evidence over the wiretap will show that Crum continued to deal with Glover as described above almost to the day of their arrest.

9. On June 22, 2007, United States Magistrate Judge John M. Facciola presided over the defendant's detention hearing. The Government asked the Court to hold the defendant without bail pending trial, in accordance with the Bail Reform Act, 18 United States Code, § 3142(f)(1)(C). That motion was based on 18 United States Code, § 3142(f)(1)(C) which authorizes pre-trial detention in any case involving a crime under the Controlled Substances Act, 21 United States Code, § 801, *et seq.*, carrying a maximum penalty of ten years or more in prison. Count One of the indictment charges the defendant with a crime which carries such a mandatory minimum term of ten years and up to life imprisonment. The law creates a presumption that when, as here, there is probable cause to believe that a defendant is trafficking in narcotics at such a level as to be liable to a sentence of 10 years or more, such persons should be incarcerated pending trial. *See* 18 United States Code, § 3142(e).

10. Defendant's criminal history generate additional concern that he is is a continuing danger to the citizens of the District of Columbia and the surrounding area. Computer records show for this defendant indicate a series of arrests for property crimes beginning in 1979. Including a conviction and ten year sentence for robbery convictions in 1980 and armed robbery in 1981. Additionally, defendant has a 1980 misdemeanor drug conviction and a 2002 misdemeanor. Not only does this record establish that as a practical matter that no judicially crafted combination of conditions will protect our community from this defendant, Congress indulged in the same logic when it mandated the inclusion of a career offender provision in the Sentencing Guidelines requiring that career offenders receive a sentence at or near the maximum term authorized. See Title 28 United States Code, § 994(h) and United States Sentencing Guidelines, § 4B1.1.

11. The defendant raised all of the arguments in his motion to vacate the detention order before Magistrate Facciola at the detention hearing. After hearing arguments from counsel at the detention hearing, Magistrate Facciola concluded that the defendant was a danger to the community and there were no conditions of release that would assure the safety of the community.

## **ARGUMENT**

12. In addressing defendant's arguments raised in his bond motion, the government adopts its arguments raised in response to co-defendant, Daniel Thompson's bond motion. For the Court's ease and that of defendant's counsel, we repeat those arguments here *in toto*. This Court should not overturn Magistrate Facciola's decision to hold the defendant without bond. When detention has been granted, 18 U.S.C. § 3145(b) states:

> (a) Review of a detention order – If a person is ordered detained by a magistrate judge, . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation of the order. The motion shall be determined promptly.

13. In reviewing a detention order, it is worthwhile recalling Congress' intent in 1984 when it enacted the current version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released . . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community . . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

*See* S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3486-3487. (*Emphasis* added.)[3]

---

[3] The Court must always consider whether defendant's release is a danger to the community. This point is made throughout the Bail Reform Act. Section 3142(e), which authorizes detention without bail pending trial, reads:

> If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required *and the safety of any other person and the community*, such judicial officer *shall order* the detention of the person before trial.

*Emphasis* added. Similarly, § 3142(f) reads:

> The judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person *and the safety of any other person and the community* –
>> (1) upon motion of the attorney for the Government, in a case that involves,
>>> (C) an offense for which a maximum term of imprisonment
>> of ten years or more is prescribed in the Controlled Substances Act
>> (21 U.S.C. § 801 *et seq.*) . . .

*Emphasis* added. This point is again made in § 3142(g), factors to be considered, states:
> The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required *and the safety of any other person and the community*, take into account the available information

14.     There are no conditions of release that will ensure that defendant will not pose a danger to the community if released. This is based first upon the presumption to that effect written into the Bail Reform Act. 18 U.S.C. § 3142(e) ("Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions of release will reasonably assure the . . . safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act."). This presumption, triggered by indictment, is overwhelmingly reinforced by the facts of this case.

