# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | **Criminal No. 07-CR-153(1) (TFH)** |
| *v.* | : | |
| | : | |
| **LONNELL GLOVER, ET. AL,** | : | |
| | : | |
| *Defendants.* | : | |

**DEFENDANT LONNELL GLOVER'S MOTION TO SUPPRESS
EVIDENCE OBTAINED FROM INTERCEPTION OF WIRE
COMMUNICATIONS AND SEIZURE OF ELECTRONIC
COMMUNICATIONS; AND MEMORANDUM OF POINTS
AND AUTHORITIES IN SUPPORT THEROF**

**DEFENDANT LONNELL GLOVER**, by and through undersigned counsel, and

pursuant to the Fourth Amendment to the United States Constitution, 18 U.S.C. § 2518(10) and

Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, hereby respectfully moves the

Honorable Court to suppress the contents of all intercepted wire communications and all

evidence derived from them.  Pursuant to Franks v. Delaware, 438 U.S. 154 (1978), Glover

requests a hearing on this motion.

## STATEMENT OF FACTS

The government has charged Glover in Count I of a fourteen count indictment

alleging that he participated in a conspiracy to possess with intent to distribute and to distribute

one kilogram or more of phencyclidine and one kilogram or more of heroin.  The Government

alleges the conspiracy lasted from sometime in August 2005 until at least June 11, 2007, in the

District of Columbia, Maryland, New York, Georgia, Missouri, California and elsewhere.

The indictment is based, in part, on evidence obtained by the government through

the use of multiple court orders authorizing the interception of electronic communications, which

resulted in over 1,800 hours of interceptions and over 34,000 activations.  The Title III

investigation began with the authorization to intercept Anthony Suggs' telephone.  The Orders

issues in this case are:

| | |
|---|---|
| January 8, 2007 | Interception of (240) 988-7588 (Suggs 1) |
| February 7, 2007 | Continued interception of (240) 988-7588 (Suggs 2) |
| February 9, 2007 | Interception of (202) 276-4337 (Glover 1) |
| March 9, 2007 | Continued Interception of (240) 988-7588 (Suggs 3) and (202) 276-4337 (Glover 2) |
| March 19, 2007 | Interception of Chevy Pickup (Glover Truck 1) |
| April 5, 2007 | Continued interception of (202) 276-4337 (Glover 3) |
| April 19, 2007 | Continued interception of Chevy Pickup (Glover Truck 2) |
| April 30, 2007 | Interception of (323) 719-5416 / (202) 531-4853 (Williams 1) |
| May 4, 2007 | Continued interception of (202) 276-4337 (Glover 4) |
| May 18, 2007 | Continued interception of Chevy Pickup (Glover Truck 3) |
| June 2, 2007 | Continued interception of (202) 276-4337 (Glover 5) |

On February 9, 2007, Federal Bureau of Investigation ("FBI") agent Ryan Pardee

swore out before District Judge Rosemary M. Collyer an Affidavit in Support of an Application

for an Order Authorizing the Interception of Wire Communications to and from Mobile Cellular

Telephone Number (202) 276-4337 (Glover 1).  In this Affidavit, Agent Pardee explains that he

> Is currently participating in an investigation which targets PCP and cocaine
> traffickers operating in the District of Columbia.  The investigation began in
> November of 2005.  The main targets of this investigation are LONNELL
> GEORGE GLOVER, and ANTHONY MAURICE SUGGS, also know as
> "APPLEJACK."  Based upon this investigation, as well as [his] training and
> experience, [he] has reason to believe GLOVER and SUGGS are large-scale
> narcotics traffickers operating in [sic] Metropolitan Washington, D.C., area.  This
> investigation has disclosed that GLOVER, SUGGS and their associates have
> distributed and continue to distribute gallon quantities of PCP.

2

Based on the investigation in which [he] has participated, and for the reasons set forth herein, there is probable cause to believe LONNELL GEORGE GLOVER . . . . and others . . .  are committing the following offenses: (a) possession with intent to distribute and distribution of controlled substances, in violation of Title 21 Unites States Code Section 841(a)(1)l; and (b) use of communications facilities to facilitate the commission of the above offenses involving controlled substances, in violation of Title 21 United States Code Section 843(b), (c) and the laundering of proceeds of specified unlawful activity . . . .

(*See* Exh. A - Glover 1 Affidavit ¶ 4).

Agent Pardee swore out the Affidavit

In part, on personal knowledge derived from [his] participation in this investigation and, in part, upon information and belief.  The sources of [his] information and belief are:

> (a) summaries of intercepted wired communications;
> (b) debriefings of cooperating witnesses;
> (c) physical surveillance conducted by [him] and other FBI agents, which have been reported to [him] either directly or indirectly;
> (d) review of telephone records for the target telephone;
> (e) [omitted by Agent Pardee];
> (f) Controlled purchases of PCP;
> (g) Seizures made by other law enforcement officers; and
> (h) Written reports about this and other investigations which [he] has received directly and indirectly from agents of the FBI and DEA.

(*See* Exh. A - Glover 1 Affidavit ¶ 11).  Agent Pardee further stated:

Since this Affidavit is being submitted for the limited purpose of seeking authorization for the interception of electronic communications, [he] has not set forth each and every fact learned during the course of this investigation, nor has [he] necessarily set forth all facts which support the authorization sought.  Nor does [he] request that this Court rely upon any facts not set forth herein in reviewing this Affidavit in support of the application for the interception of the electronic communications.

(*See* Exh. A - Glover 1 Affidavit ¶ 13) (emphasis added).  Based on the language of the Affidavit itself, Pardee asserted that probable cause existed solely within the four corners of the Affidavit and Judge Collyer should not rely upon any facts not contained within the Affidavit.

3

From the information disclosed to the defense thus far, it appears that the government used the Glover intercept as the first step in its investigation against Glover. As discussed *infra*, Agent Pardee's Affidavit was utterly lacking in indicia of probable cause that Glover was committing the listed crimes and replete with deliberate falsehoods and demonstrated a reckless disregard for the truth. The Affidavit also failed to make a showing of necessity for the intercept as required by the statute. As such, all evidence obtained as a result of the Glover 1 authorization and any other evidence derived from the fruit of the poisonous tree must be suppressed.

## ARGUMENT

**I.    THE AFFIDAVIT IS UTTERLY LACKING IN INDICIA OF PROBABLE CAUSE AND REPLETE WITH CONCLUSORY, FALSE, RECKLESS AND MISLEADING STATEMENTS**

It is established law that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter. *See Nathanson v. United States*, 290 U.S. 41, 47(1933); *Giordenello v. United States*, 357 U.S. 480, 485-86 (1958); *Aguilar v. Texas*, 378 U.S. 108, 114-115 (1964), If the warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," suppression is required. *See United States v. Leon,* 468 U.S.897, 923 (1984) (citing *Brown v. Illinois,* 422 U.S. 590, 610-11 (1975). When an issuing judge relies "solely upon the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon,* 432 F.3d 824, 827 (8th Cir. 2005).

"[I]f the magistrate or judge in issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his disregard of the truth," suppression is appropriate. *See Leon* at 923 (citing *Franks v. Delaware,* 438 U.S. 154 (1978)).

## A.    NO INDICIA OF PROBABLE CAUSE

Agent Pardee states in his Affidavit

> Through this investigation, initiated in November of 2005, the FBI has identified a large scale narcotics distribution operation managed and operated by GLOVER and SUGGS in the District of Columbia.  As set forth below, and evidenced by cooperating witness statements, physical surveillance, court authorized electronic surveillance, controlled narcotics purchases made during this investigation and other investigative tools, [he] submits there is probable cause to believe that GLOVER has used and will continue to use the target telephone to facilitate and conduct and illegal narcotics business.

(*See* Exh. A - Glover 1 Affidavit ¶ 16).

In his recitation of the facts and circumstances that he believes constitute probable cause, Agent Pardee sets forth the following:

A.    <u>Cooperating Witness Information</u> – this section notes the use of CW-1 and CW-2, and makes no mention of Glover or whether the informants even provided any information concerning Glover.  (*See* Exh. A - Glover 1 Affidavit ¶ 18, 19)

B.    <u>Parker Drug Sale # 1</u> – this proffer involves an alleged transaction between CW-2 and Parker, and makes no mention of Glover.  (*See* Exh. A - Glover 1 Affidavit ¶ 21)

C.    <u>Parker Drug Sale # 2</u> – this proffer involves an alleged transaction between CW-2 and Parker, and makes no mention of Glover.  (*See* Exh. A - Glover 1 Affidavit ¶ 22)

D. <u>Parker Attempted Drug Sale</u> – this proffer involves an alleged transaction between CW-2 and Parker, and makes no mention of Glover. (*See* Exh. A - Glover 1 Affidavit ¶ 23)

E. <u>Suggs Drug Sale # 1</u> – this proffer involves an alleged transaction between CW-1 and Suggs, and makes no mention of Glover. (*See* Exh. A - Glover 1 Affidavit ¶ 22)

F. <u>Suggs Drug Sale # 2</u> – this proffer involves an alleged transaction between CW-1 and Suggs, and makes no mention of Glover. (*See* Exh. A - Glover 1 Affidavit ¶ 25)

G. <u>Suggs Drug Sale # 3</u> – this proffer involves an alleged attempted transaction between CW-1 and Suggs, and makes no mention of Glover. (*See* Exh. A - Glover 1 Affidavit ¶ 34)

On their face, this information fails to demonstrate any indicia of probable cause that Glover is committing the listed offenses so as to warrant the authorization to intercept. In effect, Pardee relies on the activities of others (Suggs, Parker, Johnson) to attempt to bootstrap probable cause determination for Glover.

**B.    PARDEE'S STATEMENTS ARE DELIBERATELY FALSE AND DEMONSTRATE A RECKLESS DISREGARD FOR THE TRUTH**

Although there is a presumption of validity with respect to the affidavit supporting search warrants, to obtain an evidentiary hearing on a motion to suppress, a defendant must allege deliberate falsehood or reckless disregard for the truth. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978). They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. If

these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.  *Id.*

   Pardee makes the following conclusory, false, reckless and misleading statements in the Affidavit.

   <u>In Paragraph 28</u>, he notes that

> LONNELL GLOVER was first intercepted on January 10, 2007, at 5:42 p.m., then SUGGS called the target telephone.  GLOVER states that he had people working at his house and was therefore unable to 'do no moving around right now.'  SUGGS acknowledged that GLOVER had previously told him he would be busy and GLOVER agreed to call SUGGS.  On January 10, 2007, at 9:14 p.m., SUGGS received a call from JULIAN JOHNSON.  During the call SUGGS advised JOHNSON that they would meet the following day.

Agent Pardee somehow concludes that "these telephone conversations between GLOVER and SUGGS and SUGGS and JOHNSON *clearly relat*e to their shared narcotics trafficking activity." Citing the oft-repeated mantra "based upon my training and experience" he further concludes that "GLOVER is utilizing the target telephone to facilitate his ongoing narcotics trafficking activity." *Id.*

   <u>In Paragraph 29</u> (January 11, 2007) of the Affidavit, based on one call wherein Glover tells Suggs that he was waiting in front of the location, Pardee concludes that Suggs and Glover were coordinating a meeting to discuss narcotics.

   <u>In Paragraph 30</u> (January 14, 2007), based on a call arranging a meeting, Pardee again concludes that Suggs and Glover are making arrangements for Glover to supply Suggs with narcotics.  Pardee states no facts that would support his conclusion that such a meeting was ever held or that narcotics were ever exchanged.

In Paragraph 31 (January 18, 2007), Agent Pardee cites a series of calls in which Glover and Suggs appear to be setting up a meeting.  Surveillance teams observed that Suggs' Tahoe was parked behind a pick up truck with DC tags ending in 0597 and that the Tahoe drove away.  Agent Pardee concludes that based on his "training and experience," including his "knowledge that Glover supplied PCP to Suggs on January 14, 2007, [he] understands that in this meeting Suggs met with Glover to pay for PCP already supplied and to discuss further PCP transactions."  He reaches this conclusion although no observation of Glover is described, no observation of an exchange is made and no identification of a vehicle belonging to Glover is made.  Furthermore, Pardee sets forth absolutely no evidence to support his contention that "knowledge that Glover supplied PCP to Suggs on January 14, 2007."

