FILED
JUN 1 1 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| v. | : Criminal No. 07-153-19 (TFH) |
| JOHN FRANKLIN CRUM, | : |
| Defendant. | : |

### GOVERNMENT'S PROFFER OF PROOF IN SUPPORT OF DEFENDANT'S PLEA OF GUILTY

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully submits the following Proffer of Proof in Support of a Proposed Plea of Guilty by the defendant to Count One of an Indictment in the above-captioned matter.

### *Elements of the Offense*

The essential elements of the offense of Conspiracy to Possess with Intent to Distribute and to Distribute one Kilogram or more of Phencyclidine in violation of 21 United States Code § 846 and 21 United States Code §§ 841(a)(1), and 841(b)(1)(A)(iv), each of which the government must prove beyond a reasonable doubt to sustain a conviction, are:

(1) that an agreement existed between two or more persons to commit the crimes of distribution and possession with intent to distribute a controlled substance, that is, phencyclidine;

(2) that the defendant intentionally joined in that illegal agreement.

The law makes phencyclidine a controlled substance. See United States v. Lam Kwong Wah, 924 F.2d 298, 302-303 (D.C. Cir. 1991); United States v. Pumphrey, 831 F.2d 307, 308-309, 265 U.S. App. D.C. 306, 307-308 (D.C. Cir. 1987). These cases hold that the offense of violating 21 United States Code § 846, by conspiring to violate federal narcotics laws, does not include an element of

commission of an overt act in furtherance of the conspiracy.

Count One of the Indictment, which applies to this defendant, charges that defendant conspired to distribute and possess with intent to distribute more than one kilogram of a mixture and substance containing a detectable amount of phencyclidine. The essential elements of the offense of distribution of a controlled substance are:

(1) That the defendant distributed a controlled substance, that is, phencyclidine. Distribute means to transfer or attempt to transfer to another person. The government need not prove that the defendant received or expected to receive anything of value in return.

(2) That the defendant distributed the controlled substance, that is, phencyclidine, knowingly and intentionally. This means consciously, voluntarily and on purpose, not mistakenly, accidentally or inadvertently.

The essential elements of the offense of possession with intent to distribute phencyclidine are:

(1) That the defendant possessed a controlled substance, that is, phencyclidine;

(2) That the defendant did so knowingly and intentionally. This means consciously, voluntarily and on purpose, not mistakenly, accidentally or inadvertently.

(3) That when the defendant possessed the controlled substance, that is, phencyclidine, he had the specific intent to distribute it. Distribute means to transfer or attempt to transfer to another person.

Count One of the Indictment charges that John Franklin Crum conspired to distribute and possess with intent to distribute more than one kilogram of a mixture and substance containing a detectable amount of phencyclidine. Thus, in order to make the defendant liable for the sentencing enhancements set out in 21 United States Code § 841(b)(1)(A)(iv), the United States would be

required to prove beyond a reasonable doubt that the defendant and others conspired to distribute and possess with intent to distribute one kilogram or more of a mixture and substance containing a detectable amount of phencyclidine during the life of the conspiracy, as charged in the Indictment -- that is, between August 1, 2005, and June 11, 2007, <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).

### ***Penalties for the Offense***

The penalty for conspiring to commit a narcotics offense, in violation of 21 United States Code § 846, is the same as that prescribed for the substantive offense, "the commission of which was the object of the . . . conspiracy." In this case, the penalty is the same as for a violation of 21 United States Code § 841(a)(1), as set forth in 21 United States Code § 841(b)(1)(A)(iv), distribution or possession with intent to distribute phencyclidine. The maximum penalty, therefore, is:

(A) a term of imprisonment which may not be less than 10 years nor more life;

(B) a fine not to exceed $4,000,000;

(C) a term of supervised release of at least 5 years, after any period of incarceration;

(D) a special assessment of $100.

The United States Sentencing Guideline § 5E1.2 permits the Court to impose an additional fine to pay the costs of for imprisonment and any term of supervised release and/or probation.

## *Factual Proffer*

The following proffer of the government's evidence is intended only to provide the Court with enough evidence to satisfy the mandate of of the Fed. R. Crim. P 11(b)(3). This proffer is not intended to be a disclosure of all the evidence available to the United States nor, to the extent it makes representations concerning anything defendant said, is it a recitation of all that defendant said.