15.     The defendant is in the drug trade, and he is not a minor player. The interceptions over Glover's cellular telephones, and the interceptions in or in the vicinity of Glover's pickup truck, clearly establish that the defendant was not a peripheral player in the drug trade. Rather, Glover was distributing distribution quantities, that is, amounts wholly inconsistent with personal use, and defendant was one of the persons to whom they distributed. This is confirmed by the quantity of drugs, particularly the quantity of heroin, and cash seized in the search of defendant's residence. The interceptions disclose a pattern of distribution. The seizure confirms that pattern and defendant's arrest record, in addition to exposing him to life in prison, discloses that this defendant can be expected to pose a danger to the community. As such, he should be held pending his trial.

---

concerning –
    (1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
        (2) the weight of the evidence against the person;
        (3) the history and characteristics of the person . . .
        (4)*the nature and seriousness of the danger to any person or the community that would be posed by the person's release . . . .*
(*Emphasis* added.)

16.     These facts embody the danger that defendant's release poses. As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . . . The Committee also emphasizes that the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the "safety of any other person or the community.

S.Rep. No. 225, supra, at 3195-3196.

17.     The defendant may argue that his community ties overcome the presumption that he should be held pending trial. Again, the framers of the 1984 Bail Reform Act thought differently. "The Committee also notes with respect to the fact of community ties that it is aware of the growing evidence that the presence of this factor does not necessarily reflect a likelihood of appearance, and has no correlation with the question of the safety of the community." S.Rep. No. 225, *supra*, 3207. Nor is it clear why community ties, which clearly were not enough to keep the defendant from breaking the law previously, will suddenly keep him on the straight and narrow. While the combination of defendant's health and his community ties may give some comfort on the issue of the likelihood of his appearance for any judicial proceeding, it is clear from the proffered proof of defendant's steady and ongoing participation in the charged conspiracy that Magistrate Judge Facciola found no solace in his health and community ties on the question of danger to the community.

18.     In summary, if the defendant was released, he would constitute a clear, danger to the community. The defendant's bond motion provides the same information that Magistrate Facciola had before him on June 25, 2007, and there are no facts warranting a change in the defendant's release conditions.

**WHEREFORE**, the United States respectfully requests that the defendant's motion be denied and the defendant be held without bond pending trial.

                                Respectfully submitted,

                                JEFFREY A. TAYLOR
                                UNITED STATES ATTORNEY

 

_____
WILLIAM J. O'MALLEY, JR.
Assistant United States Attorney

 

_____
ANTHONY SCARPELLI     .
Assistant United States Attorney

 

_____
JOHN K. HAN
Assistant United States Attorney

## Certificate of Service

    **I HEREBY** certify that I have caused a copy of the foregoing government's Opposition to Defendant's Motion for Revocation or Amendment of Detention Order and to Set Release Conditions and proposed Order to be served by mail upon counsel for defendants as listed below; this 12th day of July, 2007.

                                                       WILLIAM J. O'MALLEY, JR.
                                                     Assistant United States Attorney
                                                     D. C. Bar No. 166991
                                                     555 4th Street, N.W., 4810
                                                     Washington, D.C.  20530
                                                     (202) 305-1749

| | |
|---|---|
| **Lonnell G. Glover**<br>Rudy Acree<br>1211 Connecticut Avenue<br>Suite 303<br>Washington, D.C. 20036 | Washington, D.C. 20036<br><br>**Charles Gladden**<br>Larry Allen Nathans<br>Suite 1800<br>120 East Baltimore Street<br>Baltimore, Maryland  21202 |
| **Velma Williams**<br>Pleasant S. Brodnax<br>1700 Pennsylvania Avenue, N.W.<br>Suite 400<br>Washington, D.C. 20006 | **Daniel Maurice Thompson**<br>Howard Katzoff<br>601 Indiana Avenue, N.W.<br>Suite 500<br>Washington, D.C. 20004 |
| **John Smith**<br>Cynthia Katkish<br>601 Pennsylvania Avenue, N.W.<br>South Bldg., Suite 900, PMB 221<br>Washington, D.C. 20004 | **Leslie Wood**<br>Edward Sussman<br>601 Pennsylvania Avenue, N.W. #900<br>South Building<br>Washington, D.C. 20004 |
| **Herbert Francis Young**<br>Cary Clennon<br>P.O. Box 29302<br>Washington, D.C.  20017 | **Christian Donaldson**<br>Frances D'Antuono<br>218 Seventh St., S.E.<br>Washington, D.C. 20003 |
| **Cornell Anthony Glover**<br>Brian K. McDaniel<br>1211 Connecticut Avenue, N.W.<br>Suite 506 | **Diane Holmes**<br>John James Carney |