In Paragraph 32, Pardee notes a series of calls on January 19, 2007, wherein Suggs and Glover agree to meet at a Home Depot.  Surveillance of the "meeting" disclosed that Suggs Tahoe "drove out of the parking space and left the area.  A black male wearing a denim jacket and a baseball cap was seen walking away from the Tahoe. . . . the black make was observed getting into a green Chevrolet pick-up truck bearing DC tag BZ-0597.  The Chevrolet pick-up truck is registered to LONNELL GLOVER . . . ."  This statement is clearly misleading in that it leaves the reader with the impression that Glover met with Suggs, when the surveillance did not witness such a meeting and, even if Glover's pick-up was there, there is no evidence that Glover himself was there.

Paragraph 33 discusses events of January 23, 2007, and certain conversations between Suggs and Julian Johnson.  Pardee believes that Suggs did not have drugs notwithstanding his earlier assertion that Glover sold drugs to Suggs on January 14.  This statement does not even mention Glover.

In Paragraph 34, Pardee describes events of January 19, 2007, wherein CW-1 made several attempts to meet Suggs to make a PCP purchase. At the eventual meeting, "Suggs put CW-1 off when CW-1 asked to purchase PCP." No mention is made of Glover.

In Paragraph 35 (January 20, 2007), Pardee refers back to Paragraph 32 and states that the black male seen walking away from Suggs' Tahoe was "later identified as" Glover. Although no exchange was seen, not actual meeting seen, and no transaction of any kind was seen, Pardee notes that "law enforcement believed that SUGGS had just been supplied with PCP by GLOVER" and that "it is clear that GLOVER supplied PCP to SUGGS."

In Paragraph 36, Pardee describes a series of calls on January 21, 2007, in which Suggs and Glover appear to be arranging a meeting. Citing his "training and experience", Pardee concludes that Suggs met Glover to pay for PCP already supplied and to discuss further PCP transactions. No evidence is presented that the meeting was ever held.

In Paragraph 46, Pardee boldly claims that the "investigation to date has determined GLOVER is responsible for the distribution of substantial quantities of PCP in the Washington, DC area . . . . The evidence indicates that GLOVER sells PCP upwards of 16 ounces at a time." These statements are utterly conclusory and baseless. Nowhere in the Affidavit does Pardee lend any support to the assertions.

These scanty boilerplate recitations to "training and experience" and conclusory statements are on their face inadequate to find probable cause. Pardee's statements amount to deliberate falsehoods and demonstrate a reckless disregard for the truth. Glover submits that without these exaggerations, conclusory statements and falsehoods, Judge Collyer would not have found probable cause to issue the interception Order. Glover respectfully requests a *Franks* hearing to challenge the validity of the Affidavit.

As an offer of proof and statement of supporting reasons as to Pardee's false statements, glover cites Pardee's affidavits supporting the government's applications for wire intercepts, the intercepts themselves, discovery provided to date.

### C.    THE GOOD FAITH EXCEPTION DOES NOT APPLY

Judge Collyer authorized interception based on a deliberately reckless and false affidavit, which was entirely lacking in indicia of probable cause. *Leon* clearly and unequivocally states that when the affidavit itself is entirely lacking in indicia of probable cause, it cannot be said that the officer acted in good faith in relying on a warrant that issues. That is the precise situation we have in this case.

"All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." *United States v. Gourde,* 440 F.3d 1065, 1067 (9th Cir. 2006) (en banc) (quoting *United States v. Anderson,* 453 F.2d 174, 175 (9th Cir. 1971) (internal quotation marks omitted)). Where the affidavit itself lacks *all* indicia of probable cause, it would unduly undermine the foregoing rule to permit extrinsic indicia of probable cause to be presented through an unsworn, unrecorded oral colloquy. Related to the foregoing, the Constitution also requires that probable cause be established "by Oath or affirmation." If unsworn, unrecorded oral colloquies, which may not be used to establish probable cause, *are* admissible to establish good faith, the constitutional and prudential standards for showing probable cause will be undermined. In effect, the good faith exception would swallow the Fourth Amendment rule. *See United States v. Luong*, 470 F.3d 898, 905 (9th Cir. 2006).

10

### D. THE INTERCEPTION OF GLOVER'S TELEPHONE WAS UNLAWFUL, THUS ALL FRUITS OF THAT INTERCEPTION MUST BE SUPPRESSED.

Any evidence recovered following an illegal search is considered a fruit of that illegality and must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471 (1963). In this case, the government relied heavily on evidence obtained through the initial Glover wiretap (Glover 1) to seek the subsequent orders authorizing the continued interception of his phone (Glover 2, 3, 4 and 5) and the interception of communications in Glover's truck (Glover Truck 1, 2 and 3) (Glover GPS??). The government further relied upon evidence obtained from these intercepts to obtain search warrants for Glover's home at 4908 Brentley Road, Temple Hills, MD, his 1998 Chevrolet pick-up and his 2002 GMC Denali. Thus, because the government obtained unlawful evidence from the initial wiretap, all evidence derived from that illegality must be suppressed. The Supreme Court has made it clear that a search cannot be made legal based on what it turns up. *See Henry v. United States*, 361 U.S. 98, 104 (1959); *United States v. DeRi*, 332 U.S. 581, 595 (1948).

### II. THE AFFIDAVIT FAILED TO DEMONSTRATE NECESSITY FOR THE INTERCEPTION OF GLOVER'S TELEPHONE.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 510 *et seq.,* authorizes the district court to approve an application for the interception of certain wire, oral, or electronic communications. *See* 18 U.S.C. § 2518. The wiretap statute requires that an application for a wiretap shall be in writing, under oath, and shall contain certain information including "a full and complete statement of the facts and circumstances relied upon by the applicant[ ] to justify his belief that an order should be issued." *Id.* § 2518(1). On the basis of the facts submitted by the applicant, the district court may authorize a wiretap upon finding that (1) probable cause exists to believe that an individual has committed or is about to

commit one of certain enumerated offenses;  (2) probable cause exists to believe that "particular communications concerning that offense will be obtained" through an interception;  (3) "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried";  and (4) probable cause exists to believe that the communication facility sought to be wiretapped "[is] being used, or [is] about to be used, in connection with the commission of [the] offense."  *Id.* § 2518(3)(a-d);  *see United States v. Donovan,* 429 U.S. 413, 435 (1977).

 The determination that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. §  2518(3)(c), is referred to as the "necessity requirement," and it is the "keystone of congressional regulation of electronic eavesdropping."  *United States v. Williams,* 580 F.2d 578, 587-588 (D.C. Cir. 1978).

Section 2518(10)(a) of Title 18, United States Code, permits any "aggrieved person" to move to suppress evidence derived from electronic surveillance. The definition of an aggrieved person in Section 2510(11) is: "a person who was a party to any intercepted wire, oral or electronic communication or a person against whom the interception was directed," and is also a definition of standing for purposes of Title III.  *United States v. Bellosi*,  501 F.2d 833, 841-42 (1974).  Section 2518(10) (a) provides that the aggrieved person may move to suppress the contents of any intercepted wire or oral communication, or evidence derived there from, on the grounds that "the communication was unlawfully intercepted"; "the order of authorization or approval under which it was intercepted is insufficient on its face"; or "the interception was not made in conformity with the order of authorization or approval."  18 USC § 2518(10).

In the present case, the government intercepted Glover's telephonic communications, which constitute electronic communications for the purpose of the statute and

are subject to suppression.  Consequently, he is an aggrieved party with standing to move to suppress the seized communications and the evidence derived from the seizure.

     **A.**    **The Fourth Amendment's Prohibition Against Unreasonable Searches and Seizures Applies to Interception of Electronic Communication.**

In *Berger v. New York*, 388 U.S. 41 (1967), the Court struck down a statute authorizing eavesdropping of wire and telecommunications as a violation of the Fourth and Fourteenth Amendments to the United States Constitution.  That statute permitted issuance of a warrant for eavesdropping upon oath "that there is reasonable ground to believe that evidence of crime may be thus obtained..." The court held: "the broad sweep of the statute is immediately observable and such a requirement raises a serious probable cause question under the Fourth Amendment." *Id.* at 54, 55.  As the court stated:

> Where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed...  The need for particularity and evidence of reliability in the showing required when judicial authorization is sought is especially great in the case of eavesdropping. By its very nature eavesdropping involves an intrusion on privacy that is broad in scope.

*Id.* at 55, 56.

The court thus condemned the New York statute as constituting little more than a general warrant to seize any and all conversations of the named persons whose communications were to be intercepted and established. Consequently, the probable cause standard for seizing telephone conversations is high for Fourth Amendment purposes.  In this regard, 18 U.S.C.§ 2516 (b) more particularly states the probable cause requirement as:

> a full and complete statement of the facts and circumstances relied upon by the applicant,        to justify his belief that an order should be issued, including details as to the particular offense that has been, is being, or is about to be committed . . . .

Further, the statutory requirement of probable cause in the application for the wiretap also requires as part of the Fourth Amendment protection against seizures that each application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

It is clear that the failure to meet these requirements under the Fourth Amendment, as more particularly set forth in 18 U.S.C. § 2518(1)(c) and 3(c), if not fully established by the Government's affidavit and application for an order, is a failure to establish probable cause vitiating any order of approval.  Glover submits that normal investigatory procedures were not attempted as to him, that the techniques had not been exhausted, and that Agent Pardee's conclusion at page 31, paragraph 42 of the Glover 1 Affidavit that "normal investigative procedures have been tried and have failed, appear reasonably unlikely to succeed if tried or continued, or are too dangerous to employ in this investigation" is unsupported by the affidavit itself, which details that the procedures being used were producing results and had not grounded to a halt such that the statutory requirements for probable cause for issuance of the wiretap order were not met.

**B.     The Government's Failure to Show Normal Investigative Procedures Have Been Exhausted as Part of  Probable Cause Showing to Support Issuance of the Warrants Renders Them Unconstitutional**

Each application for an order authorizing interception of oral or wire communications requires an independent showing of probable cause.  See 18 U.S.C. § 2518(1). Any evidence gathered pursuant to prior unlawful government conduct cannot serve as probable cause to support extensions of previously unlawful interceptions.  See United States v. Giordano,

416 U.S. 505 (1974).  Consequently, any subsequent authorization and all subsequent extensions are invalid since they incorporated and were based on the first affidavit.  Agent Pardee's Affidavit relies on boilerplate language to allege that normal investigative procedures had been exhausted or cold not be employed.

Agent Pardee's Affidavit indicates that the government had used the following investigative techniques:

### 1.     Undercover officers (¶ 44)

The Affidavit mentions that "while the FBI investigation may be able to introduce an undercover officer to make narcotics purchases from GLOVER and others" Pardee did not believe that doing so would not assist in identifying all of the persons involved in the conspiracy with Glover.  Notwithstanding the reasons for not doing so, there is no indication that the government took any steps to introduce an undercover officer.

### 2.     review of dialed number recorder date (pen registers) (¶ 45)

In an attempt bolster weak facts, Pardee states that the "pen register data indicates that GLOVER is in "frequent communications with known drug traffickers in California."  This conclusory and baseless statement is based on the data he includes at ¶ 38, where he notes the number of calls between Glover's number and the numbers associated with Brenda May, Suggs, Ernest Glover, Darryl Simms and Darrell Calhoun.  The inclusion of the total number of calls between each refers to "activations," which include calls hang-ups, dropped calls, calls to voice mail and other non-conversational calls.  There is no information provided by Agent Pardee as to how many of these activations actually resulted in some communication between Glover and others.  Second, even if the total activations resulted in actual communications, the period

described covers over one month.  Thus, the number of activations is not necessarily indicative of any illegal activity.

### 3.     Cooperating Witnesses (¶ 47)

The only information provided regarding cooperating witnesses have to do with CW-1 and CW-2 an SUGGS.  There is no indication that the government took any steps to develop or introduce such a source, nor is there any concrete information about Glover's alleged organization beyond Pardee's generic assertions and speculation that such an attempt would not succeed if tried.  Pardee's assertions amount to generic information about how drug traffickers normally operate.

### 4.     Controlled buys (¶ 48)

The only information provided regarding controlled buys has to do with CW-1 and CW-2 an SUGGS.  There is no indication that the investigation involved any attempt to make controlled buys from Glover, only the generic information and speculation that such an attempt would not succeed if tried.

### 5.     Physical surveillance (¶ 50, 51)

The Affidavit notes that Suggs identified government surveillance vehicles on January 20, 2007, and concludes that the "subjects of the investigation appear to be extremely surveillance conscious."  Although in some of the calls intercepted from Suggs' telephone the targets (not Glover) appear to identify surveillance, there is nothing in the Affidavit that Glover himself is "extremely surveillance conscious."  T

The Affidavit notes only two attempts to surveil meetings between Glover and Suggs, although by the time of the Affidavit, the government had already obtained authorization to install a GPS tracking device on Suggs vehicle on January 17, 2007, and had the ability to

track his every move.  At most, Pardee could truthfully say that Suggs and Glover may have met

on two occasions.  However, in making false statements such as he had "knowledge that Glover

supplied PCP to Suggs on January 14, 2007," when he had no evidence to that effect, Pardee

could have misled Judge Collyer into thinking that surveillance actually observed Glover

providing PCP to Suggs, when surveillance did no such thing.