Had this matter gone to trial, the government's evidence would have shown, beyond a reasonable doubt, the following:

1.  In the fall of 2005, law enforcement developed information that Anthony Maurice Suggs was distributing large quantities of Phencyclidine (PCP) in the Washington, D.C. area. Law enforcement officers collected substantial evidence that Suggs was actively distributing gallons of PCP and cocaine. After obtaining credible evidence of Suggs' drug trafficking, the government prepared an affidavit in support of wire interceptions over the cellular telephone used by Suggs, and on January 8, 2007, the Honorable Rosemary M. Collyer, United States District Court Judge for the District of Columbia, found probable cause for the interceptions of Suggs' telephone, and approved the interceptions. Interceptions commenced on January 9, 2007. Within two weeks of intercepting Suggs' telephone, law enforcement officers determined that Suggs' supplier of PCP was Lonnell George Glover. The government prepared an affidavit in support of wire interceptions over the cellular telephone used by Glover, and on February 9, 2007, Judge Collyer found probable cause for interceptions over Glover's telephone, and approved the interceptions. Shortly thereafter, when probable cause was developed to show that Glover used his pickup truck in transporting drugs and as a meeting place for drug trafficking, the government prepared an affidavit in support of an application for authority to intercept oral communications in and within the vicinity of Glover's

pickup truck. On March 19, 2007, Judge Collyer found probable cause for interceptions in and in the vicinity of Glover's pickup truck, and approved the interception of oral communications. A summary of some of those interceptions follows.

    2.    Glover's relationship with Suggs centered around the phencyclidine that Glover supplied to Suggs and this was evident in the interceptions over Suggs' cellular telephone. However, in monitoring Glover's cellular telephone and later in monitoring conversations inside Glover's pick up truck, it became clear that Glover was a source of supply for both phencyclidine and heroin. It was as a supplier of phencyclidine that Glover dealt with the defendant. In March of 2007, law enforcement intercepted calls from the defendant and thereafter defendant was intercepted in conversation with Glover inside Glover's pick up truck as well. The defendant and Glover also were observed by law enforcement meeting.

    3.    Beginning in March and through the close out of the wiretap on June 19, 2007, when the defendant and others indicted in this investigation were arrested, the defendant was intercepted at increasingly shorter intervals arranging to meet Glover and purchase drugs. Specifically, on April 13, 2007, at 5:38 p.m., Crum called Glover and they discussed their current locations and destinations. Glover said that he was getting ready to go to East Capitol and Benning Road and Crum asked if Glover wanted him to go there. Glover agreed and Crum asked if they would meet by the Shrimp Boat (a restaurant at that location) 'like we did." They agreed to meet there. At 11:36 p.m. Crum called Glover and they agreed to meet at the Navy Yard. These calls show that this was a frequent pattern in the dealings between Glover and Crum, consistent with a meeting in which drugs are 'fronted" to Crum and paid for after Crum sells the drugs. Crum obtained drugs from Glover to fill "orders" outstanding. Indeed, on April 21, 2007, 9:24 p.m., Crum called Glover to say

he had a customer. When Glover told Crum that he was in Alabama and would not return until the following evening, they agreed to meet the morning after Glover returned and Crum said he would "hold them off," meaning delay the customers. On another occasion, April 29, 2007, when Glover and Crum had scheduling problems, Crum told Glover that "the peoples couldn't wait that long so they did something else," meaning the customers Crum had went to another supplier.

    4.       During the afternoon of May 9, 2007, there was a series of telephone calls that were intercepted between Glover and the defendant, wherein they arranged to meet in the 4000 block of Branch Avenue. The FBI conducted surveillance in the 4000 block of Branch Avenue and Glover was observed meeting with Crum at 4:30 p.m. At 8:24 p.m., Crum called Glover and the call was intercepted. Crum advised that he was going to be in southwest Washington, D.C., and Glover instructed Crum to call him when he arrived in southwest. At 9:22 p.m., law enforcement observed Crum enter Glover's green Chevrolet pick-up truck, and their conversation was recorded. Crum stated "Like, if you, you, you give me the joint for twenty-four right (a gallon of PCP for $24,000), I'm talking about, I mean 22 right, the water (PCP) right, so the 32 wasn't supposed to be six." Glover explained "I'll give you a whole joint for that, but now if, if I'm gonna give you like a, quarters (32 ounces of PCP) and shit, I'm gonna give em, I, I, I'm still gonna give 'em to you cheaper, but I ain't gonna charge you that much more, because see normally for the quarters I charge seven ($7,000), but for you, I give em to you for like six or 55 ($6,500 or $5,500), you know I can play with that." Crum advised that "55 would be better because that's all I, that's, that's all I can charge." The evidence establishes that Glover met with Crum in southwest, Washington, D.C., and provided Crum with 32 ounces of PCP for a price of $5,500.00, to be paid when Crum sold the PCP. Early in the conversation Crum advised that if the price for a gallon of PCP was $22,000.00, he

should not be charged $6,000.00 for 32 ounces. Glover explained that he normally charges $22,000.00 for a whole gallon, but more when a customer wants smaller quantities or portions of a gallon. Ultimately Glover agreed to charge Crum $5,500.00 for 32 ounces of PCP. Crum indicated that he would be able to pay Glover half of the money the following day after he met with a customer who wanted 16 ounces of PCP, and that he would pay the second half after he sold the remaining 16 ounces of PCP.