601 Pennsylvania Avenue, #900
South Building
Washington, D.C. 20004

**James Taylor**
Gary M. Sidell
1015 18th Street, N.W.
Suite 801
Washington, D.C. 20036

**Jerome Hampton**
Nathan Silver, II
P.O. Box 5757
Bethesda, MD 20814

**Ronald Cook**
John Briley, Jr.
6205 30th Street, N.W.
Washington, D.C. 20015

**John Franklin Crum**
William Garber
717 D Street, N.W., #400
Washington, D.C. 20004

**Lena Brown**
Teresa Grey Kleiman
419 7th Street, N.W.
Suite 201
Washington, D.C. 20004

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | Criminal No. 07-153-19 (ESH) |
| | : | |
| **JOHN FRANKLIN CRUM,** | : | |
| Defendant. | : | |

**ORDER**

Upon consideration of the defendant's Motion to Set Conditions of Release , the government's opposition thereto and the entire record herein, it is, this _____ day of July 2007,

**ORDERED** that the defendant's motion be, and hereby is, denied and defendant is remanded to the custody of the United States Marshal pending trial in this matter

ELLEN S. HUVELLE
United States District Judge

Copies to:

William J. O'Malley, Jr.
Anthony Scarpelli
John K. Han
Assistant United States Attorneys

**Lonnell G. Glover**
Rudy Acree
1211 Connecticut Avenue
Suite 303
Washington, D.C. 20036

**Velma Williams**
Pleasant S. Brodnax
1700 Pennsylvania Avenue, N.W.
Suite 400
Washington, D.C. 20006
**John Smith**

Cynthia Katkish
601 Pennsylvania Avenue, N.W.
South Bldg., Suite 900, PMB 221
Washington, D.C. 20004

**Herbert Francis Young**
Cary Clennon
P.O. Box 29302
Washington, D.C. 20017

**Cornell Anthony Glover**
Brian K. McDaniel
1211 Connecticut Avenue, N.W.
Suite 506
Washington, D.C. 20036
**Charles Gladden**

Larry Allen Nathans
Suite 1800
120 East Baltimore Street
Baltimore, Maryland  21202

**Daniel Maurice Thompson**
Howard Katzoff
601 Indiana Avenue, N.W.
Suite 500
Washington, D.C. 20004

**Leslie Wood**
Edward Sussman
601 Pennsylvania Avenue, N.W. #900
South Building
Washington, D.C. 20004

**Christian Donaldson**
Frances D'Antuono
218 Seventh St., S.E.
Washington, D.C. 20003

**Diane Holmes**
John James Carney
601 Pennsylvania Avenue, #900
South Building
Washington, D.C. 20004

Gary M. Sidell
1015 18th Street, N.W.
Suite 801
Washington, D.C. 20036

**Jerome Hampton**
Nathan Silver, II
P.O. Box 5757
Bethesda, MD 20814

**Ronald Cook**
John Briley, Jr.
6205 30th Street, N.W.
Washington, D.C. 20015

**Lena Brown**
Teresa Grey Kleiman
419 7th Street, N.W.
Suite 201
Washington, D.C. 20004

**John Franklin Crum**
William Garber
717 D Street, N.W., #400
Washington, D.C. 20004

**James Taylor**