### 6.    other investigative techniques

Besides cursorily stating that normal investigatory procedures (including

interviews, grand jury subpoenas, search warrants) will be or have been unsuccessful or will be

too dangerous to employ, Agent Pardee fails to adequately describe why this is so.  He merely

recites boilerplate language that "the interception of wire communications to and from the target

telephone number is the only reasonable method of developing evidence of the full scope of the

suspected violations . . . . " (¶ 42).  He further states that "[n]ormal investigative techniques have

been tried and have failed, appear reasonably unlikely to success if tried or continued, or are too

dangerous to employ in this investigation to date . . . ." (Id.).  His explanations are merely

recitations of typical problems with the techniques in drug cases, but make no reference to any

facts specific to Glover that would make the techniques ineffective or dangerous.  *See United*

*States v. Rice*, 478 F.3d 704 (6th Cir. 2007).  Pardee's statements were baldly conclusory and

insufficient.  *See United States v. Spagnuolo*, 549 F.2d 705 (9th Cir. 1979); *United States v. Lilla*,

699 F.2d 99 (2nd Cir. 1983); *United States v. Mondragon*, 52 F.3d 291 (10th Cir. 1995).

It is evident from the four corners of the Affidavit that the government' first step

in its investigation of Glover was to obtain the Title III authorization.  Further, the Affidavit does

not indicate either serious consideration of investigative techniques or the reasons for Pardee's

belief in the inadequacy of the other measures as used against Glover.  Other than some

uncorroborated thoughts and opinions there is no evidence that any other investigative technique was ever used or even seriously considered as to Glover. *See Rice*, 478 F.3d at 709. Thus, the fruits of the unlawful intercept must be suppressed.

### III.    THE GOVERNMENT HAS FAILED TO COMPLY WITH ITS BURDEN TO ESTABLISHED IT HAS MINIMIZED INTERCEPTIONS AS REQUIRED BY TITLE III

Title III specifies that judicial orders contain specific provisions, including a requirement that the government minimize the interception of communications unrelated to the illegal activity specified in the application. See 18 U.S.C. § 2518(5); United States v. Killingsworth, 117 F.3d 1159, 1162 (10th Cir.), cert. denied, 522 U.S. 961 (1997). All wiretap orders are valid for no more than thirty days, but a court may extend its order upon an application for extension. An extension is granted only if the application meets all the same requirements demanded of the original application and the court makes all the same findings required for the initial order.

Glover seeks to adopt and conform to the arguments made by Suggs' counsel in ECF Document 88, filed November 19, 2007, which set forth Suggs' arguments relating to minimization.

### <u>CONCLUSION</u>

Glover submits that the government's affidavits offered in support of its application for the interception of his wire communications, purporting to show that "normal investigative procedures have been tried and have failed," was inadequate and did not meet the requirements of the statute. The explanations of why normal investigative procedures and alternatives were not available were conclusory; and, to the contrary, showed that normal investigatory methods were not even attempted as to Glover. Accordingly, the government's

applications did not contain sufficient facts to satisfy 18 U.S.C. § 2518 (1)(c) and support the issuing court's § 2518(3)(c) findings.  Additionally, Glover submits that Agent Pardee intentionally misled Judge Collyer and displayed a reckless regard for the truth by exaggerating certain facts and noting others out of context to enhance the allegations, which were essential to a finding of probable cause.

Based on the foregoing, Defendant Glover respectfully requests this Honorable Court to enter an Order suppressing from use at trial all evidence that was obtained directly or indirectly as a result of the unlawful interceptions.

Dated: Washington, DC
      June 16, 2008                       Respectfully submitted,

                                   **LAW OFFICE OF A. EDUARDO BALAREZO**

                              /s/
              By: _____
                  A. Eduardo Balarezo (Bar # 462659)
                  400 Fifth Street, NW; Suite 300
                  Washington, DC  20001
                  (202) 639-0999

                  *Counsel for Lonnell Glover*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 16th day of June 2008, I caused a true and correct copy of the foregoing Defendant Glover' Motion to Suppress Evidence Obtained from Interception of Wire Communications and Seizure of Electronic Communications and Incorporated Memorandum of Points and Authorities in Support Thereof to be delivered to the parties in this matter via Electronic Case Filing (ECF).

/s/

_____
A. Eduardo Balarezo

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE APPLICATION OF    :
THE UNITED STATES OF AMERICA FOR AN    :
ORDER AUTHORIZING THE INTERCEPTION    :     Misc. No. 07-65
OF WIRE COMMUNICATIONS TO AND FROM    :     (Under Seal)    FILED
MOBILE CELLULAR TELEPHONE NUMBER    :
(202) 276-4337    :    FEB 1 4 2007

### AFFIDAVIT

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Ryan M. Pardee, Special Agent ("SA") with the Federal Bureau of Investigation (FBI),

Washington Field Office ("WFO"), Washington, D.C. (hereinafter "affiant"), being duly sworn,

deposes and states as follows:

## INTRODUCTION

1. Your affiant is "an investigative or law enforcement officer" of the United States

within the meaning of Title 18 United States Code Section 2510(7), that is, an officer of the United

States who is empowered by law to conduct investigations of, and to make arrests for, offenses

enumerated in Section 2516 of Title 18 United States Code.

2. Your affiant has been a Special Agent with the Federal Bureau of Investigation since

2003. Your affiant is currently assigned to Squad CR-3 in the FBI's Washington Field Office, which

is responsible for conducting investigations that target large drug trafficking organizations. From

2003 to present, your affiant has been working on federal narcotics investigations that have led to

the arrest and conviction of narcotics dealers. Since 2003, your affiant has received training and

experience in interviewing and interrogation techniques, arrest procedures, search and seizure, search

warrant applications, narcotics, money laundering, and various other crimes. In the course of that

training and experience, your affiant has become familiar with the methods and techniques

1

associated with the distribution of narcotics, the laundering of narcotics proceeds, and the organization of narcotics conspiracies. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification system data; conducting court-authorized electronic surveillance; and preparing and executing search warrants that led to substantial seizures of narcotics, firearms, and other contraband.

3.    Through instruction, training and participation in investigations, your affiant has become familiar with the manner and methods by which narcotics traffickers conduct their illegal business, and the language and terms that are used to disguise conversations about their narcotics activities. From experience and training, your affiant has learned, among other things, that: (a) the area of Los Angeles, California is the manufacturing location for the majority of the phencyclidine (hereinafter "PCP") trafficked in the United States; (b) in conversations which drug traffickers believe are susceptible to interception, drug traffickers virtually never expressly refer to PCP or other illegal drugs by name; instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms; and © narcotics traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be the subject of physical surveillance by law enforcement authorities, and because they erroneously believe that interception of cellular communications is impossible or at least more difficult than interception of land-line telephones.

2

4.    Your affiant is currently participating in an investigation which targets PCP and cocaine traffickers operating in the District of Columbia. The investigation began in November of 2005. The main targets of this investigation are LONNELL GEORGE GLOVER, and ANTHONY MAURICE SUGGS, also known as "APPLEJACK." Based upon this investigation, as well as your affiant's training and experience, your affiant has reason to believe GLOVER and SUGGS are large-scale narcotics traffickers operating in metropolitan Washington, D.C., area. This investigation has disclosed that GLOVER, SUGGS, and their associates have distributed and continue to distribute gallon quantities of PCP.

5.    Based on the investigation in which your affiant has participated, and for the reasons set forth herein, there is probable cause to believe LONNELL GEORGE GLOVER, ANTHONY MAURICE SUGGS, also known as "APPLEJACK," DARRELL CALHOUN, BRENDA DONALDSON, JULIAN JOHNSON, also known as "JUJU," also known as "JU," JAMES LAWRENCE PARKER, also known as "YOGI," DESALINES CARROLL BATTLE, also known as "DEZZIE," MAURICE JERMAINE WILLIAMS, also known as "MO," ERNEST MILTON GLOVER, also known as "FISH," GLENDALE EARL LEE, also known as "GLEN," and others as yet unknown or not yet fully identified, are committing the following offenses: (a) possession with intent to distribute and distribution of controlled substances, in violation of Title 21 United States Code Section 841(a)(1), and conspiracy to commit such offenses, in violation of Title 21 United States Code Section 846; and (b) use of communication facilities to facilitate the commission of the above offenses involving controlled substances, in violation of Title 21 United States Code Section 843(b), (c) and the laundering of proceeds of specified unlawful activity *e.g.*, the distribution of controlled substances, in violation of Title 18 United States Code, Sections 1956 and 1957`.

3

6.    Based on your affiant's investigation, and for the reasons set forth herein, there is probable cause to believe LONNELL GEORGE GLOVER, ANTHONY MAURICE SUGGS, also known as "APPLEJACK," ERNEST MILTON GLOVER, also known as "FISH," DARRELL CALHOUN, BRENDA DONALDSON, and other persons as yet unknown or fully identified, have used, are using, and will continue to use the telephone described herein in connection with the above offenses.

7.    (a) Accordingly, your affiant makes this affidavit in support of an application that seeks authorization to intercept communications to and from the cellular telephone assigned Electronic Serial Number (hereinafter "ESN") 04504160719, with telephone number (202) 276-4337 (hereinafter "target telephone number"), and any other telephone number accessed through the use of this particular ESN, including background conversations intercepted while the telephone is in use, of the targeted interceptees and others, including persons as yet unknown. It is further requested that the authorization apply to any changed telephone numbers subsequently assigned to an instrument accessed through the same ESN as the target telephone, or any changed ESN subsequently assigned to the same telephone number as the target telephone, within the thirty (30) day period sought in this Affidavit.

(b)  Based upon my training and experience, and based upon conversations with service providers of wire communications, your affiant knows that when a cellular telephone is in use, signals are transmitted and received by cellular towers and that the location of the cellular towers utilized by the telephone is recorded by the service provider, in this case, Sprint Nextel (hereinafter also "service provider"). The service provider can supply this information on an

4

ongoing basis. Knowing the location of cellular towers activated by a specific cellular telephone provides the general geographic location of the cellular telephone. Moreover, by using additional technology, the service provider can determine the location of the cellular telephone within a relatively small geographical area at specific times. However, this information can only be obtained upon a specific request at a particular time. Your affiant believes there is probable cause to believe that the location of the target telephone will provide relevant evidence of the offenses listed above. Specifically, knowledge of the location of the target telephone will enable law enforcement to focus investigative efforts, including surveillance, in certain geographical areas. Law enforcement agents can use geo-location information in connection with other investigative techniques to find the target telephone, at least within a relatively small geographic area, at specific times, which in turn will assist them in identifying stash locations, meeting spots, and developing other relevant information to achieve the objectives listed above.

8.    The target telephone number is a prepaid cellular telephone and as such, no subscriber information is held by Phonetec, a reseller for Sprint Nextel, save for a zip code of 20001. This number has been in service since June 1, 2004, with subscriber ID 45787. Substantial evidence has been developed during the course of the investigation which demonstrates that the target telephone number is being used to facilitate the distribution of narcotics. For the reasons set forth below, your affiant believes the target telephone is maintained and used by GLOVER.

9.    Investigation has determined GLOVER is associated with addresses at 3529 13th Street, N.W., Washington, D.C., and at 9002 Old Palmer Road, Fort Washington, Maryland. Also, a vehicle that GLOVER has been seen driving is registered to GLOVER at 1820 M Street, N.E., Washington, D.C.

5

10.   The type of communications sought to be intercepted are communications evidencing: (a) the nature, extent and methods of operation of the narcotics trafficking activities in which GLOVER and other interceptees, and others as yet unknown, are engaged; (b) the identities, roles and telephone numbers of GLOVER's co-conspirators, accomplices and other participants in such illegal activity; (c) the source, distribution, transfer and location of the narcotics and money involved in those activities; (d) the existence and location of additional apartments, residences, businesses and other premises used in the furtherance of the illegal activity; (e) the existence, location and source of the resources used to finance the illegal activity; (f) the existence, location and disposition of proceeds of the activity; (g) the existence and location of any other items or means used in furtherance of those activities; (h) the dates, times, and details for the continued commission of the above-mentioned offenses; (i) the weights, purchase prices and other information about the controlled substances to be distributed based upon information provided when co-conspirators, customers, and other criminal associates of GLOVER's call the target telephone; and (j) other evidence necessary for successful prosecution and conviction of the above-described criminal activity.   Your affiant believes that evidence concerning the above-described offenses will be obtained through the interception of communications to and from the target telephone; that such communications will be admissible evidence of the commission of the above-stated offenses; and that there is a reasonable likelihood that such evidence will enable law enforcement to interdict a shipment of controlled substances and to ascertain the identities of, and prove beyond a reasonable doubt the guilt of, the participants in this alleged conspiracy.