  5. On May 16, 2007, law enforcement conducted surveillance of Glover meeting with Crum meeting. Crum entered Glover's Yukon Denali, and then Crum exited the vehicle and departed the area. Glover was observed entering a liquor store after which he started to drive from the area. Glover was then observed parking next to a trash can in front of 4229 Branch Avenue, Marlow Heights, Maryland. Glover retrieved a white bag from the back seat of his vehicle and placed it in the trash can. Glover then returned to his vehicle and departed the area. The white bag was retrieved by law enforcement. The contents of the white bag included a bleach bottle, four 32 ounce clear plastic VitaminWater bottles with a chemical smell consistent with PCP, and four vacuum seal type bags with a chemical smell consistent with PCP.

  6. On May 19, 2007, at 3:11 p.m., Crum called Glover and told him he needed a "fifty joint," (according to the defendant a reference to PCP). They made arrangements to meet at the Marlow Heights Shopping Center and Crum said he was coming from Virginia. Shortly thereafter Glover called Crum and announced he was there (the shopping center) by the Macy's and minutes later Crum called Glover to say he was at the Taco Bell (at the shopping center) and could see Glover by the Macy's. That night at 11:06 p.m., Crum called Glover to tell him he was just coming back and because of the lateness of the hour the agreed to meet the next morning. On this day, Crum

purchased a quantity of PCP from Glover.

7.      On May 23, 2007, Glover and Crum were intercepted in a series of telephones arranging a meeting near the "big chair" on Martin Luther King Boulevard where Glover was getting something to eat. At approximately 2:30 p.m., Crum entered Glover's truck and announced that he needed a gallon of "water" (PCP) and wanted to be sure that Glover had it. Glover assured him he did and they agreed to meet later that day. Shortly after 6:00 p.m. that evening, Glover and the defendant were observed by law enforcement meeting again at which time Glover, who was sitting in his truck, handed a package out the window to Crum. At approximately 6:40 p.m., that evening Crum again entered Glover's truck and they conversed. There ensued a long conversation in which Glover said that the "water" is not that strong so customers could not "cut it" (dilute it for sale to increase the profit margin), but it is still selling in gallons and half gallons. Crum asked who he should deal with when Glover was out of town and Glover said his nephew, Cornell "Tony" Glover, and gave Crum Tony's telephone number. They discussed the various properties where they were investing their narcotics profits and Glover discussed using an apple juice bottle as a container for PCP to disguise the contents.

8.      On June 12, 2007, a grand jury of this court returned an Indictment charging the defendant and others with conspiracy to distribute and possess with intent to distribute more than one kilogram of PCP and more than one kilogram of heroin. The Indictment was returned under seal and pursuant to Fed. R. Crim. P. 9, the presiding magistrate issued warrants for the arrest of each of the indicted defendants. On June 19, 2007, law enforcement conducted a coordinated operation in which the defendant and others were arrested upon those warrants. When defendant was arrested at his home at                                     Apartment B, Alexandria Virginia, a search of his

residence pursuant to a duly authorized search warrant resulted in the recovery of approximately 277 grams of cocaine base, as well as scales, strainers, cutting and packaging paraphernalia, and a Highpoint Model C, .9mm handgun, with Serial No. P213182.

9.     Were this matter to go to trial, the government would present competent evidence that all of the drugs seized in this case were transported to laboratories of the Drug Enforcement Administration, where they were subjected to quantitative and qualitative analysis by a qualified forensic chemist. The chemist would have testified that all of the seized materials were controlled substances as described herein. Moreover, the evidence would have shown that numerous acts in furtherance of the charged conspiracy were committed in the District of Columbia by one or more of the co-conspirators.

          Respectfully submitted,

          JEFFREY A. TAYLOR
          UNITED STATES ATTORNEY

BY: _____
      WILLIAM J. O'MALLEY, JR.
      Assistant United States Attorney

_____
ANTHONY SCARPELLI
Assistant United States Attorney

_____
JOHN HAN
Assistant United States Attorney

### *Defendant's Acceptance*

I have read the ten (10) pages which constitute the government's Proffer of Proof and have discussed it with my attorney, Joanne Vasco, Esquire. I fully understand this proffer and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this agreement fully.

I have reviewed all of the allegations in the indictment relating to narcotics trafficking and I admits that the allegations are true or that I do not have information to dispute or disprove those allegations as set forth in the indictment.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in my plea agreement.

I am satisfied with the legal services provided by my attorney in connection with this proffer and my plea agreement and matters related to it.

Date: 6-11-08

John Franklin Crum
Defendant

### *Attorney's Acknowledgment*

I have read each of the ten (10) pages which constitute the government's Proffer of Proof, reviewed them with my client, and discussed the provisions of the proffer with him, fully. These pages accurately and completely set forth the government's proof as I understand it.

Date: 6-11-08

Joanne Vasco, Esquire
Attorney for the Defendant

10