6

## BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT

11.    Your affiant makes this affidavit, in part, on personal knowledge derived from my participation in this investigation and, in part, upon information and belief. The sources of affiant's information and belief are:

    (a)    summaries of intercepted wired communications;

    (b)    debriefings of cooperating witnesses;

    (c)    physical surveillance conducted by myself and other FBI agents, which have been reported to affiant either directly or indirectly;

    (d)    review of telephone records for the target telephone;

    (f)    controlled purchases of PCP;

    (g)    seizures made by other law enforcement officers; and;

    (h)    written reports about this and other investigations which affiant has received directly and indirectly from agents of the FBI and DEA.

12.    Except where otherwise noted, the information set forth in this affidavit has been provided to your affiant directly or indirectly by special agents of the FBI or other law enforcement officers. Unless otherwise noted, whenever in this affidavit your affiant asserts that a statement was made, it was an instance in which the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) with whom your affiant has spoken or whose report your affiant has read and reviewed. Such statements are among many statements made by others and are stated in substance, unless otherwise indicated. Similarly, information resulting from surveillance, except where otherwise indicated, may not always set forth your affiant's personal observations, but rather represent information provided directly or indirectly

by other law enforcement officers who conducted such surveillance.

13.    Since this affidavit is being submitted for the limited purpose of seeking authorization for the interception of electronic communications, your affiant has not set forth each and every fact learned during the course of this investigation, nor has your affiant necessarily set forth all facts which support the authorization sought.   Your affiant is aware of no facts not set out herein which

in my training and experience would mitigate against granting the authorization sought.   Nor does your affiant request that this Court rely upon any facts not set forth herein in reviewing this affidavit in support of the application for the interception of the electronic communications.

## SUBJECTS AND OFFENSES

14.    There is probable cause to believe LONNELL GEORGE GLOVER, ANTHONY MAURICE SUGGS, also known as "APPLEJACK," ERNEST MILTON GLOVER, also known as "FISH," DARRELL CALHOUN, BRENDA DONALDSON, and other persons as yet unknown, are committing, and will continue to commit, offenses involving drug trafficking; using wire communication and electronic communication to promote, manage, establish, and carry out unlawful activity and facilitate the promotion, management, establishment, and carrying on of said unlawful activity, attempts and conspiracies to commit those offenses, in violation of Title 21 United States Code Sections 841(a)(1), 846, 1956 and 1957, which offenses are enumerated in Title 18 United States Code Section 2516©, thus permitting an application for authorization to intercept wire communications.

8

15.    There is probable cause to believe the known likely interceptees are as follows:[1]

(a)    LONNELL GEORGE GLOVER appears to be responsible for coordinating the importation and distribution of PCP in the Washington D.C. area.  GLOVER is a black male, who was born October 3, 1961. LIONEL GEORGE GLOVER, with the same date of birth and same social security number as LONNELL GLOVER, has an FBI number of 616762V2, and also lists LONNELL GLOVER as a known alias. LONNELL GLOVER has an FBI number of 859778KA2. It should also be noted that both of the FBI numbers for the individuals carry the same federal charge for an arrest on September 25, 1989. As a result of this investigation and an inquiry from your affiant the fingerprints maintained under FBI number 616762V2 and FBI number of 859778KA2 were compared and determined to be from the same individual.  The records were thus merged under FBI number 616762V2.  The following criminal history for LONNELL GLOVER results from that merger :

| DATE | CHARGE | DISPOSITION |
| --- | --- | --- |
| 11/12/1979 | Possession of a Stolen Vehicle | Unknown |
| 11/12/1979 | Drug Offense | Unknown |
| 11/12/1979 | Resisting Officer | Unknown |
| 11/12/1979 | Carrying prohibited | Unknown |

---

[1] Based on the methodology employed by this narcotics trafficking organization to date, your affiant expects that communications will be intercepted involving persons who are presently unknown to your affiant.  Upon learning the identity of any such persons, they will be provided the protection of an inventory notice.  In this vein, the pen register analysis, *infra*, discloses that Lonnell Glover has been in contact on four occasions with Velma Williams who is known to law enforcement as a marijuana trafficker.  Williams' son, Flintard Coleman, also known as Flintard Williams, is known to traffic in several controlled substances including both cocaine and PCP. Both Williams and her son are in California, a source area for PCP and cocaine, but there is not a sufficient basis at this time to conclude either is engaged in trafficking with GLOVER.

9

| 11/12/1979 | Robbery | Unknown |
| 11/12/1979 | Opium possession | 5 years |
| 09/23/1984 | Concealment of a weapon | Nolle prossed |
| 09/23/1984 | Possess handgun after being convicted of robbery | Guilty |
| 09/23/1984 | Possess handgun with intent to commit robbery | Disposition not reported |
| 09/25/1989 | Passing and possession of counterfeit currency | Not Guilty |

(b)    ANTHONY MAURICE SUGGS, also known as "APPLEJACK," appears to be responsible for distribution of PCP in the Washington D.C. area. SUGGS is a black male, who was born August 12, 1967. The following criminal history was found for SUGGS under FBI Number 4006639HA6:

| DATE | CHARGE | DISPOSITION |
| --- | --- | --- |
| 08/23/1987 | PWID PCP, Cannabis | Unknown |
| 08/23/1987 | Possession of Cocaine | Unreported[2] |
| 08/27/1987 | Rape 2nd Degree | Dismissed |
| 10/01/1987 | UCSA (2 counts) | Dismissed |
| 10/17/1989 | Possession of a Handgun | Dismissed |
| 11/20/1998 | CSA Crack | Unreported |
| 11/20/1998 | CSA | Unreported |
| 11/20/1998 | Vio C/S | Unreported |

---

[2]    The term "unreported" is used to reflect that the National Crime Information System (NCIS) reflects no disposition for this charge.

| 11/20/1998 | PWID Crack Cocaine | Convicted |
| 07/26/1999 | Distribution of 5 grams or more of Cocaine Base | Unreported |

(c)    ERNEST MILTON GLOVER, also known as "FISH," has been charged and convicted of distribution of PCP. GLOVER currently has a telephone subscribed to in his own name and utilizes a second telephone in the name of Darryl Simms. GLOVER is a black male, who was born on October 11, 1963, and has an FBI number of 354331MA7. GLOVER has the following criminal history:

| DATE | CHARGE | DISPOSITION |
| --- | --- | --- |
| 11/06/1990 | Controlled Substance Act - Cocaine | Dismissed |
| 04/29/1996 | Distribution of PCP | Convicted |
| 04/29/1996 | Distribution of Cocaine | Unknown |

(d)    DARRELL CALHOUN is described as a black male. CALHOUN was born on August 19, 1947 and has the following criminal history under FBI number 394563R7:

| DATE | CHARGE | DISPOSITION |
| --- | --- | --- |
| 02/28/1977 | Conspiracy to possess and distribute heroin | Dismissed |
| 02/28/1977 | Conspiracy to import heroin into the US | Unknown |
| 02/28/1977 | Narcotics Distribution | Convicted |
| 02/28/1977 | Aiding and abetting | Unknown |
| 05/25/1994 | RICO/Counterfeiting | Conviction |

11

(e)     BRENDA DONALDSON, also known as BRENDA MAY, is described as a black female. DONALDSON was born on May 6, 1962, though she also uses the date of birth of May 6, 1963. DONALDSON has the following criminal history under FBI number 599954W4:

| DATE | CHARGE | DISPOSITION |
|------|--------|-------------|
| 01/02/1981 | Larceny 3rd Degree | Guilty |
| 06/30/1981 | Larceny 3rd Degree | Unknown |
| 11/06/1982 | PC-Burglary | Conviction |
| 04/26/1983 | Larceny | Unreported |
| 09/05/1983 | Larceny | Unreported |
| 12/22/1983 | PC-Criminal Conspiracy | Unknown |
| 12/18/1984 | PC-Burglary | Unknown |
| 12/18/1984 | PC-Theft/Petty Theft | Unknown |
| 01/16/1985 | PC-Burglary | Unknown |
| 01/16/1985 | False ID to peace officer | Unknown |
| 05/13/1985 | HS-Possession Controlled Substance | Unknown |
| 05/13/1985 | Transport/Sell/ETC PCP | Unknown |
| 11/25/1985 | Theft by shoplifting | Unreported |
| 11/25/1985 | Burglary | Unreported |
| 05/14/1987 | Theft by shoplifting | Unknown |
| 05/14/1987 | PC-Grand Theft: Property | Conviction |
| 02/14/1989 | VFAP - Theft Burglary | Unknown |
| 03/15/1990 | Passport Fraud | Unknown |

12

| | | |
|---|---|---|
| 03/15/1990 | Document fraud to facilitate A drug trafficking crime | Guilty |
| 03/19/1990 | Supervised Release Violator | Guilty |
| 11/25/1992 | Flight to Avoid | Nolle Prossed |
| 07/01/1994 | PWID 5 kilos cocaine | Unknown |
| 07/01/1994 | Possession with intent cocaine | Conviction |

## FACTS AND CIRCUMSTANCES

16.     Through this investigation, initiated in November of 2005, the FBI has identified a large scale narcotics distribution operation managed and operated by GLOVER and SUGGS in the District of Columbia.  As set forth below, and evidenced by cooperating witnesses statements, physical surveillance, court authorized electronic surveillance, controlled narcotics purchases made during this investigation and other investigative tools, your affiant submits there is probable cause to believe that GLOVER has used and will continue to use the target telephone to facilitate and conduct an illegal narcotics distribution business.

A. <u>COOPERATING WITNESS INFORMATION</u>

17.     During the course of this investigation, information has been provided to the FBI by cooperating witnesses, who will be referred to herein as "CW-1" and "CW-2." The information provided by these sources has been corroborated to the extent possible by independent investigation, including but not limited to surveillance, the controlled purchase of illegal drugs, the review of air time records and pen register records, and the review of telephone subscriber information.  The cooperating witnesses have previously been charged with criminal offenses, and have entered into cooperation plea agreements with the government.

13

CW-1

18.    CW-1 has known SUGGS for several years. Information provided by CW-1 was obtained through telephone conversations and meetings with SUGGS. CW-1 has in the past provided the FBI with a substantial amount of credible information regarding narcotics traffickers in Washington, D.C. Much of the information provided by CW-1 has been corroborated through other investigations. CW-1 is utilized by the FBI as an operational informant. Under the supervision of law enforcement, CW-1 has participated in recorded telephone calls and controlled narcotics purchases with SUGGS. CW-1 will testify in this matter if CW-1's testimony becomes relevant. No information provided by CW-1 in the course of this investigation has proven to be false.

CW-2

19.    CW-2 has known SUGGS and JAMES LAWRENCE PARKER, an individual who purchases narcotics from SUGGS, for over ten years. Information provided by CW-2 was obtained in extended debriefings of CW-2 concerning CW-2's historical knowledge and experience with SUGGS and PARKER. Additionally, CW-2 made two controlled narcotics purchases from PARKER, and has attempted a third. A substantial amount of the information provided by CW-2 has been corroborated by other investigations. CW-2 has previously provided information that has been used in a search warrant where a firearm was recovered. CW-2 will testify in this matter if CW-2's testimony becomes relevant. No information provided by CW-2 in the course of this investigation has proven to be false.

14

B. THE INVESTIGATION

BACKGROUND

20.    CW-1 advised law enforcement that SUGGS was distributing large quantities of cocaine and PCP in the Washington, D.C. area. CW-1 provided the address of 3536 New Hampshire Avenue, N.W., Washington, D.C., and described it as a location that SUGGS would frequent. Further investigation revealed that the residence at 3536 New Hampshire Avenue, N.W., is owned by SUGGS' grandmother, and surveillance disclosed that SUGGS is often at or in the vicinity of the residence.

PARKER DRUG SALE #1

21.    CW-2 and PARKER have known each other for more than ten years, during which time CW-2 has regularly purchased illegal drugs from PARKER. On September 21, 2006, CW-2 contacted PARKER at 202-391-3648 to arrange to meet the following day for the purpose of making a purchase of narcotics. On September 22, 2006, CW-2 met with law enforcement at a pre-determined staging location. CW-2 and CW-2's vehicle were searched and found to be free of contraband. CW-2 was provided with $2,000.00 in pre-recorded funds to make a controlled purchase of phencyclidine (PCP) from PARKER. CW-2 was also provided an audio transmitter and video recorder. CW-2 was followed by law enforcement and observed entering 2400 Queens Chapel Road, Hyattsville, Maryland. CW-2 asked PARKER about selling CW-2 PCP. PARKER agreed and then sold CW-2 four ounces of PCP for $1400.00. CW-2 turned over the PCP and $600.00 to law enforcement. CW-2 and CW-2's vehicle were again searched with negative results. The

15

narcotics were taken to the DEA Mid-Atlantic Laboratory for analysis, where the entire volume was measured and a one ounce sample was examined. The analysis indicated the substance was PCP. The sample contained a concentration of 86 mg/mL, with a weight of 105.3 grams.

### PARKER DRUG SALE #2

22.     On January 4, 2007, at the direction of law enforcement, CW-2 contacted JAMES PARKER at 202-391-3648 for the purpose of arranging a controlled purchase of narcotics. PARKER and CW-2 agreed to meet at a prearranged location to discuss the sale of narcotics to CW-2. CW-2 was then provided with a vehicle and $4,000 in prerecorded funds. CW-2 was searched, as well as the vehicle that CW-2 was driving and found to be free of contraband. CW-2 then drove to meet PARKER at a prearranged location. During this meeting, PARKER told CW-2 that he might be able to sell CW-2 twelve ounces of PCP for $3,500.00 CW-2 and PARKER agreed to meet later. CW-2 later met with PARKER at a second location in Washington, D.C. PARKER told him that he was only able to obtain eight ounces of PCP, but could get the remaining four ounces of PCP the following morning. PARKER then left the area of CW-2's vehicle and walked to a nearby vehicle. PARKER was observed entering a vehicle belonging to ANTHONY SUGGS. PARKER returned a couple of minutes later to the vehicle being driven by CW-2 with the eight ounces of PCP. PARKER then entered CW-2's vehicle and gave CW-2 a glass bottle containing approximately eight ounces of PCP. CW-2 then handed PARKER $2,500.00. PARKER exited CW-2's vehicle and departed the area. CW-2 was followed back to the prearranged meeting location. At that time, the glass bottle containing the PCP was recovered, as well as the remaining $1,500.00 in prerecorded

16

funds. CW-2 was searched as well as the vehicle driven by CW-2 and found to be free of contraband. Pen register data indicates that after first being contacted about this sale by CW-2, PARKER made or received a total of 15 telephone calls involving ANTHONY SUGGS.

PARKER ATTEMPTED DRUG SALE

23.    On January 26, 2007, at the direction of law enforcement, CW-2 contacted JAMES PARKER at 202-391-3648 for the purpose of arranging a controlled purchase of narcotics. PARKER advised CW-2 that he would call CW-2 back later to talk to CW-2 in person. This telephone call was made after SUGGS had placed a telephone call to LONNELL GLOVER at 3:17 p.m., wherein SUGGS tells GLOVER that he needs to "rap" with GLOVER. At 3:25 p.m., PARKER received a telephone call from SUGGS wherein PARKER tells SUGGS that he will "be up there later to hollar" at SUGGS. At 6:26 p.m., CW-2 placed another telephone call to PARKER wherein PARKER told him that he was still waiting on his car to be returned to him. Based upon other telephone calls that SUGGS made and received, your affiant believes that PARKER's source of supply, SUGGS, was out of PCP and PARKER was therefore stalling CW-2. PARKER did not contact CW-2 the remainder of the weekend. SUGGS did, however, continue to try and meet with GLOVER. At 7:56 p.m., GLOVER called SUGGS and the two agreed to meet in the morning. On January 27, 2007, GLOVER called SUGGS and SUGGS told GLOVER that he would be finished at his mother's house in 45 minutes and would call GLOVER when he got in town. At 1:54 p.m., PARKER attempted a telephone call to SUGGS. The call was sent to voicemail. At 2:14 p.m., SUGGS returned the telephone call to PARKER. The two agreed to meet later that day. At 3:55 p.m., SUGGS placed a telephone call to GLOVER where the two agreed to meet at a grocery store in Maryland. At 4:30 p.m., GLOVER called SUGGS. The call was sent to voicemail. GLOVER

17

asked SUGGS to call him. At 4:33 p.m., GLOVER again called SUGGS. The call was sent to voicemail. GLOVER again asked SUGGS to call him. At 4:35 p.m., SUGGS called GLOVER and told GLOVER that he was stuck at the store and the two should meet in Washington, D.C. At 4:59 p.m., SUGGS made an outgoing call to GLOVER. During this call, GLOVER told SUGGS that he was on 12th Street. SUGGS told GLOVER that he was on the corner of 12th and G Streets. Shortly thereafter, SUGGS was observed by surveillance units at the corner of 12th and G Streets, N.W., Washington, D.C. Later, at 5:34 p.m., SUGGS spoke with JULIAN JOHNSON, wherein JOHNSON asked SUGGS if the "tickets" had come in yet. SUGGS told JOHNSON that they hadn't come in and, that in fact, SUGGS had just met with "his little partner" regarding that matter. At 7:24 p.m., PARKER called SUGGS and left a voicemail for SUGGS to call him. At 7:28 p.m., SUGGS spoke in code and told PARKER to meet him at a prearranged location. At 7:42 p.m., PARKER called SUGGS and told him that he had arrived at the location. Based upon my training and experience in this and other drug trafficking investigations, your affiant believes that in light of the ongoing activity involving CW-2's attempt to arrange a controlled purchase of drugs from PARKER and LONNELL GLOVER's confirmed role as SUGGS' supplier, see ¶ 34, *infra,* that in the above-described telephone calls with GLOVER, GLOVER is utilizing the target telephone to facilitate his ongoing narcotics trafficking activity, in this instance to arrange a meeting to discuss with SUGGS the question of supplying "tickets," that is, PCP, to SUGGS for distribution to PARKER and CW-2.

### SUGGS DRUG SALE #1

24.    On August 2, 2006, CW-1 was contacted by SUGGS. SUGGS told CW-1 that he had two gallons of PCP to sell. SUGGS was willing to sell the CW-1 as little as sixteen ounces of PCP for $3,500.00, or a gallon for $32,000.00. SUGGS also told CW-1 that he would sell CW-1 a

kilogram of cocaine hydrochloride for $24,000.00. This meeting is corroborated by telephone toll records indicating calls from SUGGS to CW-1 on August 2, 2006. On August 23, 2006, CW-1 met with law enforcement for the purpose of making a controlled purchase of PCP from SUGGS. CW-1 met law enforcement at a pre-determined staging location where CW-1 and CW-1's vehicle were searched and found to be free of contraband. CW-1 was then provided with $4000.00 in pre-recorded funds. CW-1 was also equipped with an audio transmitter and video recorder. At the direction of law enforcement, CW-1 contacted SUGGS. CW-1 asked to meet SUGGS, and SUGGS told CW-1 to meet him at 3536 New Hampshire Ave., N.W. Law enforcement followed CW-1 from the staging location to 3536 New Hampshire Ave., N.W. CW-1 met with SUGGS and MAURICE WILLIAMS, and the three went around the corner to a vehicle used by SUGGS. At that time, SUGGS sold CW-1 sixteen ounces of PCP in two eight ounce lemon juice bottles for $4,000.00. CW-1 returned to its vehicle. CW-1 was then followed back to the staging location where law enforcement recovered the PCP. CW-1 and CW-1's vehicle were again searched with negative results. The narcotics were taken to the DEA Mid-Atlantic Laboratory for analysis, where the entire volume was measured and a one ounce sample was examined. The analysis indicated the substance was PCP. The sample contained a concentration of 72 mg/mL, with a gross weight of 105.3 grams.

<u>SUGGS DRUG SALE #2</u>

25.    On November 14, 2006, under direction of law enforcement, CW-1 again contacted SUGGS. During the telephone conversation, SUGGS asked CW-1 when CW-1 wanted to meet with SUGGS for the purposes of purchasing drugs from him. CW-1 arranged to meet SUGGS the following day. This telephone call was recorded. On November 15, 2006, CW-1 met with law enforcement for the purpose of making a controlled purchase of cocaine hydrochloride from

19

SUGGS. CW-1 met law enforcement at a pre-determined staging location where CW-1 and CW-1's vehicle were searched and found to be free of contraband. CW-1 was then provided with $4200.00 in pre-recorded funds. CW-1 was also equipped with an audio transmitter and video recorder. At the direction of law enforcement, CW-1 again contacted SUGGS and the two agreed to meet at 3536 New Hampshire Avenue N.W. CW-1 was followed from the staging location to 3536 New Hampshire Avenue, N.W. CW-1 met with SUGGS at 3536 New Hampshire Ave., N.W., and SUGGS sold CW-1 approximately 125 grams of cocaine hydrochloride for $3,000.00. CW-1 returned to its vehicle, was followed back by law enforcement to the staging location, and then CW-1 turned over the cocaine hydrochloride and remaining $1,200.00 to law enforcement. CW-1 and CW-1's vehicle were again searched and found to be free of contraband. The narcotics were taken to the DEA Mid-Atlantic Laboratory for analysis, where they were subjected to quantitative and qualitative analysis. The analysis indicated the substance was 81% cocaine with a gross weight of 124.5 grams.

<u>INTERCEPTION OF WIRED COMMUNICATIONS</u>

26.     On January 8, 2007, the Honorable Judge Rosemary Collyer, in the District of Columbia, signed an order authorizing the interception of wire communications for telephone number 240-988-7588. That telephone has been and continues to be used by ANTHONY MAURICE SUGGS. At approximately 8:10 p.m., on January 9, 2007, the FBI began intercepting calls pursuant to that order. Interceptions of conversations on the target telephone have confirmed that SUGGS is engaged in narcotics trafficking in the Washington D.C., metropolitan area. During the interception of communications on that telephone, communications were intercepted wherein JAMES PARKER, ANTHONY SUGGS, LONNELL GLOVER, ERNEST GLOVER and JULIAN JOHNSON have been identified as individuals with whom SUGGS has a narcotics trafficking

20

relationship and as participants with SUGGS in a conspiracy to traffick in controlled substances. Pursuant to this court order, the following communications between ANTHONY SUGGS and others have been intercepted:

27.    On January 10, 2007, at 2:23 p.m., SUGGS called JULIAN JOHNSON, also known as JUJU, who asked SUGGS if he had taken care of business yet, a phrase frequently used by traffickers in reference to drug sales. SUGGS responded that he would do it later on, but definitely today. SUGGS agreed to call JOHNSON later. At 5:39 p.m., SUGGS received a call from JOHNSON where the two had a coded conversation. JOHNSON told SUGGS that he was in town and SUGGS could come through. SUGGS said that he was suppose to "take care of that" after rush hour and asked if JOHNSON wanted to talk to him first. JOHNSON asked if SUGGS was dead, meaning that SUGGS did not have any drugs, and SUGGS said yes. JOHNSON suggested that SUGGS might as well come get "you know." SUGGS then indicated to JOHNSON that he did not know "what you wanted from the market though." JOHNSON responded "oh, same thing we did." JOHNSON also stated that he wanted to go "heavy," but "I ain't got no storage bin." Based upon my training and experience in this and other investigations, your affiant believes SUGGS used code to advise JOHNSON that he was going to meet with the supplier after rush hour and to determine the quantity of PCP JOHNSON wanted to receive. JOHNSON then let SUGGS know that he wanted the same quantity that he had previously received. JOHNSON also indicated that he would like to receive more, but did not have a good place to store a larger quantity of PCP.

28.    LONNELL GLOVER was first intercepted on January 10, 2007, at 5:42 p.m., when SUGGS called the target telephone. GLOVER stated that he had people working at his house and was therefore unable to "do no moving around right now." SUGGS acknowledged that GLOVER

21

had previously told him that he would be busy and GLOVER agreed to call SUGGS. On January 10, 2007, at 9:14 p.m., SUGGS received a call from JULIAN JOHNSON. During the call SUGGS advised JOHNSON that they would meet the following day. These telephone conversations between GLOVER and SUGGS and SUGGS and JOHNSON clearly relate to their shared narcotics trafficking activity. That GLOVER supplies SUGGS with PCP is established by the activity set out in ¶ 34, *infra*. That JOHNSON is in turn supplied PCP by SUGGS is established by numerous telephone conversations intercepted during the court ordered monitoring of SUGGS, see *e.g.* ¶¶ 23 and 27, *supra*, and ¶ 33 *infra*. Based upon my training and experience in this and other narcotics investigations, your affiant understands that in these conversations GLOVER is utilizing the target telephone to facilitate his ongoing narcotics trafficking activity.    Specifically your affiant understands from the call between SUGGS and GLOVER and the calls between SUGGS and JOHNSON, that when SUGGS anticipated meeting with GLOVER and receiving PCP from GLOVER, he informed JOHNSON that they would be able to meet later in the day. However, when GLOVER was unable to supply SUGGS with PCP, SUGGS then told Johnson that he would not be able to supply Johnson with PCP until the following day.

29.    On January 11, 2007, at 12:59 p.m., SUGGS called the target telephone to speak with LONNELL GLOVER. The call was not answered, but SUGGS left a message that he was waiting for GLOVER. At 1:10 p.m., SUGGS received a call from the target telephone. GLOVER said he would be there in five minutes. SUGGS tried to tell GLOVER that he was sitting in front of a location, but GLOVER interrupted before SUGGS could provide the location. Based upon my

22

training and experience in this investigation your affiant understands from this series of conversations that SUGGS and GLOVER are coordinating a meeting to discuss their illegal narcotics trafficking business.

30.    On January 14, 2007, at 4:10 p.m., SUGGS called the target telephone and said ". . . I need to see you Unc whenever you're ready to see me." GLOVER and SUGGS then agreed to meet in approximately fifteen to twenty minutes and used coded language to confirm the prearranged location. At 5:21 p.m., SUGGS called GLOVER again on the target telephone and GLOVER said he was about five minutes away from the meeting location. SUGGS responded, "I'm sitting right here." Based upon my training and experience in this and other investigations, your affiant understands that in these conversations that SUGGS and GLOVER are using the target telephone to make arrangements for a meeting in which GLOVER will supply SUGGS with PCP.

31.    On January 18, 2007, at 2:33 p.m., SUGGS placed a call to the target telephone. GLOVER asked SUGGS to wait until 4:00 or 5:00 p.m., and SUGGS agreed. At 4:15 p.m., SUGGS received a call from the target telephone wherein SUGGS and GLOVER agreed to meet in an hour. At 5:26 p.m., SUGGS again called GLOVER on the target telephone and they agreed to meet in fifteen to twenty minutes. At 6:20 p.m., a spot check was conducted at Bladensburg Road and Channing Street, N.E., Washington, D.C., and SUGGS' Chevrolet Tahoe bearing Maryland tag 865M412 was observed parked on Bladensburg Road. A pick-up truck bearing a DC tag ending in 0597 was parked directly in front of the Tahoe. A 6:24 p.m., the Tahoe and the pick-up truck drove south on Bladensburg Road. Based upon my training and experience in this and other investigations,

23

including my knowledge that GLOVER supplied PCP to SUGGS on January 14, 2007, see ¶ 30, *supra*, your affiant understands that in this meeting SUGGS met with GLOVER to pay for PCP already supplied and to discuss further PCP transactions. See ¶¶ 34 and 35, *infra*.

32.    On January 19, 2007, at 10:23 p.m., SUGGS called the target telephone to talk to LONNELL GLOVER and they agreed to meet the following day when SUGGS finished working. Then, on January 20, 2007, at 11:31 a.m., SUGGS called GLOVER on the target telephone. GLOVER told SUGGS that he was on his way to Home Depot on St. Barnabas Road and they agreed to meet there. At 11:52 a.m., surveillance units observed SUGGS' Tahoe bearing Maryland tag 865M412 in the Home Depot parking lot. At 12:13 p.m., the Tahoe drove out of a parking space and left the area. A black male wearing a denim jacket and a baseball cap was seen walking away from the Tahoe. At 12:20 p.m., the black male was observed getting into a green Chevrolet pick-up truck bearing DC tag BZ-0597. The Chevrolet pick-up truck is registered to LONNELL GLOVER, date of birth October 3, 1961, at 1820 M Street, N.E., Washington, D.C.

33.    On January 23, 2007, at 5:29 p.m., SUGGS called JULIAN JOHNSON. SUGGS said "some more of that real estate is suppose to be back in this weekend." Based upon my training and experience in this and other investigations, your affiant believes that SUGGS informed JOHNSON that he did not have drugs, but expected to receive drugs the following weekend. At 9:09 p.m., SUGGS received a call from JOHNSON, and he advised JOHNSON that he was going to Tyson's this weekend "and look at them North Face coats." JOHNSON then asks SUGGS if "he is normally a man of his word." JOHNSON also commented that "he gonna have a mother fucker gonna jump on him uh aircraft." Based upon his training and experience in this and other investigations, the

(202)276-4337AFFIDAVIT-00001198

affiant believes that as in the 5:29 p.m. call, SUGGS again informed JOHNSON that he expected to receive additional drugs the following weekend. Further, your affiant believes that JOHNSON's comment indicates that the source of supply of PCP is located outside the Washington, DC metropolitan area.

### SUGGS DRUG SALE #3

34.     On January 19, 2007, at the direction of law enforcement CW-1 made several consensually monitored attempts to contact SUGGS by telephone to arrange a purchase of PCP from SUGGS. Those calls went unanswered and your affiant based upon his training and experience in this investigation and his understanding of the relationship between SUGGS and CW-1, believes that SUGGS, because his "caller ID" function told him it was CW-1 calling, did not answer CW-1's calls because he had no PCP to sell to CW-1. In fact, CW-1's and SUGGS' relationship is confined almost entirely to their drug trafficking activity in which SUGGS supplies PCP for which CW-1 pays upon delivery. Eventually, after law enforcement sent CW-1 into the neighborhood of SUGGS' grandmother's house, SUGGS called CW-1 and they met. At the meeting SUGGS put CW-1 off when CW-1 asked to purchase PCP.

35.     Based upon communications intercepted on January 20, 2007 in which SUGGS and GLOVER arranged a meeting, see ¶ 32, *supra,* surveillance was conducted by law enforcement at Home Depot in Oxon Hill, MD. During this surveillance, a vehicle belonging to ANTHONY SUGGS was observed in the parking lot. At 12:13 p.m., SUGGS' vehicle was observed leaving the parking lot, while a black male, later identified as LONNELL GLOVER was observed walking away from SUGGS' vehicle. At approximately 12:19 p.m., ANTHONY SUGGS attempted a telephone call to CW-1 from a second telephone belonging to SUGGS. That telephone, (202) 420-9847, is

25

subscribed to Kelly Smith and is a number over which CW-1 frequently calls or receives calls from SUGGS and your affiant therefore believes is a second cellular telephone utilized by SUGGS. See ¶ 40, *infra*. Your affiant knows from CW-1 that almost all of CW-1's interaction with SUGGS concerns narcotics trafficking. The telephone call went unanswered. Because law enforcement believed that SUGGS had just been supplied with PCP by GLOVER, CW-1 was directed by law enforcement to contact SUGGS at 202-420-9847. That telephone call was recorded. Shortly thereafter, CW-1 met law enforcement at a pre-determined staging location where CW-1 and CW-1's vehicle were searched and found to be free of contraband. CW-1 was then provided with $4,000.00 in pre-recorded funds. CW-1 was also equipped with an audio transmitter and video recorder. At the direction of law enforcement, CW-1 again contacted SUGGS. CW-1 and SUGGS agreed to meet at 3536 New Hampshire Avenue, N.W. CW-1 was followed from the staging location. While en route to that location, SUGGS told CW-1 to meet him at another location nearby. SUGGS sold CW-1 approximately sixteen ounces of PCP for $4,000.00.[3] CW-1 returned to its vehicle, was followed back by law enforcement to the staging location, and then CW-1 turned over the PCP. CW-1 and CW-1's vehicle were again searched and found to be free of contraband. Based upon my training and experience in this and other investigations and the entire chain of events, beginning with CW-1's attempts to contact SUGGS and SUGGS' determination to delay a cash sale (¶ 34), SUGGS meeting with GLOVER and his almost immediate attempt to contact CW-1 followed by his distribution of

---

[3] In that call intercepted pursuant to this Court's January 8, 2007 Order SUGGS advised CW-1 that he was concerned about a Jeep Cherokee parked near 3256 New Hampshire Avenue, N.W. In fact law enforcement conducting surveillance in the vicinity of that address was stationed in a Jeep Cherokee and observed SUGGS drive by at about the time he changed the meeting site.

16 ounces of PCP to CW-1, your affiant submits that it is clear that GLOVER supplied PCP to SUGGS who then had PCP to supply to CW-1, PCP SUGGS did not have the night before.

36.    On January 21, 2007, at 2:49 p.m., SUGGS used the target telephone to call LONNELL GLOVER. SUGGS indicated that he wanted to "rap" to GLOVER and they agreed to meet at 3:30 p.m. At 2:51 p.m., SUGGS used the target telephone to call GLOVER a second time and used coded language to confirm that they would be meeting at a prearranged location. At 4:03 p.m., SUGGS received a call on the target telephone from GLOVER who advised he was on his way. At 4:04 p.m., SUGGS used the target telephone to call GLOVER and offered to drive closer to GLOVER's location. GLOVER said that was not necessary and SUGGS said he would wait. Again, based upon my training and experience in this and other investigations, including my knowledge that GLOVER supplied PCP to SUGGS on January 20, 2007, see ¶¶ 34 and 35, *supra*, your affiant understands that in this meeting SUGGS met with GLOVER to pay for PCP already supplied and to discuss further PCP transactions.

## ANALYSIS OF PEN REGISTER
## RECORDS FOR THE TARGET TELEPHONE

37.    On January 20, 2007, your affiant served an administrative subpoena on Sprint Nextel requesting telephone call records for the period of December 10, 2007, until January 23, 2007, for telephone number (202) 276-4337. On January 26, 2007, upon application of the United States of America, the Honorable Magistrate Judge Deborah A. Robinson of the United States District Court for the District of Columbia, signed an order authorizing the installation and use of a device, commonly referred to as a pen register, to register telephone numbers being dialed to and from (202) 276-4337. As noted above, this telephone has a prepaid type of subscription, and as such, no

27

subscriber has been provided to the Phonetec.

38.     Your affiant's review of pen register records for the above time period identified seven pertinent telephone numbers with calls to and/or from the target telephone. The following is a list of those pertinent telephone numbers, including subscriber information, and the number of telephone calls between the former target telephone number and the pertinent telephone number for the period of December 10, 2007 until February 6, 2007:

| TELEPHONE NUMBER | NAME OF SUBSCRIBER | NUMBER OF CALLS |
|---|---|---|
| (312) 498-7788 | BRENDA MAY<br>(Last called February 6, 2007) | 633 calls |
| (404) 964-2616 | BRENDA MAY<br>(Last called February 6, 2007) | 182 calls |
| (240) 988-7588 | IRVING YORK<br>(Last called February 4, 2007) | 115 calls |
| (202) 420-9847 | KELLY SMITH<br>(Last called January 19, 2007) | 007 calls |
| 202-577-8966 | ERNEST MILTON GLOVER<br>(Last called February 6, 2007) | 138 calls |
| (202) 550-8112 | DARRYL SIMMS<br>(Last called February 6, 2007)<br>(Used by Ernest Milton Glover) | 029 calls |
| (323) 481-7566 | DARRELL CALHOUN<br>(Last called February 3, 2007) | 006 calls |

39.     Both of the telephones belonging to BRENDA MAY are believed to belong to BRENDA DONALDSON, that is, it is believed that MAY and DONALDSON are the same person. A database check of addresses indicates that MAY and DONALDSON are currently at the same address. The criminal history for BRENDA DONALDSON lists BRENDA MAY as an alias for

28

DONALDSON. Additionally, the date of birth given by MAY to Sprint Nextel is May 6, 1963. The actual date of birth for DONALDSON is May 6, 1962. May 6, 1963 is listed as an alternate date of birth for DONALDSON. Based upon DONALDSON's extensive criminal history and prior drug convictions, including a 1994 conviction for involvement in cocaine and a 1985 arrest for PCP trafficking, your affiant believes that these two telephone numbers are pertinent.

40.    There are two telephones belonging to ANTHONY SUGGS, one in the name of IRVING YORK (240) 988-7588, and KELLY SMITH (202) 420-9847, which are considered pertinent because, as discussed *supra*, GLOVER supplies PCP to SUGGS. While conversations over telephone number (240) 988-7588 are being intercepted pursuant to this Court's Orders of January 8 and February 7, 2007, there is currently no monitoring of SUGGS' conversations over telephone number (202) 420-9847, which is known to be used by SUGGS. See ¶ 35, *supra*. Based upon the aforementioned intercepted conversations, controlled purchases of narcotics from SUGGS, and correlative surveillance, your affiant believes that both of these telephone numbers are pertinent.

41.    There are two telephone numbers that belong to ERNEST MILTON GLOVER, which are both considered pertinent (202) 577-8966, and (202) 550-8112. Although your affiant believes that there is a familial relationship between ERNEST GLOVER and LONNELL GLOVER, it is clear, based upon telephone calls intercepted between ANTHONY SUGGS and ERNEST GLOVER, that ERNEST GLOVER is in the business of trafficking narcotics, specifically PCP. For instance, at 4:48 p.m. on January 11, 2007, SUGGS received an incoming call from ERNEST MILTON

(202)276-4337AFFIDAVIT-00001203

GLOVER, also known as "Fish," a target in this investigation.[4]  SUGGS said he was coming from

Maryland and would be there by 5:00 p.m.  FISH told SUGGS to wait for his call.  At 6:24 p.m.

FISH called SUGGS and SUGGS asked if he wanted "the same pockey book as last time?"  FISH

said "Yeah, the same pockey book."  Based upon my experience and training I know this is a

common ploy used by narcotics traffickers in discussing drugs on the telephone.  In an attempt to

disguise the true subject of their conversation, they make reference to some innocuous item.  SUGGS

drives a trash truck and FISH is recently released from prison.  It is clear in that conversation  that

the two of them did not actually discuss pocket books.  SUGGS rather, asked FISH if he wanted the

same amount and/or type of drugs as the last time.  Later, at 6:47 p.m. SUGGS called FISH that he

was en route to their meeting.  Again, based upon my training and experience in this and other

investigations, your affiant understands that in this meeting SUGGS supplied Fish with PCP.

    42.    The telephone number in the name of DARRELL CALHOUN is considered pertinent

as DARRELL CALHOUN's criminal history indicates a previous drug conviction.  Further, based

upon your affiant's training and experience, the Los Angeles, California area is a primary location

for the manufacturing of PCP, and PCP manufacture and distribution is largely associated with

members of the "Crips," a highly organized criminal street gang in the Los Angeles area.  Indeed,

in the last several major investigations of PCP trafficking organizations in this area, the source of

that PCP has been determined to be in the Los Angeles area.  Given his history of narcotics

trafficking (1977 conviction for cocaine distribution) and serious criminal activity (1994 conviction

for RICO), CALHOUN's telephone number is particularly of interest and relevant given our goal

---

[4] For clarity's sake, in the remainder of this paragraph we will refer to ERNEST MILTON
GLOVER by his nickname, "Fish."

to identify and prosecute the source of the PCP which GLOVER distributes to SUGGS for sale in the Washington, D.C. metropolitan area.

## OTHER INVESTIGATIVE PROCEDURES

42.      Based upon the experience and training of your affiant, as well as the experience of other agents and law enforcement officers consulted, and based upon all the facts set forth herein, your affiant believes that interception of wire communications to and from the target telephone number is the only reasonable method of developing evidence of the full scope of the suspected violations being committed by LONNELL GEORGE GLOVER, ANTHONY MAURICE SUGGS, also known as "APPLEJACK," DARRELL CALHOUN, BRENDA DONALDSON, JULIAN JOHNSON, also known as "JUJU," also known as "JU," JAMES LAWRENCE PARKER, also known as "YOGI," DESALINES CARROLL BATTLE, also known as "DEZZIE," MAURICE JERMAINE WILLIAMS, also known as "MO," ERNEST MILTON GLOVER, also known as "FISH," GLENDALE EARL LEE, also known as "GLEN," and others as yet unknown or not yet all fully identified. This is because normal investigative procedures have been tried and have failed, appear reasonably unlikely to succeed if attempted or continued, or are too dangerous to further employ in this investigation. Normal investigative procedures that have been employed in this investigation to date have included: surveillance; debriefings of cooperating witnesses; consensual recording of telephone conversations; controlled purchases of narcotics; review of pen register records for the target telephone number and former telephones; and review of public records. While this information has been probative in establishing probable cause that an ongoing illegal narcotics business is operating, it has not yielded sufficient evidence or ascertained the identities of, and proven beyond a reasonable doubt the guilt of, all those participants in this illegal conspiracy. This

31

includes the persons who supply and assist in the transportation of the narcotic controlled substances, and the distribution of proceeds from these illegal activities.

43.    Based upon your affiant's training and experience, and based on your affiant's knowledge of the facts of this investigation as set forth herein, it is your affiant's belief that the interception of wire communications is the only available investigative technique that has a reasonable likelihood of revealing and securing admissible evidence needed to establish the full scope and nature of the offenses being investigated.

44.    While the FBI investigation might be able to introduce an undercover officer to make narcotics purchases from GLOVER and others, such an effort would almost certainly not assist in fully identifying all of the persons involved in supplying PCP to GLOVER and others, nor the manner in which large quantities of PCP are manufactured, obtained and transported to the Washington, D.C. area.  Based upon my training and experience in this investigation and other investigations, as well as the training and experience of other law enforcement agents associated with this investigation, it is very unlikely that an individual operating at GLOVER's level would introduce a customer to his supplier.  More to the point, while we have cooperating individuals who can deal with SUGGS, SUGGS has never introduced those CWs to GLOVER nor has SUGGS disclosed to the CWs that he deals with GLOVER for any controlled substance.  In point of fact law enforcement have no feasible method of arranging an introduction of an undercover officer to GLOVER.  In addition, even were an undercover introduction possible, the undercover officer would not be able to identify all of the other members of the organization assisting GLOVER and the other subjects listed above in obtaining and redistributing large quantities of PCP.  Further, the undercover officer would not be able to determine how the subjects dispose of the proceeds of their operation.  While

an undercover investigation might be probative of the nature of GLOVER's ongoing illegal narcotics business, such efforts would not yield sufficient evidence of the full scope of the illegal operation. The introduction of an undercover officer would not appreciably advance the investigation into the broad-scale operations of the conspiracy. It is not likely that GLOVER would introduce an undercover officer to anyone who supplies PCP to GLOVER or to anyone else who would have access to GLOVER or any conspirator who is involved in the conspiracy's efforts to transport large quantities of PCP into the Washington, D.C. area.

45.     Based on information developed in the investigation to date, it is believed that the organization's principal source of supply for PCP is located in the Los Angeles, California area. In part this belief is based upon recent trends in the Washington, D.C. area indicating that the principal source of supply for PCP intended for this area is in the Los Angeles area. Further, while the investigation has not yet determined where the PCP distributed by the organization is manufactured[5] or how the manufactured PCP is transported to the Washington, D.C. area, it appears relatively clear based upon intercepts over SUGGS' telephone that SUGGS' principal source of supply is GLOVER, see ¶¶ 32 and 34, *supra,* and the pen register data indicates that GLOVER is in frequent communication with known drug traffickers in California. Information regarding the manufacture and transportation of PCP would be very closely held among the people in the higher echelons of the conspiracy to whom we would either not have access or, like GLOVER, would not discuss such things with others not positioned at an appropriate level. It is thus unlikely that we would be able

---

[5] The process by which illegal PCP is produced, known as "cooking," involves the mixture of several relatively easily obtained precursor chemicals using fairly standard chemical procedures. Some of the more critical precursors in the process are, like the end product, controlled substances. *Cf.* 21 United States Code § 841(c).

33

to determine the process by which the PCP makes its way to the Washington, D.C. area without the interception of wire communications over GLOVER's telephone, that is, the target telephone. It is not reasonable to believe that information identifying and locating GLOVER's source of supply will be heard in the ongoing interceptions over SUGGS' telephone. In point of fact no such information has been overheard to date in those interceptions nor, given the fact that GLOVER as SUGGS' source of supply would never disclose to SUGGS his source of supply out of concern that SUGGs would approach that source directly. As a consequence, if we are to determine the identity of GLOVER's source of supply, it will be necessary to monitor GLOVER's conversations over the target telephone.

46.    While the investigation to date has determined GLOVER is responsible for the distribution of substantial quantities of PCP in the Washington, D.C. area, the investigation has been unsuccessful in identifying all the purchasers within the Washington, D.C. area of the wholesale quantities of PCP being distributed by GLOVER. The evidence indicates that GLOVER sells PCP upwards of 16 ounces at a time. In your affiant's experience and training, as well as the experience of other agents and law enforcement officers involved in this investigation, it is extremely unlikely that someone dealing PCP at GLOVER's level would have only one customer such as SUGGS. It is thus our reasonable expectation that in monitoring the target telephone we will intercept and identify others dealing at the same level as SUGGS who are being supplied PCP by GLOVER. Your affiant considers identification of such wholesale purchasers as a significant objective of this investigation, particularly in view of the often violent activities associated with the intermediate level trafficking groups. While it is possible that an undercover officer dealing with the conspiracy might encounter other customers, it is unlikely since neither those customers, nor GLOVER, willingly

34

expose their illegal activity to others. Moreover, while the use of an undercover officer might yield some information and evidence regarding GLOVER of a type already developed in this investigation, as the investigation to date indicates, it is highly unlikely that GLOVER would disclose anything concerning his sources of supply and the methods they use. It is your affiant's experience and the experience of other veteran narcotics investigators, that a narcotics distributor almost never discloses his source of supply to his customers for fear of the customers dealing directly with the source of supply. Additionally, in your affiant's experience, for security reasons, most suppliers will not deal with their customer's customers because such dealings risk robbery and prosecution.

47.    As indicated earlier, a portion of the information herein was obtained from cooperating witnesses. Although valuable evidence has been collected through the use of cooperating witnesses, including controlled narcotics purchases by CW-1 and CW-2, the cooperating witnesses are not privy to the identities and conversations of all other co-conspirators comprising the distribution network of this organization and in particular, they do not have the ability to approach GLOVER regarding drug dealing or the sale of PCP. CW-1 and CW-2 remain available to investigators for contacts and in particular, for controlled purchases of narcotics from various members of the conspiracy. However, in your affiant's experience and that of other experienced narcotics investigators, the manner in which CW-1 and CW-2 deal with the conspiracy and its members will not permit or facilitate contacts with members of the conspiracy operating at a level above those CW-1 and CW-2 normally contact. For this reason it is unlikely that anyone in the conspiracy who is now dealing with CW-1 or CW-2 would introduce CW-1 or CW-2 to those who are supplying the drugs to the conspirators who sell them to CW-1 and CW-2, to include GLOVER and those operating at GLOVER's level. It is highly unlikely that they would be able to obtain any

35

additional information other than that already learned during the controlled narcotics purchase made by CW-1 and CW-2. Even during CW-1's and CW-2's interaction with the conspiracy they were not privy to the movement or the direction of the organization's upper echelon. Similarly, while efforts by CW-1 and CW-2 to purchase drugs from SUGGS, PARKER and others may generate activity involving GLOVER, it is clear that without the ability to monitor GLOVER's telephone conversations other than those conversations with SUGGS, such activity will not disclose the extent of this conspiracy beyond GLOVER. Based on my experience, even if an undercover officer or another cooperating witness gained access to the organization at GLOVER's level, they would not be able to learn information concerning the full scope of the organization, how PCP is transported into the United States and distributed around the country, where such PCP is manufactured and how it is thereafter distributed, or provide evidence to establish beyond a reasonable doubt how the conspiracy accomplishes these vital tasks. Illegal narcotics trafficking organizations such as the one under investigation here, like any organization that values security, use compartmentalization of information as an important element of security. Thus, the cooperating witnesses and persons associated with them would be shut-off from certain information and people in the organization.

48. As was noted above, controlled narcotics purchases have been made by cooperating witnesses from SUGGS. However, despite months of investigative efforts, the cooperating witnesses have not managed to buy PCP from anyone higher in the chain of supply than SUGGS. Investigation indicates that SUGGS purchases his PCP from GLOVER. Therefore, it would likely raise suspicion if the cooperating witnesses requested introduction to GLOVER and would thus compromise the investigation or at least compromise the ability of the cooperating witnesses to continue to aid the

36

investigation as well as their safety. Indeed, in your affiant's experience and that of other narcotics investigators, a dealer operating at GLOVER's level would find it highly suspicious if any customer of SUGGS' sought an introduction to him.

49.     While controlled purchases have been completed in this investigation, they have not served to reveal the inner workings of the organization at or above GLOVER's level in the organization nor as we have explained above do we believe that any future controlled purchases without monitoring of the target telephone will disclose the identity and role of any conspirators not already known. While investigation to date and information from cooperating witnesses has served to establish certain facts about GLOVER as a source of supply for the PCP that SUGGS distributes, that information and other evidence does not allow for adequate identification of the organization's full distribution network and, in particular, the source of supply for GLOVER. More importantly, that information does not provide an adequate basis for prosecution of the organization's full distribution network.

50.     Physical surveillance, though invaluable in identifying some activities of the subjects, such as meetings and daily patterns, has not always been a viable investigative tool in this investigation.  Physical surveillance has yielded some valuable information to further the investigation, though it has not identified all of the conspirators. Physical surveillance in this matter is complicated by the surveillance consciousness of the conspirators.  During surveillance of SUGGS on January 16, 2007, SUGGS identified two of the vehicles used by law enforcement agents who were conducting the surveillance and accurately described those vehicles in an intercepted conversation with the individual that SUGGS met that day. On January 20, 2007, while conducting a controlled purchase, SUGGS again identified a vehicle used by law enforcement.

51.    Although physical surveillance has provided some helpful information, physical surveillance, if not used in conjunction with other techniques, including electronic surveillance, is of limited value. Physical surveillance of the alleged conspirators will not establish conclusively the elements of the violations, and has not, and most likely will not, establish conclusively the identities of various conspirators.   Indeed, as discussed above, prolonged or regular surveillance of the movements of the suspects would most likely be noticed, causing them to become more cautious in their illegal activities. It also may cause them to flee to avoid further investigation and prosecution or cause a real threat to the safety of the cooperating witnesses. The subjects of the investigation appear to be extremely surveillance conscious.   Physical surveillance, even if conducted in conjunction with additional controlled purchases, is also unlikely to establish conclusively the roles of the named conspirators, to identify additional conspirators, or otherwise to provide admissible evidence in regard to this investigation.   It is also true in this case that given that SUGGS is extremely surveillance conscious, if surveillance is to be conducted in this investigation when SUGGS is involved, that surveillance must be instructed by monitoring such that surveillance can be in place at a meeting site rather than follow SUGGS or any other participant to the meeting site.

52.    The use of search warrants and interviews would be premature at this time.  These techniques would alert the subjects to the existence of the investigation and would hamper or prevent the identification of other co-conspirators and/or the seizure of contraband.  GLOVER and the other members of the organization are conducting a highly secretive illegal operation.  Because of the close-knit nature of the organization, the execution of search warrants may cause the conspirators to become even more secretive and thereby frustrate law enforcement efforts to obtain evidence of the ongoing criminal operation.  Further, it may prompt the conspirators to relocate their base of

operations to another location and obtain new telephones. The use of search warrants would not be likely to reveal the total scope of the illegal operation and the identities of the co-conspirators. From your affiant's experience in this and other investigations, it is doubtful that search warrants, if obtained and executed, would result in obtaining historical records and physical evidence sufficient to show the complete extent and nature of this illegal conspiracy, particularly the identity and roles of all co-conspirators, the manner in which narcotics are transported into the United States, and the methodology utilized to transport or transmit laundered narcotics.

53.    In addition, in the absence of interception of wire communications, it would be difficult to determine future PCP distribution and/or the locations of stored narcotics by conspirators for purposes of sale and distribution, so as to permit the effective execution of search warrants for such illegal drugs. In addition, your affiant does not know the location in Washington, D.C. metropolitan area where the organization stores its narcotics nor to whom these narcotics are presently being redistributed.

54.    Calling witnesses before the Grand Jury, or otherwise interviewing them, would likely not result in the gathering of sufficient evidence to uncover the full scope, nature, or identities of all the participants in this criminal conspiracy. Only the individuals intimately involved in the criminal activity at the highest levels have the requisite knowledge regarding the full scope and nature of the operation and those who might be the most culpable persons. As noted above, the FBI has obtained information from the cooperating witnesses concerning the conspirators' illegal drug activities. Some of this information is historical and does not further the FBI's objective of obtaining current information about conspirators' illegal operations. Furthermore, disclosure of the cooperating witnesses at this time would compromise other ongoing investigations. Other witnesses, besides

cooperating witnesses, even if immunized, are reluctant to incriminate themselves and their close working associates. To obtain their testimony would require immunization and non-prosecution of those who are the principals of the operation. Even if obtained, that testimony could not be adequately corroborated and could be tailored to mislead the Grand Jury or interviewing agent, and be used to falsely exculpate the witness. Moreover, a Grand Jury investigation, immunity grants or the use of interviews would disclose the facts of this ongoing investigation and the substantial scope and magnitude of the investigation. Although this could lead to certain lower level participants providing information under grants of immunity, this information would not disclose the full scope and nature of the criminal conspiracy or likely identify unknown participants or co-conspirators. Further, should the focus of the investigation and the magnitude of the potential penalties involved be disclosed to the principals, it is likely that they would then become more secretive, attempt to further disguise or hide the criminal activities previously described herein, or simply relocate. In addition, it is likely that some or all of the principals would flee the area and possibly the country. As was described above, the identities of some of the conspirators are not adequately known and would be difficult to establish. As a consequence, such persons would escape justice and remain a threat.

55.    The use of pen registers has been valuable in providing investigative leads and intelligence, but are limited in their use. An analysis of pen register data has provided law enforcement officers with detailed information regarding the telephone numbers called by, and the telephone numbers used to call, the target telephone number. Although this information has been useful to capture relevant information, pen registers fail to provide detailed, real-time information which is needed to successfully further the objectives of this investigation. Also, pen registers do

not provide the substance of conversations. Your affiant knows from personal experience that pen registers provide only limited evidence of narcotics dealing between individuals. Pen registers, in and of themselves, are useful mainly in establishing relationships and patterns of operations and provide little direct evidence of the significance of the telephone calls.

56.    In summary, normal investigative techniques have not produced significant admissible evidence as to identify all of the participants nor the full scope and nature of this criminal conspiracy.

57.    Based upon the experience and training of your affiant, as well as the experience of other law enforcement officers consulted, and based upon all the facts set forth herein, your affiant believes that interception of wire communications is the only reasonable method of developing evidence of the full scope of the suspected violations being committed by the target subjects and others as yet unknown or not yet fully identified. This is because normal investigative procedures have been tried and have failed, appear reasonably unlikely to succeed if continued, or are too dangerous to employ further in this investigation.

## PERIOD OF INTERCEPTION

58.    Your affiant believes, based upon experience, and the experience of other agents working on this investigation, and based upon the facts set forth herein, demonstrating a consistent course of criminal conduct over a substantial time period, that after the described communications have first been intercepted, additional communications of the same type will occur. The interception of more than one such communication will be necessary to determine the identities of the co-conspirators and to establish and understand the full extent and nature of their participation in the conspiracy, and the method of its operation. For these reasons, authorization to intercept

41

communications should not be terminated upon the interception of the first described communication but should continue until the object of the investigation is attained.

59.    The requested order is sought for a period of time until the interception fully reveals the manner in which the above named individuals and their confederates participate in the above described offenses, or for a period of (30) days, whichever is earlier. Pursuant to Title 18 United States Code Section 2518(5), it is further requested that the time set forth in the order run from the day on which the investigative agents first begin to conduct the interception pursuant to the court's order, or (10) days from the date the order is entered, whichever is earlier.

## MONITORING AND MINIMIZATION

60.    All monitoring of wire communications will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18 United States Code, and all interceptions conducted pursuant to this Court's Order will be terminated upon attainment of the authorized objectives or, in any event, at the end of thirty (30) days from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception under this Court's Order or ten (10) days after the Order is entered, whichever is earlier.

61.    Monitoring of an intercepted conversation will be immediately terminated when it is determined that the conversation's subject matter is unrelated to communications subject to interception under Chapter 119 Title 18 United States Code. Interception will be suspended immediately when it is determined, through voice identification, physical surveillance, or otherwise, that none of the named interceptees or any of their confederates, when identified, are participants in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Reasonable spot monitoring will be utilized to ensure that

(202)276-4337 AFFIDAVIT-00001216

minimized calls have not become criminal in nature. Monitoring will be conducted by Special Agents and/or FBI Task Force Officers, under the supervision of investigative or law enforcement officers authorized to conduct the interception. Your affiant, as well as other agents and investigators participating in this interception of wire communications, will operate all equipment necessary to monitor all calls, and the FBI will maintain custody of the logs of conversations monitored.

62.     In the event that intercepted communications are in a code or foreign language and an expert translator in that code or foreign language is not reasonably available during the interception period, minimization will be accomplished as soon as practicable after such interception in accordance with Title 18 United States Code Section 2518(5). Accordingly, in the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the government, will be under the direct supervision of a federal agent. If, however, such a translator is not reasonably available on the spot, the following after-the-fact minimization procedures have been established pursuant to Title 18 United States Code 2518(5): (a) all such foreign language conversations will be intercepted and recorded in their entirety; and (b) as soon as practicable after such interception, these conversations will be reviewed and minimized by a translator under the guidance of a federal agent, after which an English translation of the pertinent criminal conversations will be furnished to the supervising federal agent.

## PRIOR INTERCEPTIONS

63.     On February 6, 2007 and February 9, 2007, your affiant caused the records of the Drug Enforcement Administration ("DEA"), Immigration and Customs Enforcement ("ICE"), and FBI to be searched, and on the basis of those searches, your affiant represents that no previous

(202)276-4337 AFFIDAVIT-00001217

applications beyond those specified below have been made to any judge of competent jurisdiction for authorization to intercept, or for approval of interception of wire, oral or electronic communications involving the same persons, places or facilities specified herein except as follows:

(a)    As detailed above, ANTHONY MAURICE SUGGS, also known as "APPLEJACK," ERNEST MILTON GLOVER, also known as "FISH," and LONNELL GEORGE GLOVER, were intercepted pursuant to this Court's Order of January 8, 2007, which was authorization to intercept wired communications from telephone number( 240) 988-7588 being used by ANTHONY SUGGS.  On February 7, 2007 this Court extended authority to intercept wire communications over that telephone with the above individuals also named in that affidavit.

(b)  BRENDA DONALDSON, not further identified, was named in a previous application filed by the DEA for an order authorizing the interception of wired communications. That order was signed on January 17, 1995, by United States District Court Judge Stanley Sporkin, for the District of Columbia.

## TECHNICAL ASSISTANCE

64.    Your affiant requests that, pursuant to the provisions of Title 18 United States Code Section 2518(4), the Court order that communications service provider, in this case Sprint Nextel, Mailstop KSOPM0206, 6480 Sprint Parkway, Overland Park, Kansas 66251, and Phonetec, 3300 North A St, Building One, Midland, Texas, furnish to the Federal Bureau of Investigation forthwith all information, facilities and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services as that provider is according

44

to the person whose communications are to be intercepted. Reasonable expenses incurred through the furnishing of facilities or assistance will be processed for payment by the Federal Bureau of Investigation, United States Department of Justice.

## CONCLUSION

65.    Based on all of the above, your affiant submits that there is probable cause to believe that the above-described violations have occurred, are presently occurring, and will continue to occur; that GLOVER and others have used, are using, and will continue to use the target telephone number in furtherance of illicit narcotics activities; and that normal investigative techniques have failed to produce evidence necessary to sustain a prosecution of the aforesaid offenses and reasonably appear unlikely to succeed.

RYAN M. PARDEE, Special Agent
Federal Bureau of Investigation
United States Department of Justice

SWORN TO AND SUBSCRIBED before me this ___9th___ day of February, 2007.

ROSEMARY M. COLLYER, Judge
United States District Court
for the District of Columbia

United States District Court
For the District of Columbia
A TRUE COPY
NANCY MAYER WHITTINGTON, Clerk

By _____
Deputy Clerk

45

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES** | **:** | |
| | **:** | **Criminal No. 07-CR-153(1) (TFH)** |
| *v.* | **:** | |
| | **:** | |
| **LONNELL GLOVER, ET. AL,** | **:** | |
| | **:** | |
| *Defendants.* | **:** | |

## ORDER

Upon consideration of Defendant Glover's Motion to Suppress Evidence

Obtained from Interception of Wire Communications and Seizure of Electronic Communications

and Incorporated Memorandum of Points and Authorities in Support Thereof, and any opposition

thereto, it is this _____ day of_____ 2008, hereby

**ORDERED**, that the Defendant's Motion shall be and hereby is **GRANTED**.


_____
**THOMAS F. HOGAN**
**UNITED STATES DISTRICT JUDGE**

Copies to:

The Parties via ECF