# U[1]NITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,   :
                                  :

              v.                  :      Criminal No.  07-153 (TFH)
                                  :

LONNELL GLOVER, *et al.*,      :
                    Defendants.     :

## GOVERNMENT'S RESPONSE TO DEFENDANTS'
## SEVERAL MOTIONS TO SUPPRESS THE RESULTS OF
## COURT ORDERED ELECTRONIC SURVEILLANCE

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully responds to defendants' several motions to suppress the fruits of court ordered electronic surveillance conducted in the investigation which led to the defendants' indictment in this matter.  As grounds for its opposition, the government cites the following points and authorities and such other points and authorities as may be cited at any hearing on these motions.

Defendants Lonnell Glover (Documents 232, 291, 292 and 293) and Velma Williams (Document 250) filed motions to suppress the fruits of the government's several Title III interceptions in this matter and the remaining defendants moved to adopt those motions.  Defendant Lonnell Glover's motion contends that the government's first Application for authority to intercept wire communications over Lonnell Glover's cellular telephone was not supported by probable cause and therefore that wiretap was illegal and all subsequent wiretaps were contaminated as fruit of the poisonous tree.  Mr. Glover thus posits that all interceptions subsequent to the February 9, 2008

---

[1]

Application to intercept communications over Glover's cellular telephone must be suppressed.[2] Ms. Williams also raises this argument. In a second motion filed August 4, 2008, defendant Glover complains that Judge Collyer's Order permitting entry into Glover's truck was overbroad. Mr. Glover also contends that the affidavit in support of the request to monitor conversations in and within the vicinity of Glover's pick up truck did not make allegations sufficient to establish the necessity for monitoring those conversations. Finally, Mr. Glover argues that the government did not have the authority to install a geolocation tracking device on his truck. (Document 292.) The defendants are wrong. As we will prove below, the Affidavit in support of the application to monitor Glover's telephone contained more than sufficient facts to justify Judge Collyer's finding of probable cause. Similarly, the affidavit in support of the application to monitor truck conversations met the requirements of the statute.

Ms. Williams correctly notes that interceptions pursuant to Judge Collyer's authorization to intercept communications over Mr. Glover's cellular telephone began on February 9, 2007 and the Application, Affidavit and Orders in Miscellaneous No. 07-MS-065 (RMC) were not **filed** until February 14, 2007. What Ms. Williams fails to note is that those documents were presented to the Court and signed on February 9, 2007 shortly after 6:00 p.m. February 9, 2007 was the Friday of a three day President's Day weekend and the first day thereafter that the Court was open to receive

---

[2] Before addressing defendant Glover's major premise, which premise we deny vigorously, we note here that defendant's analysis is incomplete. He does not attack probable cause to intercept communications over Mr. Suggs' cellular telephone. As such, any communication between Suggs and defendant intercepted over Mr. Suggs' telephone would thus be admissible. Further, such conversations being admissible and untainted by the "poisonous tree," they could, and we submit do, form the basis for probable cause for any and all subsequent Applications and the resultant Orders. The Court need not address this point however since as we will show, defendant Glover's major premise fails completely.

sealed documents was February 13, 2007 when the documents in question were delivered to Judge Collyer's courtroom Deputy. They were obviously filed the following day, February 14, 2007. Nonetheless, the Order was in place on February 9, 2007 when interceptions were commenced and that is all that is necessary to constitute a lawful monitoring of Glover's cellular telephone.

Similarly, Ms. Williams second contention is easily dismissed. She contends that there was a gap between the June 4, 2007 termination date on the Judge Collyer's May order for Glover's cellular telephone and the June 6, 2007 **filing** date for the Court's June Order. Once again, Ms. Williams fails to note that the Order filed June 6, 2007 was signed on June 2, 2007 long before the thirty days authorized under Judge Collyer's May Order had expired.

Finally, defendant Glover claims that Special Agent Pardee's affidavit in this matter contains deliberate falsehoods. As we shall show, defendant Glover's charge is erroneous and irresponsible, motivated by the fact that he has no other basis upon which to challenge the wire in this matter nor, more importantly, given the fruits of the electronic surveillance of his cellular telephone and his pick up truck, does he have any credible claim of innocence, legal or moral.

*Facts*

The Indictment in this matter charges the defendants in several counts, with conspiracy to distribute and possess with intent to distribute phencyclidine and heroin and with certain substantive counts of activity in furtherance of and in relation to that conspiracy in violation of 21 United States Code, sections 846, 844, 841(a)(1), 841(b)(1)(A)(iv) and 841(b)(1)(C), and 18 United States Code, section 922(g)(1), and seeks the forfeiture of assets derived from the criminal conspiracies charged

in the Indictment.[3]   The remaining defendants are charged as co-conspirators in Count One, with

conspiracy to possess and to possess with intent to distribute one kilogram or more of phencyclidine

and one kilogram or more of heroin, in violation of Title 21, United States Code, Sections 846,

841(a)(1) and 841(b)(1)(A)(i) and (iv).  The Indictment charges that the conspiracy opened on or

about August 1, 2005, the exact date being unknown, and continued thereafter up to and including

at least June 12, 2007, in the District of Columbia, the District of Maryland, the Eastern District of

New York, the Southern District of New York, the Southern District of Florida, the Northern District

of Georgia, the Eastern District of Missouri, the Central District of California, and elsewhere.

The greatest part of the government's evidence in this matter is the result of electronic

surveillance conducted in the District of Columbia pursuant to Title 18 United States Code, section

2510, *et seq*., authorized by the Honorable Rosemary M. Collyer of this Court.   Electronic

surveillance conducted pursuant to eleven court orders signed by Judge Collyer[4] resulted in the

interception of 26,444 separate activations and 21,183 completed calls.[5]  An "activation" is a term

---

[3]  The Indictment in this matter is related to the Indictment in *United States v. Suggs, et al.,* Criminal No. 07-152 (ESH), in that both indictments arise from the same investigation and the same series of court authorized interceptions of wire and oral communications.

[4]  Judge Collyer signed Orders on January 9, 2007 (Suggs' cellular telephone),  February 7, 2007 (extension on Suggs' cellular telephone), February 9, 2007 (Glover's cellular telephone), March 9, 2007 (extension on Suggs' and Glover's cellular telephones), March 19, 2007 (Glover's truck), April 5, 2007 (extension on Glover's cellular telephone), April 19, 2007 (extension on Glover's truck),  April 30, 2007 (Williams' cellular telephones), May 4, 2007 (extension on Glover's cellular telephone), May 18, 2007 (extension on Glover's truck), and June 2, 2007 (extension on Glover's cellular telephone).

[5]  These totals include interceptions pursuant to Judge Collyer's authorization to monitor conversations in and within the vicinity of Mr. Glover's truck.  In that case interceptions were accomplished by way of the installation of a hidden cellular telephone which when activated permitted the FBI to monitor conversations in and within the vicinity of Mr. Glover's truck. Thus, every activation of that cellular telephone of necessity involved a completed call and

of art in electronic surveillance which means that the target telephone has been turned on, that is with regard to a cellular telephone, that the send button or its equivalent has been pushed. While every activation does not result in a conversation, the large majority of activations result in an interception of either a conversation, a voicemail message or, while the telephone is activated and acting as a microphone, the interception of a background conversation. When a conversation, a voicemail message or, while the telephone is activated and acting as a microphone, the interception of a background conversation occurs, the result is a completed call, another term of art in electronic surveillance. In other words, a completed call is one in which monitoring results in the seizure of a communication.[6]

While Judge Collyer was considering the government's application to conduct electronic surveillance over defendant Suggs' cellular telephone the Assistant United States Attorneys (AUSA) supervising the conduct of surveillance drafted a memorandum to all monitors entitled General Operating Procedures For Interception Of Wire Communications To and From Cellular Telephone(240) 988-7588,[7] which outlined the procedures for monitoring pursuant to Judge Collyer's order. All monitors were required to read that memorandum before "sitting on the wire." Despite the fact that the vast majority of monitors having previously monitored electronic surveillance and were thus very familiar with the standard procedures, all monitors were required

---

intercepted communication. There were 833 activations in the truck and 833 completed calls.

[6] An uncompleted call is one in which no communication is intercepted. These include hang-ups, calls partially dialed, or calls otherwise not resulting in communication.

[7] Such a memorandum was drafted and distributed to monitors for each of the four distinct surveillances, that is, one each for Suggs' telephone, for Glover's telephone, for Glover's truck and for Williams' telephones and the practice was the same for each line and the "bug."

to attend a "minimization conference," that is, a session lasting approximately an hour in which the Assistants discussed the procedures for minimization in this wiretap. If monitors could not attend the first such session they were required to attend an individual minimization session with one of the two AUSAs supervising the wire. All monitors were also required to read Agent Pardee's affidavit and Judge Collyer's order authorizing interceptions over Mr. Suggs' cellular telephone before sitting. A notebook was maintained in the monitoring room containing the operating memorandum, the affidavit and Judge Collyer's order and before monitoring all personnel were required to certify that they had read the designated documents. As monitoring went forward the AUSAs and the case agents maintained posted notices in the monitoring room identifying those subjects for whom monitoring had developed a pattern of innocence or a pattern of involvement as well as the telephone numbers associated with those persons.

Judge Collyer's order required that during the course of monitoring communications over Suggs' cellular telephone, and indeed over course of monitoring of all the telephones and Mr. Glover's truck, that every 15 days[8] the supervising AUSAs must file a periodic report with the Judge Collyer reporting on progress and compliance with the Court's orders. These reports were filed and indeed, when the reports indicated that the hoped for results were not forthcoming on Ms. Williams' telephones the Court terminated interceptions over those lines, in the case of one telephone, before the thirty day authorization had expired.

---

[8] In other words on the 15th and 30th day of monitoring over a particular telephone or in Mr. Glover's truck, the government had an obligation to report to the Court. Typically when the government filed an application to extend, the Court accepted the accompanying affidavit as fulfilling the obligation for the report on the 30th day.

*The February 9, 2007 Affidavit*

On February 9, 2007, Special Agent Ryan Pardee appeared with Assistant United States Attorneys William J. O'Malley, Jr., and Anthony Scarpelli before Judge RoseMary Cllyer if this Court at her home in northwest Washington, D.C. At that time, Judge Collyer having previously reviewed the documents, Agent Pardee swore to his affidavit and the Assistant United States Attorneys swore to the Application. At 6:09 p.m., Judge Collyer signed the Order authorizing monitoring of defendant Glover's cellular telephone and the Order to the service provider of that cellular telephone compelling the service provider to facilitate the authorized monitoring of Glover's cellular telephone. Shortly thereafter monitoring commenced pursuant to the Court's Order.[9] Thereafter, on March 9, 2007, April 5, 2007, May 4, 2007 and June 2, 2007, Judge Collyer, upon consideration of sworn affidavits and applications, signed Orders authorizing thirty day extensions of authority to intercept conversations over Glover's cellular telephone. On March 19, 2007 Judge Collyer authorized the interception of oral communications in and within the vicinity of Glover's pick up truck and at appropriate intervals thereafter Judge Collyer approved thirty day extensions of the authority to intercept conversations in and within the vicinity of Glover's pick up truck.[10]

---

[9] The "system" and technology have safety valves designed to insure that monitoring does not commence without an order signed by a duly authorized judge. The line agent(s) must deliver a copy of a signed Order and Order to the service provider to the technical section of the Washington Field Office who then transmit the service provider's Order to the service provider with the appropriate codes. Only then will the service provider connect the target telephone to the equipment to commence monitoring.

[10] On April , 2007, Judge Collyer authorized monitoring of wire communications over two telephones used by Ms. Williams. Other than Glover's poisonous tree argument, there is no challenge to monitoring of those telephones. However, the United States has no current plans to utilize interceptions over those lines in any remaining trial of this matter.

Agent Pardee's February 9, 2007 affidavit contains ample probable cause to establish that Lonnell George Glover, Anthony Maurice Suggs, and others were utilizing the cellular telephone bearing telephone number 202-276-4337 (hereinafter "target telephone") and Electronic Serial Number (hereinafter "ESN") 04504160719, to commit the offenses of:  (a)  possession with intent to distribute and distribution of controlled substances, in violation of  Title 21 United States Code Section 841(a)(1), and conspiracy to commit such offenses, in violation of Title 21 United States Code Section 846; and (b) use of communication facilities to facilitate the commission of the above offenses involving controlled substances, in violation of Title 21 United States Code Section 843(b), (c) and the laundering of proceeds of specified unlawful activity *e.g.*, the distribution of controlled substances, in violation of Title 18 United States Code, Sections 1956 and 1957.  The affidavit set out that the target telephone was a prepaid cellular telephone with no known subscriber and service provided by Sprint Nextel (hereinafter also "service provider").  A prepaid telephone is one in which the user purchases the telephone and a finite amount of "air time."  When that air time is exhausted the user may either discard the telephone or purchase additional air time in any one of several ways that do not require the user to identify himself.  Because the user enters into no credit relationship with the service provider,[11] the service provider has no need to identify the user.   Because law enforcement inquiry to the service provider concerning such telephones will result in no identification of the user, such telephones are frequently utilized by narcotics traffickers to evade law enforcement detection.

---

[11]  Such prepaid telephones are not necessarily sold by the service provider but may also be sold by commercial interests which have no involvement in providing service other than selling the telephone.  Indeed, the Court has almost certainly seen such telephones for sale in such commercial facilities as 7-Eleven or kiosks at local shopping malls.

With regard to probable cause the affidavit begins by setting out information which clearly identifies Anthony Maurice Suggs as a narcotics trafficker who sells phencyclidine (PCP) and cocaine. In doing so the affidavit describes for the Court criminal activity of Suggs and persons associated with him in narcotics trafficking. Agent Pardee identifies two cooperating witnesses (CW-1 and CW-2) who were utilized in this investigation and provides the Court with reason to credit the statements of these two persons. CW-1 and CW-2 were utilized by law enforcement in a series of controlled purchases involving Suggs and other members of the conspiracy under investigation. For present purposes we will summarize here the most relevant of those controlled purchases.

**August 23, 2006**

On August 2, 2006, CW-1 was contacted by Suggs. Suggs told CW-1 that he (Suggs) had two gallons of PCP to sell. Suggs was willing to sell the CW-1 as little as sixteen ounces of PCP for $3,500.00, or a gallon for $32,000.00. Suggs also told CW-1 that he would sell CW-1 a kilogram of cocaine hydrochloride for $24,000.00. This meeting is corroborated by telephone toll records indicating calls from Suggs to CW-1 on August 2, 2006. On August 23, 2006, CW-1 met with law enforcement for the purpose of making a controlled purchase of PCP from Suggs. CW-1 met law enforcement at a pre-determined staging location where CW-1 and CW-1's vehicle were searched and found to be free of contraband. CW-1 was then provided with $4000.00 in pre-recorded government funds. CW-1 was also equipped with an audio transmitter and video recorder. At the direction of law enforcement, CW-1 contacted Suggs. CW-1 asked to meet Suggs, and Suggs told CW-1 to meet him at 3536 New Hampshire Ave., N.W., in the District of Columbia.[12]    Law

_____

[12] This is Suggs' grandmother's house.

9

enforcement followed CW-1 from the staging location to 3536 New Hampshire Ave., N.W.  CW-1 met with Suggs and Maurice Williams, and the three went around the corner to a vehicle used by Suggs.  At that time, Suggs sold CW-1 sixteen ounces of PCP in two eight ounce lemon juice bottles for $4,000.00.  CW-1 returned to its vehicle.  CW-1 was then followed back to the staging location where law enforcement recovered the PCP.  CW-1 and CW-1's vehicle were again searched with negative results.  The narcotics were taken to the DEA Mid-Atlantic Laboratory for analysis, where the entire volume was measured and a one ounce sample was examined.  The analysis indicated the substance was PCP.  The sample contained a concentration of 72 mg/mL, with a gross weight of 105.3 grams.

**November 14, 2006**

On November 14, 2006, under direction of law enforcement, CW-1 again contacted Suggs. During the telephone conversation, Suggs asked CW-1 when CW-1 wanted to meet with Suggs for the purposes of purchasing drugs from him.  CW-1 arranged to meet Suggs the following day.  This telephone call was recorded.  On November 15, 2006, CW-1 met with law enforcement for the purpose of making a controlled purchase of cocaine hydrochloride from Suggs.  CW-1 met law enforcement at a pre-determined staging location where CW-1 and CW-1's vehicle were searched and found to be free of contraband.  CW-1 was then provided with $4200.00 in pre-recorded funds. CW-1 was also equipped with an audio transmitter and video recorder.  At the direction of law enforcement, CW-1 again contacted Suggs and the two agreed to meet at 3536 New Hampshire Avenue N.W.  CW-1 was followed from the staging location to 3536 New Hampshire Avenue, N.W. CW-1 met with Suggs at 3536 New Hampshire Ave., N.W., and Suggs sold CW-1 approximately 125 grams of cocaine hydrochloride for $3,000.00.  CW-1 returned to its vehicle, was followed back

by law enforcement to the staging location, and then CW-1 turned over the cocaine hydrochloride and remaining $1,200.00 to law enforcement. CW-1 and CW-1's vehicle were again searched and found to be free of contraband. The narcotics were taken to the DEA Mid-Atlantic Laboratory for analysis, where they were subjected to quantitative and qualitative analysis. The analysis indicated the substance was 81% cocaine with a gross weight of 124.5 grams.

**January 26, 2007**

On January 26, 2007, at the direction of law enforcement, CW-2 contacted James Parker at 202-391-3648 for the purpose of arranging a controlled purchase of narcotics. Parker advised CW-2 that he would call CW-2 back later to talk to CW-2 in person. Monitoring over Suggs line disclosed that Suggs had placed a telephone call to Lonnell Glover at 3:17 p.m., in which Suggs told Glover that he needed to "rap" with Glover. At 3:25 p.m., after receiving the call from CW-2, Parker received a telephone call from Suggs in which Parker told Suggs that he would "be up there later to hollar" at Suggs. At 6:26 p.m., CW-2 placed another telephone call to Parker and in that call Parker told CW-2 that he was still waiting on his car to be returned to him. Relying on this series of calls and other telephone calls that Suggs made and received, the FBI believed that Parker's source of supply, Suggs, was out of PCP and Parker was therefore stalling CW-2. Parker did not contact CW-2 over the remainder of the weekend. Suggs did, however, continue to try and meet with Glover. At 7:56 p.m., Glover called Suggs and the two agreed to meet in the morning. On January 27, 2007, Glover called Suggs and Suggs told Glover that he would be finished at his mother's house in 45 minutes and would call Glover when he got in town. At 1:54 p.m., Parker attempted a telephone call to Suggs. The call was sent to voicemail. At 2:14 p.m., Suggs returned the telephone call to Parker. The two agreed to meet later that day. At 3:55 p.m., Suggs placed a telephone call to Glover in

11

which the two agreed to meet at a grocery store in Maryland.  At 4:30 p.m., Glover called Suggs.  The call was sent to voicemail.  Glover asked Suggs to call him.  At 4:33 p.m., Glover again called Suggs and again the call was sent to voicemail.  Glover again asked Suggs to call him.  At 4:35 p.m., Suggs called Glover and told Glover that he was stuck at the store and the two should meet in Washington, D.C.  At 4:59 p.m., Suggs made an outgoing call to Glover.  During this call, Glover told Suggs that he was on 12th Street.  Suggs told Glover that he was on the corner of 12th and G Streets.  Shortly thereafter, Suggs was observed by surveillance units at the corner of 12th and G Streets, N.W., Washington, D.C.  Later, at 5:34 p.m., Suggs spoke with Julian Johnson.  Johnson asked Suggs if the "tickets" had come in yet.  Suggs told Johnson that they hadn't come in and, that in fact, Suggs had just met with "his little partner" regarding that matter.  At 7:24 p.m., Parker called Suggs and left a voicemail for Suggs to call him.  At 7:28 p.m., Suggs spoke in code and told Parker to meet him at a prearranged location.  At 7:42 p.m., Parker called Suggs and told him that he had arrived at the location.  Based upon his training and experience in this and other drug trafficking investigations, Agent Pardee reasonably believed that in light of the ongoing activity involving CW-2's attempt to arrange a controlled purchase of drugs from Parker and Lonnell Glover's confirmed role as Suggs' supplier, *infra,* pp. 14-16*,* that in this series of telephone calls Glover was utilizing his telephone to facilitate his ongoing narcotics trafficking activity, in this instance to arrange a meeting to discuss with Suggs the question of supplying "tickets," that is, PCP, to Suggs for distribution to Parker and ultimately to CW-2.

These controlled purchases established beyond peradventure that Suggs was trafficking in PCP and provided clear probable cause to believe not only that Glover was his supplier in this endeavor, but also that Glover was utilizing his telephone to facilitate his narcotics trafficking

activities. However, the FBI's investigation in this matter did not stop here nor was this all that was supplied in the Pardee affidavit of February 9, 2007.

As previously indicated, monitoring of Suggs' cellular telephone pursuant to Judge Collyer's Order of January 9, 2007 had been ongoing for some time when the February 9th affidavit was submitted to Judge Collyer in support of the application to monitor Glover's cellular telephone. The affidavit reported some of those intercepted calls as well. Lonnell Glover was first intercepted on January 10, 2007, at 5:42 p.m., when Suggs called the target telephone[13]. Glover stated that he had people working at his house and was therefore unable to "do no moving around right now." Suggs acknowledged that Glover had previously told him that he would be busy and Glover agreed to call Suggs. On January 10, 2007, at 9:14 p.m., Suggs received a call from Julian Johnson. During the call Suggs advised Johnson that they would meet the following day. These telephone conversations between Glover and Suggs and Suggs and Johnson clearly relate to their shared narcotics trafficking activity. That Glover supplies Suggs with PCP is established by activity reported later in his the affidavit and referenced by Pardee at this point. That Johnson is in turn supplied PCP by Suggs was established by numerous telephone conversations intercepted during the court ordered monitoring of Suggs. Based upon his training and experience in this and other narcotics investigations, your affiant understands that in these conversations Glover is utilizing the target telephone to facilitate his ongoing narcotics trafficking activity. Specifically Pardee understood from the call between Suggs and Glover and the calls between Suggs and Johnson, that when Suggs anticipated meeting with Glover and receiving PCP from Glover, he informed Johnson that they would be able to meet

---

[13]   In Pardee's February 9th affidavit and in this Opposition references to the target telephone are references to Glover's cellular telephone, the telephone bearing telephone number 202-276-4337.

later in the day. However, when Glover was unable to supply Suggs with PCP, Suggs then told Johnson that he would not be able to supply Johnson with PCP until the following day.

On January 14, 2007, at 4:10 p.m., Suggs called the target telephone and said ". . . I need to see you Unc whenever you're ready to see me." Glover and Suggs then agreed to meet in approximately fifteen to twenty minutes and used coded language to confirm the prearranged location. At 5:21 p.m., Suggs called Glover again on the target telephone and Glover said he was about five minutes away from the meeting location. Suggs responded, "I'm sitting right here." Pardee understood that in these conversations Suggs and Glover were using the target telephone to make arrangements for a meeting in which Glover will supply Suggs with PCP. On January 18, 2007, at 2:33 p.m., Suggs placed a call to the target telephone. Glover asked Suggs to wait until 4:00 or 5:00 p.m., and Suggs agreed. At 4:15 p.m., Suggs received a call from the target telephone and in that call Suggs and Glover agreed to meet in an hour. At 5:26 p.m., Suggs again called Glover on the target telephone and they agreed to meet in fifteen to twenty minutes. At 6:20 p.m., a spot check was conducted at Bladensburg Road and Channing Street, N.E., Washington, D.C., and Suggs' Chevrolet Tahoe bearing Maryland tag 865M412 was observed parked on Bladensburg Road. A pick-up truck bearing a DC tag ending in 0597 was parked directly in front of the Tahoe.[14] A 6:24 p.m., the Tahoe and the pick-up truck drove south on Bladensburg Road. Pardee understood from the conversations and surveillance as well as the events of January 14, 2007 and January 20, 2007 that in this meeting Suggs met with Glover to pay for PCP already supplied and to discuss further

---

[14]  The FBI knew that Glover owned a 1998 Chevrolet pickup truck with District of Columbia registration BZ0597 and VIN 1GCGK29R0WE126375 which was registered to Lonnell G. Glover at 1820 M Street, N.E., Washington, D.C., 20002. Given the considerable efforts Suggs and Glover made to avoid detection it was determined that to maneuver to observe the full tag on the pick up would risk exposing the surveillance.

PCP transactions.

On January 19, 2007, at 10:23 p.m., Suggs called the target telephone to talk to Lonnell Glover and they agreed to meet the following day when Suggs finished working. Then, on January 20, 2007, at 11:31 a.m., Suggs called Glover on the target telephone. Glover told Suggs that he was on his way to Home Depot on St. Barnabas Road and they agreed to meet there. At 11:52 a.m., surveillance units observed Suggs' Tahoe bearing Maryland tag 865M412 in the Home Depot parking lot. At 12:13 p.m., the Tahoe drove out of a parking space and left the area. A black male wearing a denim jacket and a baseball cap was seen walking away from the Tahoe. At 12:20 p.m., the black male was observed getting into a green Chevrolet pick-up truck bearing District of Columbia tag BZ-0597, that is, Glover's pick up truck.

On January 23, 2007, at 5:29 p.m., Suggs called Julian Johnson. Suggs said "some more of that real estate is suppose to be back in this weekend." Based upon his training and experience in this and other investigations, Pardee believed that Suggs informed Johnson that he did not have drugs, but expected to receive drugs the following weekend. At 9:09 p.m., Suggs received a call from Johnson, and he advised Johnson that he was going to Tyson's this weekend "and look at them North Face coats." Johnson then asked Suggs if "he is normally a man of his word." Johnson also commented that "he gonna have a mother fucker gonna jump on him uh aircraft." Pardee understood that as in the 5:29 p.m. call, Suggs again informed Johnson that he expected to receive additional drugs the following weekend and further, that Johnson's comment indicated that the source of supply of PCP is located outside the Washington, DC metropolitan area.

**January 20, 2007**

On January 19, 2007, at the direction of law enforcement CW-1 made several consensually monitored attempts to contact Suggs by telephone to arrange a purchase of PCP from Suggs. Those calls went unanswered and Pardee, based upon his training and experience in this investigation and his understanding of the relationship between Suggs and CW-1, believed that Suggs, because his "caller ID" function told him it was CW-1 calling, did not answer CW-1's calls because he had no PCP to sell to CW-1. In fact, CW-1's and Suggs' relationship is confined almost entirely to their drug trafficking activity in which Suggs supplied PCP for which CW-1 paid upon delivery. Eventually, after law enforcement sent CW-1 into the neighborhood of Suggs' grandmother's house, Suggs called CW-1 and they met. At the meeting Suggs put CW-1 off when CW-1 asked to purchase PCP.

Based upon communications intercepted on January 20, 2007 in which Suggs and Glover arranged a meeting, surveillance was conducted by law enforcement at Home Depot in Oxon Hill, Maryland. During this surveillance, a vehicle belonging to Anthony Suggs was observed in the parking lot. At 12:13 p.m., Suggs' vehicle was observed leaving the parking lot, while a black male, later identified as Lonnell Glover was observed walking away from Suggs' vehicle. At approximately 12:19 p.m., Anthony Suggs attempted a telephone call to CW-1 from a second telephone belonging to Suggs. That telephone, 202-420-9847, was subscribed to Kelly Smith and was a number over which CW-1 frequently called or received calls from Suggs and Pardee believed was a second cellular telephone utilized by Suggs. Pardee knew from CW-1 that almost all of CW-1's interaction with Suggs concerned narcotics trafficking. The telephone call went unanswered. Because law enforcement believed that Suggs had just been supplied with PCP by Glover, CW-1 was

16

directed by law enforcement to contact Suggs at 202-420-9847. That telephone call was recorded. Shortly thereafter, CW-1 met law enforcement at a pre-determined staging location where CW-1 and CW-1's vehicle were searched and found to be free of contraband. CW-1 was then provided with $4,000.00 in pre-recorded funds. CW-1 was also equipped with an audio transmitter and video recorder. At the direction of law enforcement, CW-1 again contacted Suggs. CW-1 and Suggs agreed to meet at 3536 New Hampshire Avenue, N.W. CW-1 was followed from the staging location. While en route to that location, Suggs told CW-1 to meet him at another location nearby. Suggs sold CW-1 approximately sixteen ounces of PCP for $4,000.00.[15] CW-1 returned to its vehicle, was followed back by law enforcement to the staging location, and then CW-1 turned over the PCP. CW-1 and CW-1's vehicle were again searched and found to be free of contraband. Considering CW-1's attempts to contact Suggs and Suggs' determination to delay a cash sale, Suggs meeting with Glover and his almost immediate attempt to contact CW-1 followed by his distribution of 16 ounces of PCP to CW-1, Pardee believed that it was clear that Glover supplied PCP to Suggs who then had PCP to supply to CW-1, PCP Suggs did not have the night before.

On January 21, 2007, at 2:49 p.m., Suggs used the target telephone to call Lonnell Glover. Suggs indicated that he wanted to "rap" to Glover and they agreed to meet at 3:30 p.m. At 2:51 p.m., Suggs used the target telephone to call Glover a second time and used coded language to confirm that they would be meeting at a prearranged location. At 4:03 p.m., Suggs received a call on the target telephone from Glover who advised he was on his way. At 4:04 p.m., Suggs used the target

---

[15]  In that call intercepted pursuant to this Court's January 8, 2007 Order Suggs advised CW-1 that he was concerned about a Jeep Cherokee parked near 3256 New Hampshire Avenue, N.W. In fact law enforcement conducting surveillance in the vicinity of that address was stationed in a Jeep Cherokee and observed Suggs drive by at about the time he changed the meeting site.

telephone to call Glover and offered to drive closer to Glover's location. Glover said that was not necessary and Suggs said he would wait. Based his knowledge that Glover supplied PCP to Suggs on January 20, 2007, Pardee understood that in this meeting Suggs met with Glover to pay for PCP already supplied and to discuss further PCP transactions.

The affidavit also contained a discussion of the results of an analysis of pen register and air time records for Glover's cellular telephone.

### Installation of the Monitoring Device in Glover's Truck

On March 19, 2007, Judge Collyer reviewed Agent Pardee's affidavit in support of a request to monitor conversations in and within the vicinity of defendant Lonnell Glover's 1998 Chevrolet pickup truck with District of Columbia registration BZ0597 and Vehicle Identification Number (VIN) 1GCGK29R0WE126375. Having reviewed the Application, Affidavit and accompanying Orders, Judge Collyer signed the Orders. The following day, March 20, 2007 the Judge Collyer signed an Amended Order permitting the FBI to recover geolocation information regarding the truck.

With regard to the collection and use of GPS information in this electronic surveillance and the installation, maintenance and repair of the listening device, we think it is important that the Court understand that the interceptions in this matter were made by the use of a cellular telephone hidden in the pickup truck and hard-wired to the truck's electrical system. GPS information was collected by the telephone and transmitted to the FBI by the same telephone. Because of the manner in which the cellular telephone operates, the telephone could not transmit oral communications and GPS information simultaneously. Thus, in order to use the GPS function agents monitoring the line must terminate or interrupt and interception to utilize the GPS function. More importantly, for purposes of geolocation information Judge Collyer did not authorize the installation of a tracking device, she

18

authorized the installation of a listening device (a cellular telephone) which device by law must have a geolocation capacity, and then authorized the monitoring of that geolocation capacity.

Judge Collyer signed the Order in this matter on March 19, 2007. At that time Glover was out of the area and his pickup truck was parked at Thurgood Marshall BWI Airport. Our first effort to install the monitoring device was unsuccessful. When the FBI arrived at the parking lot at BWI and located the truck, before any entry was made into the truck it was determined by the FBI technicians that there was an alarm installed on the truck that they were not equipped to over-ride. Because the FBI knew the time of Glover's scheduled return, it was determined to abandon the effort and return with the proper equipment on the following day. On March 20, 2007, the alarm was disarmed and the listening device was successfully installed while the vehicle remained in the parking spot where Glover left it when he flew out of BWI. At no time on March the 19th was the truck entered. At no time on March 19th or 20th was the truck ever moved from the parking spot where Glover left the truck. Following the entry to install the listening device on March 20, 2007, because the device was entirely powered by the truck's electrical system and never malfunctioned, there was never any reason to re-enter the truck and the truck was not re-entered by law enforcement until it was seized following Glover's arrest on June 19, 2007.

Because interceptions were possible following the installation on March 20th and despite the fact that the truck was unoccupied in a parking lot at BWI, we counted March 20, 2007 as the first day of interception. Glover was to return to the area late on March 21st and did so but did not reach his truck until after midnight. As a result there were no interceptions on days 1 and 2 of monitoring. On March 28, 2007, Lonnell George Glover took his truck in for repairs. During the period from March 28, 2007 until some time on April 3, 2007, the truck was not being used by Glover and the

monitoring device was not activated.  Glover picked up the truck on April 3, 2007 and, based upon

the nature and type of conversations in the truck thereafter, we do not believe that the monitoring

device was detected during this period.[16]

*Argument*

*A.  The Affidavits Presented to Judge Collyer Contained Ample*
*Probable Cause to Justify Monitoring Lonnell Glover's Cellular Telephone*

Probable cause to search a particular place exists if an issuing magistrate finds, based on "a

practical, common-sense" evaluation of the affidavit in support of the warrant, that there is a "fair

probability that contraband or evidence of a crime will be found in [that] place." *Illinois v. Gates,*

462 U.S. 213, 238 (1983).  The probable cause standard "does not deal with hard certainties, but with

probabilities," and law enforcement officers are entitled to "formulate[] certain common-sense

conclusions about human behavior." *Id.* at 231 (quoting *United States v. Cortez*, 449 U.S. 411, 418

(1981)).  Accordingly, the facts presented to the magistrate need only "warrant a man of reasonable

caution" in the belief that evidence of a crime will be found; there is no requirement "that such a

belief be correct or more likely true than false." *Texas v. Brown,* 460 U.S. 730, 742 (1983) (plurality

opinion).

For the issuance of a wiretap order, probable cause is present if the totality of the

circumstances reveals that there is a fair probability that a wiretap will uncover evidence of a crime.

*United States v. Fairchild*, 189 F.3d 769 (8th Cir. 1999).  In dealing with a challenge to the

government's showing of probable cause in an application to conduct wire surveillance pursuant to

---

[16]  The device was located in an area of the truck which would not ordinarily be involved in normal or maintenance repairs and the wiring to the trucks electrical system was done in a manner which would not normally be discovered.

18 United States Code, § 2510, et seq., the Seventh Circuit Court off Appeals said

> Under this test, "[t]he task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the [judge] had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Illinois v. Gates,* 462 U.S. at 238-39, (quoting *Jones v. United States,* 362 U.S. 257, 271, (1960)).

*United States v. Zambrana*, *supra,* 841 F.2d 1320, 1332 (7th Cir. 1988). The standard for probable cause under Title III is identical to that under the Fourth Amendment. *United States v. Zambrana*, *supra*; *United States v. Gotti*, 399 F3d 214 (S.D.N.Y. 2005); *United States v. Mares-Martinez*, 240 F. Supp.2d 803 (N.D. Ill. 2002); *United States v. Santana*, 218 F. Supp.2d 53 (D. N.H. 2002); *United States v. Aparo*, 221 F.Supp.2d 359 (E.D.N.Y. 2002)(citing *United States v. Fury*, 554 F.2d 522 (2d Cir. 1977)). In determining whether to issue a wiretap order, the District Court judge may find probable cause is present if the totality of the circumstances reveals that there is a fair probability that a wiretap will uncover evidence of a crime. *United States v. Fairchild*, 189 F.3d 769 (8th Cir. 1999). The Supreme Court in *Gates* also cautioned that "after-the-fact scrutiny by courts of an affidavit should not take the form of *de novo* review," and that the "Magistrate's determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates,* 462 U.S. 213, 236 (1983). That deference is particularly warranted here given that the wiretap orders were issued by a district court judge.

It is true as well that the District Court reviewing the instant application for wiretap authority magistrate was also entitled to give weight to Agent Pardee's experience. *See Texas v. Brown,* 460

U.S. at 742-743 (plurality opinion). The courts of appeals, moreover, are generally in agreement that a magistrate issuing a search warrant or, we submit, a District Court reviewing an application for wiretap authority, may rely on averments in a law enforcement agent's affidavit, based on his training and experience, that evidence of certain crimes is likely to be kept in a particular place, such as the suspect's residence or automobile. Similarly where, as here, the agent sets out his training and experience for the District Court's review, the Court is entitled to rely upon the agent's explanation of the meaning of coded language in drug cases. Other courts of appeals have upheld search warrants in matters where an affiant's averment as to the meaning of certain facts or practice in particular areas of crime. *See, e.g., United States v. Luloff*, 15 F.3d 763, 768 (8th Cir. 1994) (upholding warrant based on agent's averment that "drug traffickers often keep in their residences records of their illicit activity"); *United States v. Thomas*, 989 F.2d 1252, 1254 (D.C. Cir. 1993) (per curiam; Wald, R.B.Ginsburg & Sentelle, JJ.) (officer observed defendant engaging in drug trafficking in a different part of the city from where the defendant resided; court noted that "observations of illegal activity outside the home can provide probable cause for the issuance of a search warrant for a suspect's house, even in the absence of an allegation that any illegal activity occurred in the home itself"); *United States v. Williams*, 974 F.2d 480, 481-482 (4th Cir. 1992) (evidence that defendant was a drug dealer and was currently residing in a motel room supported warrant to search that room); *United States v. $149,442.43 in United States Currency,* 965 F.2d 868, 874 (10th Cir. 1992) (search warrant was issued based on agent's affidavit that "drug records are commonly kept where dealers have ready access to these documents"; holding that "[w]here a suspect has no place of business separate from his residence, it is reasonable for an officer to conclude that evidence may be at the suspect's residence"); *United States v. Lamon*, 930 F.2d 1183,

1189 (7th Cir. 1991) (search warrant based on agent's affidavit that "drug dealers often store drugs and drug paraphernalia in their automobiles"); *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986) ("A magistrate is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of the offense. In the case of drug dealers, evidence is likely to be found where the dealers live.").

One final point with regard to probable cause we think is very important here. Defendant's subliminally urge upon the Court an incorrect analysis of the facts. In reviewing the averments in Agent Pardee's affidavit, defendants ask the Court to assess Agent Pardee's understanding of any event cited without due reference to other facts and circumstances known to Agent Pardee at the time he made those averments. Agent Pardee expressed his understanding of the events discussed in his affidavit at the time he swore to that affidavit. Thus when Agent Pardee explained to Judge Collyer on February 9, 2007 what he understood concerning statements and activity of defendants Suggs and Glover on January 10, 2007 or January 14, 2007, it was with full knowledge of the events of January 19 and 20, 2007. Thus, not only is Agent Pardee's understanding instructed by his training and experience in other cases, it is also instructed by his experience in this case as recited in his "mantra." Indeed, there are at least five cites in the affidavit to facts set out elsewhere in the affidavit.[17]

In point of fact, the events of January 19, 2007 and January 20, 2007, are critical to an understanding of what Glover and Suggs are doing, their relationship to each other in their common efforts, their use of the telephone (and in particular the target telephone) in those efforts and probable cause in this matter. We begin with the fact, set out in Pardee's affidavit, that CW-1 and Suggs have

---

[17]  *See*, Affidavit of Agent Pardee, February 9, 2007, ¶¶ 28, 31, 35 and 36.

a relationship that centers almost entirely around CW-1's purchase of drugs from Suggs.  On January

19th CW-1, at the FBI's direction made several calls to Suggs on the telephone being monitored by

the FBI at the time of CW-1's calls.  The calls from CW-1 on January 19, 2007 were not answered

and based on other calls that day and the nature of CW-1's relationship with Suggs, Agent Pardee

understood that Suggs did not answer the calls because Suggs had no drugs and knew that drugs was

the only reason CW-1 would call Suggs.  Based on calls to Glover who was using the target

telephone, Pardee knew that Suggs and Glover were planning to meet on January 20, 2007.  On that

date the FBI established surveillance of Suggs.

> At 11:52 a.m., surveillance units observed SUGGS' Tahoe bearing
> Maryland tag 865M412 in the Home Depot parking lot.  At 12:13
> p.m., the Tahoe drove out of a parking space and left the area. A
> black male wearing a denim jacket and a baseball cap was seen
> walking away from the Tahoe.  At 12:20 p.m., the black male was
> observed getting into a green Chevrolet pick-up truck bearing DC tag
> BZ-0597.  The Chevrolet pick-up truck is registered to LONNELL
> GLOVER, date of birth October 3, 1961, at 1820 M Street, N.E.,
> Washington, D.C.

Pardee Affidavit, February 9, 2007, ¶ 32.  At 12:19 p.m., almost immediately after Suggs left the

parking lot where he met with Glover, Suggs placed a call to CW-1 which CW-1 received but

knowing from his "caller ID" feature that the call was from Suggs, CW-1 did not answer the call.

> Because law enforcement believed that SUGGS had just been
> supplied with PCP by GLOVER, CW-1 was directed by law
> enforcement to contact SUGGS at 202-420-9847.  That telephone call
> was recorded.  Shortly thereafter, CW-1 met law enforcement at a
> pre-determined staging location where CW-1 and CW-1's vehicle
> were searched and found to be free of contraband.  CW-1 was then
> provided with $4,000.00 in pre-recorded funds.  CW-1 was also
> equipped with an audio transmitter and video recorder.  At the
> direction of law enforcement, CW-1 again contacted SUGGS. CW-1
> and SUGGS agreed to meet at 3536 New Hampshire Avenue, N.W.

CW-1 was followed from the staging location. While en route to that location, SUGGS told CW-1 to meet him at another location nearby. SUGGS sold CW-1 approximately sixteen ounces of PCP for $4,000.00.[18] CW-1 returned to its vehicle, was followed back by law enforcement to the staging location, and then CW-1 turned over the PCP. CW-1 and CW-1's vehicle were again searched and found to be free of contraband.

Pardee Affidavit, February 9, 2007, ¶ 35. These circumstances clearly and unequivocally set out probable cause to believe that Glover supplied PCP to Suggs which Suggs, in turn, sold to CW-1. Glover's activity in this sale was all arranged through a series of telephone calls using the target telephone to speak to Suggs. More importantly, it is the lens through which Agent Pardee examines and analyzes Suggs and Glover's communications intercepted over Suggs' telephone. And, because Agent Pardee repeatedly made Judge Collyer aware of the fact that the events of January 19 and 20, 2007, were central to his understanding of the communications between Glover and Suggs, Judge Collyer had a more than adequate basis upon which to assess probable cause in Agent Pardee's February 9, 2007 affidavit in this matter.

However, the events of January 19 and 20, 2007, were not the only basis for determining that there was probable cause to believe that Mr. Glover was using the target telephone to facilitate his illegal narcotics trafficking activities.

On January 26, 2007, at the direction of law enforcement, CW-2 contacted JAMES PARKER at 202-391-3648 for the purpose of arranging a controlled purchase of narcotics. PARKER advised CW-2 that he would call CW-2 back later to talk to CW-2 in person. This

---

[18]  In that call intercepted pursuant to this Court's January 8, 2007 Order SUGGS advised CW-1 that he was concerned about a Jeep Cherokee parked near 3256 New Hampshire Avenue, N.W. In fact law enforcement conducting surveillance in the vicinity of that address was stationed in a Jeep Cherokee and observed SUGGS drive by at about the time he changed the meeting site.

telephone call was made after SUGGS had placed a telephone call to
LONNELL GLOVER at 3:17 p.m., wherein SUGGS tells GLOVER
that he needs to "rap" with GLOVER.  At 3:25 p.m., PARKER
received a telephone call from SUGGS wherein PARKER tells
SUGGS that he will "be up there later to hollar" at SUGGS.  At 6:26
p.m., CW-2 placed another telephone call to PARKER wherein
PARKER told him that he was still waiting on his car to be returned
to him.  Based upon other telephone calls that SUGGS made and
received, your affiant believes that PARKER's source of supply,
SUGGS, was out of PCP and PARKER was therefore stalling CW-2.
PARKER did not contact CW-2 the remainder of the weekend.
SUGGS did, however, continue to try and meet with GLOVER.  At
7:56 p.m., GLOVER called SUGGS and the two agreed to meet in the
morning.  On January 27, 2007, GLOVER called SUGGS and
SUGGS told GLOVER that he would be finished at his mother's
house in 45 minutes and would call GLOVER when he got in town.
At 1:54 p.m., PARKER attempted a telephone call to SUGGS.  The
call was sent to voicemail.  At 2:14 p.m., SUGGS returned the
telephone call to PARKER.  The two agreed to meet later that day.
At 3:55 p.m., SUGGS placed a telephone call to GLOVER where the
two agreed to meet at a grocery store in Maryland.  At 4:30 p.m.,
GLOVER called SUGGS. The call was sent to voicemail. GLOVER
asked SUGGS to call him.  At 4:33 p.m., GLOVER again called
SUGGS. The call was sent to voicemail. GLOVER again asked
SUGGS to call him.  At 4:35 p.m., SUGGS called GLOVER and told
GLOVER that he was stuck at the store and the two should meet in
Washington, D.C.  At 4:59 p.m., SUGGS made an outgoing call to
GLOVER.  During this call, GLOVER told SUGGS that he was on
12th Street.  SUGGS told GLOVER that he was on the corner of 12th
and G Streets.   Shortly thereafter, SUGGS was observed by
surveillance units at the corner of 12th and G Streets, N.W.,
Washington, D.C.  Later, at 5:34 p.m., SUGGS spoke with JULIAN
JOHNSON, wherein JOHNSON asked SUGGS if the "tickets" had
come in yet. SUGGS told JOHNSON that they hadn't come in and,
that in fact, SUGGS had just met with "his little partner" regarding
that matter.  At 7:24 p.m., PARKER called SUGGS and left a
voicemail for SUGGS to call him.  At 7:28 p.m., SUGGS spoke in
code and told PARKER to meet him at a prearranged location.  At
7:42 p.m., PARKER called SUGGS and told him that he had arrived
at the location.  Based upon my training and experience in this and
other drug trafficking investigations, your affiant believes that in light
of the ongoing activity involving CW-2's attempt to arrange a
controlled purchase of drugs from PARKER and LONNELL

26

> GLOVER's confirmed role as SUGGS' supplier, see ¶ 34, *infra,* that in the above-described telephone calls with GLOVER, GLOVER is utilizing the target telephone to facilitate his ongoing narcotics trafficking activity, in this instance to arrange a meeting to discuss with SUGGS the question of supplying "tickets," that is, PCP, to SUGGS for distribution to PARKER and CW-2.

Pardee Affidavit, February 9, 2007, ¶ 23.   Agent Pardee had a more than ample basis to interpret these events as he did and that basis was set out for Judge Collyer in his affidavit.   In the first instance, on January 4, 2007, Pardee and other FBI agents and law enforcement officers conducted a controlled purchase with Parker.   On January 4, 2007, at the direction of law enforcement, CW-2 contacted James Parker for the purpose of arranging a controlled purchase of narcotics.   Parker and CW-2 agreed to meet at a prearranged location to discuss the sale of narcotics to CW-2. CW-2 was then provided with a vehicle and $4,000 in prerecorded funds. CW-2 was searched, as well as the vehicle that CW-2 was driving and found to be free of contraband.   CW-2 then drove to meet Parker at a prearranged location.   During this meeting, Parker told CW-2 that he might be able to sell CW-2 twelve ounces of PCP for $3,500.00  CW-2 and Parker agreed to meet later.   CW-2 later met with Parker and Parker told him that he was only able to obtain eight ounces of PCP, but could get the remaining four ounces of PCP the following morning.   Parker then left the area of CW-2's vehicle and walked to a nearby vehicle.   Parker was observed entering a vehicle belonging to Anthony Suggs.  Parker returned a couple of minutes later to the vehicle being driven by CW-2 with the eight ounces of PCP.  Pen register data indicated that after first being contacted about this sale by CW-2, Parker made or received a total of 15 telephone calls involving Anthony Suggs.

As the Supreme Court made clear in *Gates* :

> Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a "practical, nontechnical conception." *Brinegar v. United States,* 338 U.S. 160 (1949). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.,* at 175. Our observation in *United States v. Cortez,* 449 U.S. 411(1981), regarding "particularized suspicion," is also applicable to the probable cause standard:
>
>> the magistrate must be informed of *some of the underlying circumstances* from which the informant concluded that ... narcotics were where he claimed they were, and *some of the underlying circumstances* from which the officer concluded that the informant ... was 'credible' or his information 'reliable.' "
>
> \*          \*          \*          \*          \*
>
> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same-and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*Illinois v. Gates, supra*, 462 U.S. at 231-32. Agent Pardee's affidavit when assessed under any reasonable standard, but certainly when assessed upon the *Gates* standard of "a practical, common-sense" approach to the facts set out in the affidavit, sets out ample probable cause to justify the authorization of interceptions over the target telephone.

### B. Defendants Have Not Established Any Basis to Challenge the Affidavit Pursuant to Franks

Defendants next assert that Agent Pardee made a series of "conclusory, false, reckless and misleading statements in the affidavit." Quoting paragraph 28 of the affidavit in which Agent Pardee said,

> LONNELL GLOVER was first intercepted on January 10, 2007, at
> 5:42 p.m., when SUGGS called the target telephone. GLOVER stated
> that he had people working at his house and was therefore unable to
> "do no moving around right now."  SUGGS acknowledged that
> GLOVER had previously told him that he would be busy and
> GLOVER agreed to call SUGGS.  On January 10, 2007, at 9:14 p.m.,
> SUGGS received a call from JULIAN JOHNSON.  During the call
> SUGGS advised JOHNSON that they would meet the following day.

Defendant Glover goes on to say, "Agent Pardee somehow concludes that these telephone conversations between GLOVER and SUGGS and SUGGS and JOHNSON *clearly relate* to their shared narcotics trafficking activity."  Defendant Glover's Motion, p. 7.  There is no "somehow" about it.  Agent Pardee's affidavit spelled out exactly how he arrived at this conclusion when he went on in that same paragraph to say,

> These telephone conversations between GLOVER and SUGGS and
> SUGGS and JOHNSON clearly relate to their shared narcotics
> trafficking activity.  That GLOVER supplies SUGGS with PCP is
> established by the activity set out in ¶ 34, *infra*.  That JOHNSON is
> in turn supplied PCP by SUGGS is established by numerous
> telephone conversations intercepted during the court ordered
> monitoring of SUGGS, see *e.g.* ¶¶ 23 and 27, *supra*, and ¶ 33 *infra*.
> Based upon my training and experience in this and other narcotics
> investigations, your affiant understands that in these conversations
> GLOVER is utilizing the target telephone to facilitate his ongoing
> narcotics trafficking activity.  Specifically your affiant understands
> from the call between SUGGS and GLOVER and the calls between
> SUGGS and JOHNSON, that when SUGGS anticipated meeting with
> GLOVER and receiving PCP from GLOVER, he informed
> JOHNSON that they would be able to meet later in the day.
> However, when GLOVER was unable to supply SUGGS with PCP,
> SUGGS then told Johnson that he would not be able to supply
> Johnson with PCP until the following day.

Pardee Affidavit, paragraph 28.  Defendants mistake here lies in their failure to acknowledge what is clear from the language cited above, that is, that in interpreting these calls and communicating his understanding of the content of the conversation there, Agent Pardee relies on his "training and

experience in **this** and other cases." His experience in this case is not limited to what he knew when the conversation occurred. It includes what he knew when he offered his opinion to Judge Collyer, in effect, his opinion benefits from the luxury of 20/20 hindsight. That this is so could not be clearer from exactly what Agent Pardee said. On February 9, 2007, Agent Pardee explained to Judge Collyer his understanding of statements by Glover, Suggs and Johnson made on January 10, 2007 relying on events occurring on January 26, 2007 (paragraph 23), January 10, 2007 (paragraph 27), January 23, 2007 (paragraph 33), and January 19 and 20, 2007 (paragraph 34). There is no mystery, no "somehow" about it.

Defendant goes on to conclude that similar facts and Agent Pardee's conclusions there from also represent "conclusory, false, reckless and misleading statements in the affidavit." Defendants are under the mistaken impression that their fulsome expressions of incredulity are all that is necessary here. They are wrong.

**The Legal Standard**

The test for reviewing the allegation that a warrant was based on a false affidavit derives from the United States Supreme Court's decision in *Franks v. Delaware,* 438 U.S. 154 (1977). While the precise question in *Franks* was whether the defendant was entitled to an evidentiary hearing on the issue of falsity in the face of Delaware law to the contrary, having determined that the defendant was entitled, the Supreme Court went on to set out the parameters of such an inquiry. Subsequent judicial decisions have applied the *Franks* test in ruling on the validity of the warrant even after the facts relating to the alleged falsity of the supporting affidavit have been determined. *United States v. Richardson,* 861 F. 2d 291, 293 n. 2 (D.C. 1988) (citations omitted), *cert. denied,* 489 U.S. 1058 (1989). Thus the test to be applied as to whether the defendant is entitled to an

evidentiary hearing on the issue of the alleged falsity of the statements in the affidavit, or whether statements proven to be untrue invalidate the warrant, is the same. There is a "presumption of validity" which applies to such affidavits, and the rule announced in *Franks* with respect to an evidentiary hearing "has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded." *Franks v. Delaware, supra,* 438 U.S. at 167. To merit an evidentiary hearing a defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit" and that "the allegedly false statement is necessary to the finding of probable cause" *Franks v. Delaware, supra,* 438 U.S. at 155-156. *See also United States v. Richardson, supra*, 861 F. 2d at 293. The defendant must make a substantial showing therefore that three facts are true. First, that the affidavit contains a false statement. Second, that the absence of the false statement in the affidavit would negate probable cause. And third, that the affiant made the false statement with the requisite *scienter*, that is, knowingly or with a reckless disregard for the truth. *United States v. Richardson, supra*, 861 F.2d at 293-294.

**The Defendant Is Not Entitled to an Evidentiary Hearing**

Application of the test enunciated in *Franks* to the facts of this case demonstrates clearly that the defendant has failed completely to make the requisite showing to warrant an evidentiary hearing. The defendant bases his claim for relief on his allegation that certain conclusions reached by Agent Pardee are "conclusory, false, reckless and misleading statements in the affidavit." Their claim is not supported by either the facts of this case or the relevant legal authority. Our review of the record indicates that there is not one "false, reckless and misleading" statement in the affidavit. Further,

assuming that the statements cited by the defendants are "false, reckless and misleading" they did not effect the existence of probable cause and, they were made without the requisite *scienter*.

We begin by conceding one point that defendants make. The statements complained of are indeed "conclusory." But such is not matter for a *Franks* hearing. Such hearings are reserved for deliberately false or reckless statements made by the affiant which are critical to probable cause in the affidavit. Where as here, an affiant sets out his training and experience and based upon that training and experience that affiant arrives at certain conclusions, it is very difficult for anyone to establish that such conclusion is not indeed the affaint's opinion. Thus, when Agent Pardee rendered for Judge Collyer an opinion "based upon his training and experience in this and other cases," unless defendants can establish otherwise - they can not and have not - it is almost certainly a completely truthful statement and the law requires that a presumption of truthfulness be accorded such statements. Defendants then are left with establishing that the statements were made in reckless disregard for the truth. Just as Agent Pardee was blessed with the luxury of 20/20 hindsight in his interpretation of defendants' statements, so to are we blessed with that gift in assessing the "recklessness" of Agent Pardee's conclusions in his affidavit.

It is certainly true that what is found in an illegal search can not serve to establish probable cause for that search but that is not the issue here. But here we are addressing the question of whether conclusions reached by an affiant were made with reckless disregard for the truth, that is, the correctness of Agent Pardee's conclusions. Just as statements by a defendant recovered in violation of the law may yet be used to impeach that defendant's testimony, *Harris v. New York,* 401 U.S. 222 (1971), it seems to us that when a defendant claims that an affiant was reckless in certain conclusions, the record may be consulted to determine if that affiant was indeed reckless.

32

In *Harris* a nearly unanimous Supreme Court held when a defendant took the stand he was subject to impeachment with his otherwise reliable statement recovered in violation of *Miranda*. The Court said, "Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment." *Id.,* at 225-26. *See also Walder v. United States*, 347 U.S. 62 (1954).

*Harris* and its progeny make clear that the search for truth is paramount to the legal process and where, as here, a defendant complains that certain statements were made with reckless disregard for the truth, the ultimate accuracy of those statements must certainly be relevant and admissible in a determination of their recklessness. In other words, the fact that Galileo and Columbus were right is something that must be considered in determining if they were reckless. Here a jury has indeed determined that Agent Pardee was correct in his assertions that Suggs and Parker were talking about drugs in their conversations throughout this electronic surveillance. Similarly, that Mr. Glover and Mr. Suggs were talking about drugs is clearly established by the seizures in this matter on March 27, 2007 and the conversations between Glover and Suggs following that seizure.

More importantly, however, and more pointedly for purposes of evaluating this affidavit, the events of January 19 and 20, 2007, which events precede Agent Pardee's conclusions and are fulsomely discussed and cited in the affidavit, clearly establish probable cause to believe that defendant Glover and Suggs were dealing together in PCP. Such probable cause makes reasonable and reliable Agent Pardee's conclusions concerning the conversations between them intercepted over

Suggs' line. Thus defendants have utterly failed to carry their burden to establish that Agent Pardee's statements are "false, reckless and misleading." A defendant is entitled to an evidentiary Franks hearing "*only* if his attack on the accuracy of the affidavit is 'more than conclusory' and is accompanied by 'allegation of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.'" *United States v. Gaston*, 357 F.3d 77, 80 (D.C. Cir. 2004). Moreover, "if the addition of omitted facts would not have altered the probable cause determination, the trial court need not hold a hearing.*"* *United States v. Akinyemi*, No. 93-3109, 1994 U.S. App. LEXIS 22972, at *2 (D.C. Cir. Aug. 19, 1994) (unpublished).

**The Probable Cause Analysis**

The defendant has failed to demonstrate that the affidavit contains any false statements that were made either knowingly or with reckless disregard for the truth. Accordingly, the Court's inquiry need go no further and defendants are not entitled to an evidentiary hearing on their unsupported and unfounded claims of the falsity of the affidavit. Defendants have made no substantial showing that Agent Pardee's affidavit contains any false, reckless and misleading false statements, and that any such statements were made with the necessary scienter. Nor, assuming they could make such necessary showing, can they make the requisite showing that the absence of the statements would negate probable cause.

As we have indicated throughout this pleading in any determination of probable cause to support the February 9, 2007 Application to intercept wire communications over Glover's cellular telephone must take in to account the events of January 19 and 20, 2007. Those events disclose ample probable cause to believe that Glover was trafficking in narcotics and that he used the target telephone to do so. We submit that when those events are considered along with the other

34

"controlled buys" set out in the affidavit and the pen register analysis of activity over the target telephone (paragraphs 37 - 40), there is ample probable cause to find that Glover was using and would continue to use that telephone to facilitate narcotics trafficking and that there was therefore probable cause to believe that such telephone conversations would be intercepted in any monitoring of the cellular telephone.

We submit that the defendant has failed completely to make the required substantial showing that there were false statements and that the absence of the allegedly false statements to which he directs the Court's attention  would negate probable cause for issuance of the order authorizing wire interceptions in this case.

### C.  The Good Faith Exception and the Poisonous Tree

In the syllogism of defendants' argument regarding the electronic surveillance evidence in this matter we have established clearly and beyond peradventure that defendants' major thesis can not stand.  There clearly was probable cause to support Judge Collyer's February 9, 2007 Order in this matter and there were no false statements in the affidavit.  It being thus so, defendants' assertion that the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984), are not applicable in the face of a valid *Franks* challenge are rendered inapplicable.

Similarly, defendants' claim that because there was no probable cause for the electronic surveillance, evidence recovered as a result of that electronic surveillance must be suppressed as fruit of the poisonous tree.  *Wong Sun v. United States,* 371 U.S. 471 (1963).  Defendants seem to erroneously believe that if they were to prove that the February 9, 2007 Order should not have issued, that, as night the day, it therefore follows that all else must be suppressed as fruit of the poisonous tree.  Not only have defendants failed to establish that the February 9, 2007 Order should not have

issued, they have failed to establish that all subsequent Orders are necessarily tainted by the February 9, 2007 Order. That is their burden, not ours since there is a presumption of validity that attaches to searches pursuant to a warrant. Moreover, since defendant has similarly clearly failed to establish the there is any actionable *Franks* concern in this matter, even assuming that probable cause were lacking, by defendants own argument the good faith exception of *United States v. Leon*, 468 U.S. 897 (1984), is then applicable and would immunize the subsequent Orders.

### D. The Order Permitting Installation of the Listening Device in Glover's Truck Was Justified and Appropriately Limited

Defendant contends upon information and belief that "the federal agents seized the truck for an extended period of time during which they entered it several times to install the bug." In point of fact defendant is grossly in error. On March 19, 2008 after Judge Collyer signed the Order authorizing interception of oral communications inside a 1998 Chevrolet pickup truck with District of Columbia registration BZ0597 and vehicle identification number 1GCGK29R0WE126375, agents proceeded to the parking lot at BWI where Glover had parked his truck when he flew to Chicago. The agents involved in this investigation were accompanied by agents and technicians who would install the listening device in the truck. The FBI was prepared to tow the truck from its parking space and return it to the same space after installing the listening device. When they arrived at the truck's location the technical personnel inspected the vehicle without ever entering or moving the vehicle and determined that the vehicle had an "after factory" alarm system installed. The technical personnel determined that the listening device could be installed without moving the car but the alarm system was such that the technical personnel, knowing that Glover was not scheduled to return to BWI for two days, determined that the best plan of action was to obtain the appropriate equipment

to disarm the alarm on the truck before attempting to install the listening device. There was no entry to the vehicle and it was never moved.

The following day law enforcement personnel, including the technical personnel, returned to the BWI parking lot, disarmed the alarm, entered the truck, installed and tested the listening device, re-armed the alarm and locked the truck. The truck never moved at all and this was accomplished in slightly more than thirty minutes. From the time the truck was locked until the truck was seized upon Lonnell Glover's arrest no one from law enforcement entered the defendant's truck for any reason at any time and installation of the listening device was accomplished without ever depriving Glover (or anyone else to our knowledge) of the use of his vehicle.

Judge Collyer's March 19, 2008 Order provides that

> based upon the request of the Applicants, Special Agents of the Federal Bureau of Investigation are permitted to make all necessary surreptitious and/or forcible entries to and temporary seizures of the target vehicle to effectuate the purposes of the Court's order, whether the target vehicle is located in the District of Columbia, the District of Maryland or the Eastern District of Virginia, including but not limited to entries to install, maintain and remove electronic listening devices within the 1998 Chevrolet pickup truck with District of Columbia registration BZ0597 and VIN 1GCGK29R0WE126375.

March 19, 2008, Order, p. 5. This much is also quoted in defendant's motion, Truck Motion, p. 6, but having quoted the entire paragraph (including "It is" at the end of the prior paragraph), defendant for some reason neglects to include the last sentence of the paragraph which states, "On the first business day after any such surreptitious entry or seizure the United States will notify the Court of the entry or seizure." Defendant attempts to suggest that Judge Collyer granted broad and unfettered authority to law enforcement when in fact Judge Collyer did not and he knows it. Judge Collyer granted authority to seize the truck and/or enter the truck "to effectuate the purposes of the Court's

37

order . . . including but not limited to entries to install, maintain and remove electronic listening devices . . . ." Most importantly for consideration of defendant's claim that such authorization was overbroad, Judge Collyer required that on the first business day following any entry or seizure, the government must report the entry or seizure to the Court.  This requirement directly addressing any entry or seizure must be considered within the context of the Order's other provision for notice to the Court, that is, the Order also requires that the United States "shall provide this Court with a report on or about the fifteenth and thirtieth days following the date of this Order, or as soon thereafter as practicable, showing what progress has been made toward achieving the authorized objectives and the need for continued interception."

It must be remembered here that the statute and Judge Collyer's Order grant authority to monitor for a period of thirty days, that is, the statute and thus Judge Collyer's Order, presume that for up to forty days from the signing of the Order[19] there is probable cause to seize evidence to be found within the defendant's truck.  The statute also requires that the government take certain steps to insure that over the period of authorization such presumptions remain valid.  Judge Collyer's Order specifically provides an appropriate balance between the exigencies of any situation the FBI might encounter in carrying out the primary purpose of the Order and the need to insure that law enforcement's actions are justified and appropriate, but in the context of the statute's underlying presumption that there is over the thirty day life of the Order probable cause to believe that the

---

[19] The March 19, 2007 application being an original (*i.e.,* not an extension) application, consistent with the statute provides that the "interception of oral communications must terminate upon the attainment of the authorized objectives, not to exceed 30 days measured from the earlier of the day on which investigative or law enforcement officers first begin to conduct an interception pursuant to this Order or 10 days after the Order is entered."  March 19, 2007 Order, p. 6.

evidence sought will be found.  Nor we submit, can this Court ignore the character of the "premises" to be entered.  We are not discussing a home complete with private areas where the most intimate of conduct occurs.  Nor are we discussing a business premises with similarly private areas.  We are talking about a pick up truck, a premise of a decidedly different character than a home or office.  *See South Dakota v. Opperman*, 428 U.S. 364, 367-72 (1976); *Arkansas v. Sanders*, 442 U.S. 753 (1979); *Cady v. Dombroski*, 413 U.S. 433 (1973).  The truck's mobility and the necessarily limited expectation of privacy therein are factors Judge Collyer and this Court are entitled to consider.

In support of his contention that the authority granted was over broad, defendant cites the Court to our Court of Appeals' decision in *United States v. Ford*, 553 F.2d 146 (D.C. Dir. 1977). The facts in *Ford* present an entirely different picture, so different as to make *Ford* inapplicable here. In *Ford* the Narcotics Branch of the Metropolitan Police Department suspected that a shoe store in Northwest Washington, D. C., was the locus of narcotics distribution activity.  These suspicions were corroborated by information received through intermittent physical surveillance of the store and from informants, some of whom made controlled purchases of narcotics there.  The police concluded that the narcotics operation was extensive, but they were unable to gather sufficient information as to the persons involved.  Therefore, they decided to seek a court order authorizing electronic surveillance. Their information indicated that the prime suspect mistakenly believed his telephone was already the object of a wiretap order, and therefore, he would not discuss narcotics activity over the telephone.  The police concluded that under the circumstances a wiretap would be fruitless, so a decision was made to seek judicial authority to install eavesdropping devices "bugs" inside the premises.

On September 4, 1975 a judge of the District Court upon finding probable cause signed an intercept order authorizing the installation and monitoring of a "bug" in the shoe store. The Assistant United States Attorney informed the authorizing judge, off the record, that the police intended to effect entry into the shoe store by means of a bomb-scare ruse. The store was evacuated and three "bugs" were installed, with at least one of the devices being placed in an area of the store not open to the general public. The operation lasted approximately half an hour. On the following day police assigned to monitor conversations discovered that the devices were inoperative and not transmitting. The authorizing judge was notified that another entry was contemplated and although the authorizing judge disagreed with the efficacy of the government's plan, the judge apparently authorized the required entry. No record was made of these entirely informal conversations. Police made a second daytime entry on September 10, 1975 and installed two additional devices, one in a non-public area, all of which worked and during the next five weeks the police successfully monitored numerous narcotics-related conversations. There is no indication that any further entries were made until October 15, 1975, when, prior to the expiration of an extension order issued September 26, 1975, the police entered without subterfuge to remove the listening devices.

Based upon these facts the Court of Appeals in *Ford* affirmed the District Court's determination to suppress the evidence obtained by use of the bug. The Court in *Ford* said:

> [U]nless a judicially created exception to the warrant requirement can be invoked, when a case involves incursions on both private premises and conversational privacy, each requires prior valid judicial authorization though such authorization may be contained in the same document.

*United States v. Ford, supra*, 553 F.2d at 162. The Court went on to say:

> In light of the privacy interests implicated, the legislative history of Title III, specific findings and provisions in the District of Columbia Code, and the Supreme Court's recognition that exigency factors will rarely, if ever, be present in instances of electronic surveillance, we conclude that the minor incremental burden involved in obtaining proper judicial authorization for the particular invasions of privacy at issue here is not sufficient justification for dispensing with a fundamental Fourth Amendment requirement. When police seek to invade, surreptitiously and without consent, a protected premises to install, maintain, or remove electronic surveillance devices, prior judicial authorization in the form of a valid warrant authorizing that invasion must be obtained.

*United States v. Ford, supra*, 553 F.2d at 163-65 [footnotes omitted]. In other words, the Ford court held that there must be specific authorization in the wiretap "warrant," that is, the wiretap Order, for the covert entry into any protected premises for purposes of placing a listening device.

Defendant all but ignores the Supreme Court's holdings in *United States v. Dalia*, 441 U.S. 238 (1979). Defendant's single reference to *Dalia* is in footnote 2 of his motion, where he tells us that "*United States v. Dalia* [citation omitted] is inapposite in this case." In point of fact the Supreme Court in *Dalia* all but reversed our Court of Appeals in *Ford* and defendant's protestations to the contrary can not change that fact. Defendant argues in his footnote that *Dalia* dealt only with the questions of whether the courts may authorize electronic surveillance requiring covert entry and whether any such authorization must include a specific statement approving covert entry. Defendant minimizes and fails to understand the Supreme Court's holding in *Dalia*. We submit that in point of fact the Supreme Court in *Dalia*, fully aware of our Circuit's opinion in *Ford*, ruled that the fruits of a "bug" requiring covert entry were admissible in the trial of Dalia and others. Again, a

41

comparison of the facts in *Dalia* to those in *Ford* and the instant matter is helpful to an understanding of *Dalia* and its effect on *Ford* and will make it clear that *Dalia* so undercuts *Ford* as to reverse it and further, that *Dalia* all but specifically approves of the government's actions here.

On March 14, 1973, Justice Department officials applied to the United States District Court for the District of New Jersey, seeking authorization to intercept telephone conversations on two telephones in petitioner's business office.  After examining the affidavits submitted in support of the Government's request, the District Court authorized the wiretap for a period of 20 days or until the purpose of the interception was achieved, whichever came first.  The court found probable cause to believe that petitioner was a member of a conspiracy to steal goods being shipped in interstate commerce and that petitioner's business telephones were being used to further this conspiracy.  At the end of the 20-day period the Government requested an extension of the wiretap authorization and, for the first time, requested authority to intercept all oral communications taking place in Dalia's office.  On April 5, 1973, the court granted the Government's request for an extension of intercept authority and the request to "bug" Dalia's office.  Specifically, the court authorized the interception of all oral communications concerning the conspiracy at "the business office of Larry Dalia, consisting of an enclosed room, approximately fifteen (15) by eighteen (18) feet in dimension, and situated in the northwesterly corner of a one-story building housing Wrap-O-Matic Machinery Company, Ltd., and Precise Packaging, and located at 1105 West St. George Avenue, Linden, New Jersey."  The electronic surveillance order of April 5 was extended by court order on April 27, 1973.  Neither order made any reference at all to entry onto the target premises, covert or otherwise.  Nor is there any indication that law enforcement entered the target premises for any purpose other than to install the listening device.

On November 6, 1975, Dalia and others were indicted in a five-count indictment charging that he had been involved in a conspiracy to steal an interstate shipment of fabric. At trial, over Dalia's objection, the government introduced evidence of intercepted oral and wire communications. Upon review the Supreme Court addressed three issues raised by Dalia's appeal.

> Petitioner first contends that the Fourth Amendment prohibits covert entry of private premises in all cases, irrespective of the reasonableness of the entry or the approval of a court. He contends that Title III is unconstitutional insofar as it enables courts to authorize covert entries for the installation of electronic bugging devices. [246-47]

> Petitioner's second contention is that Congress has not given the courts statutory authority to approve covert entries for the purpose of installing electronic surveillance equipment, even if constitutionally it could have done so. Petitioner emphasizes that although Title III sets forth with meticulous care the circumstances in which electronic surveillance is permitted, there is no comparable indication in the statute that covert entry ever may be ordered. [249]

> Petitioner's final contention is that, if covert entries are to be authorized under Title III, the authorizing court must explicitly set forth its approval of such entries before the fact. In this case, as is customary, the court's order constituted the sole written authorization of the surveillance of petitioner's office. As it did not state in terms that the surveillance was to include a covert entry, petitioner insists that the entry violated his Fourth Amendment privacy rights.[254-55]

*United States v. Dalia*, *supra*, 441 U.S. at 246-47, 249, 254-55. Defendant, in his cursory footnote reference to *Dalia* contends that *Dalia* only decided whether courts may authorize covert entry and whether the wiretap authorization must include a specific statement of authorization. Defendant acknowledges that the Court decided those issues in favor of the government and suggests that this case presents an overbroad authorization and therefore is "inapposite." We submit that in comparison to the authorization contemplated and approved in *Dalia*, Judge Collyer's authorization

43

is a model of exactitude and in any event is more than adequate.

Consider first a standard United States District Court search warrant, Form AO93(rev. 5/85)Search Warrant, Attachment A hereto. It requires that the law enforcement agent supply the name, address or brief description of person or property to be searched and that the application and/or affidavit under oath establish probable cause to believe that the person or property so described contains the evidence sought. The only limitations on the authority to search granted by the warrant are a date and time by which the warrant must be executed, the time of the day (daytime or any time) during which the warrant must be executed and a direction to leave a copy of the warrant and an inventory of property seized at the search site and to make a prompt inventory with the court. Exactly what does defendant believe is missing from the warrant in this instance? Obviously the premises to be searched is described with more than adequate particularity - "the 1998 Chevrolet pickup truck with District of Columbia registration BZ0597 and VIN 1GCGK29R0WE126375." Clearly, Agent Pardee's affidavit sets out probable cause to believe that the evidence sought may be found in the track. The Order and the statute, 18 United States Code, § 2510, *et seq.,* clearly set out the period of authorization and the time during which the order may be executed as well as the terms of inventory and notice.

Form AO93 contains no other limitations upon the authority to search. The warrant authorizes a search but makes no attempt to suggest that the authorizing magistrate should give any more specific directions such as what door to enter or how to make that entry. The undersigned has never experienced such direction and knows of no reason why such direction, beyond limiting the purpose of entry and any re-entry "to effectuat[ing] the purposes of the Court's order . . . including but not limited to entries to install, maintain and remove electronic listening devices," a direction

no more specific than an authorization to search for the described evidence. Moreover, despite the more generous requirements of the statute, Judge Collyer's Order requires that the government give her notice of any entry "[o]n the first business day after any such surreptitious entry or seizure the United States will notify the Court of the entry or seizure." As previously indicated only one entry was made and accordingly, on March 21, 2007, the United States reported that entry to the Court. *See* Attachment B, hereto. Thus the comparison of Judge Collyer's Order to every other standard search warrant in the federal system, that is Form AO93, reflects that Judge Collyer's Order meets or exceeds that standard.

Consider next the Order approved by the Supreme Court in *Dalia.* That Order is quoted extensively in the Court's *Dalia* opinion, 441 U.S. 242, *fn.* 4. Given the focus of the Court's review, we can only assume that the quoted excerpt contains all references in the original Order relevant to any entry or re-entry, the central issue in *Dalia*. The quoted Order contains absolutely no reference to any entry or re-entry of the target premises. Defendant concedes that the issue in *Dalia* raised by the defendants there was that, if covert entries are to be authorized under Title III, must the authorizing court must explicitly set forth its approval of such entries before the fact. The Court in *Dalia* said:

> Petitioner contends, nevertheless, that the April 5 order was insufficient under the Fourth Amendment for its failure to specify that it would be executed by means of a covert entry of his office. Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that, in addition to the three requirements discussed above, search warrants also must include a specification of the precise manner in which they are to be executed. On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant -subject of course to the general Fourth Amendment protection "against unreasonable

searches and seizures."

*United States v. Dalia*, *supra*, 441 U.S. at 256-57 [footnoe omitted].   The three requirements

referenced by the Court were

> First, warrants must be issued by neutral, disinterested magistrates.
> See, *e. g., Connally v. Georgia*, 429 U.S. 245, 250-251 (1977); (*per
> curiam); Shadwick v. Tampa*, 407 U.S. 345, 350 (1972); *Coolidge v.
> New Hampshire*, 403 U.S. 443, 459-460, (1971). Second, those
> seeking the warrant must demonstrate to the magistrate their probable
> cause to believe that "the evidence sought will aid in a particular
> apprehension or conviction" for a particular offense. *Warden v.
> Hayden*, 387 U.S. 294, 307 (1967). Finally, "warrants must
> particularly describe the 'things to be seized,' " as well as the place
> to be searched. *Stanford v. Texas*, 379 U.S. 476, 485 (1965).

*United States v. Dalia*, *supra*, 441 U.S. at 255.  We submit that the holding in *Dalia* is anything but

inapposite.  Indeed, it is on all fours with the issue posed by defendants' motion.  If, as in *Dalia,* it

is sufficient to permit covert entry without even mentioning the possibility of or the need for covert

entry in the Order, than surely, as here, where the Courts Order recognizes the need and specifically

grants the authority placing definite limitations upon the purpose for any entry, Judge Collyer's

Order is more than adequate to the Constitution's requirements and can not possibly be viewed as

overbroad.

### E.   The Affidavits in the Wiretaps Establishes Necessity

Defendants next contend that Agent Pardee's affidavits do not establish necessity to conduct

a wiretap investigation.  Defendants argue that the Court improperly authorized the interception of

conversations in and within the vicinity of Glover's truck because the government failed to establish

"necessity" in its Applications and Agent Pardee's Affidavits in support thereof.  Specifically,

defendants claim that the government's demonstration of necessity because the affidavit "is chock

46

full of instances in which law enforcement had gained sufficient information through the previously authorized wiretap of Glover's telephone, and combined with other effective techniques, including surveillance, had already successfully pursued its targets through 'other investigative procedures' without the necessity for 'bugging' the truck." Glover, Truck Motion, p. 6-7.[20]   Assuming that defendants are suggesting that the government must demonstrate that other investigative methods have failed such that the investigation in question grinds to a halt to establish necessity for the requested wiretap, defendant has incorrectly stated the standard.  Accordingly, when defendants argue that there was no necessity for interception such that the Court should have not have authorized the wiretap, they are in error.

Judge Collyer authorized the original wiretaps, and the several extensions, because she properly found that: "(1) probable cause exists to believe that an individual has committed or is about to commit one of certain enumerated offenses; (2) probable cause exists to believe that particular communications concerning that offense will be obtained through an interception; (3) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried; and (4) probable cause exists to believe that the communication sought to be wiretapped is being used, or is about to be used, in connection with the commission of the offense." *United States v. Carter*, 449 F.3d 1287, 1292 (D.C. Cir. 2006)(internal quotations and brackets omitted); *United States v. Jones*, 451 F.Supp.2d 71, 80 (D.D.C. 2006)(Huvelle, J.).

First, the original applications in each of the four electronic surveillances in this matter established that such surveillance was necessary to accomplish certain definitive objectives or

---

[20]  "Truck Motion" refers to defendant Lonnell Glover's Motion to Suppress Evidence Obtained from Interception of Communications In and Within the Vicinity of a 1998 Chevrolet Pickup Truck with District of Columbia Registration BZ0597, filed August 4, 2008.

because that the objectives of the earlier authorizations had not yet been "fully" achieved. The wiretap statute provides that an order authorizing an interception cannot extend "for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days." 18 U.S.C. § 2518(5); *Carter,* 449 F.3d at 1292. In this case, while the government learned of several important aspects of Sugg's narcotics operation during the initial thirty-days of the wiretap (*e.g.,* that Lonnell Glover was Sugg's supplier of PCP), there remained much more to uncover in building a case against Suggs and his co-conspirators. Similarly, the original application to monitor Glover's cellular telephone makes clear that the government's principal objectives were to identify Glover's supplier(s) and the methods that he and his supplier(s) utilized to transport their drugs into this area. Monitoring of Glover's line quickly established that not only was their a PCP supply to identify but there was also a heroin supply to identify. It was not long into the monitoring process before we also learned that Glover was attempting to acquire cocaine and to develop a steady source of supply for that cocaine. Thus, throughout the term of electronic surveillance in this matter, the government sought to identify all those persons responsible for supplying PCP, heroin and cocaine to Glover for distribution in the metropolitan Washington, D.C., area. Glover was identified as Suggs' supplier in our monitoring of his telephone. Williams was identified as responsible for transporting PCP to Glover but monitoring never disclosed who supplied that PCP, where it was manufactured and how it was delivered to Williams' control. We identified Glover's source of supply for heroin but were not able to who supplied that heroin, where or how it was imported and how it was delivered to Glover's supplier's control. And with regard to Glover's scheme to import cocaine, we identified the persons involved with Glover in that scheme who was to supply that cocaine and how it was to be delivered to Glover.

None of these suppliers was ever actually identified.  While the wire disclosed that Velma Williams and Henry Brown were in the chain of supply for some of Glover's PCP, the source of that PCP was never actually identified.  Evidence was developed identifying a source of supply located in New York who was involved in supplying heroin to Glover, the source of that heroin was never identified.  Similarly, two persons involved in Glover's cocaine scheme were identified and have been indicted  with Glover and his nephew, Cornell Glover, but the source for that cocaine located in the Bahamas has never been identified.   In short, while significant progress was made in identifying Suggs' and Glover's distribution networks and their customers, the clearly articulated goals of this wiretap investigation were never fully accomplished and continued monitoring was justified.

Indeed, Judge Collyer's Orders specifically authorized the government to continue monitoring the wiretap on Glover's telephone and in his truck even after some useful information had been intercepted.  The Orders state:

> that such interceptions shall not terminate automatically after the first interception that reveals the manner in which the alleged co-conspirators and others as yet unknown conduct their illegal activities, but may continue until all communications are intercepted which reveal <u>fully</u> the manner in which the above-named persons and others as yet unknown are committing the offenses described herein, and which reveal <u>fully</u> the identities of their confederates, <u>their places of operation</u>, and the nature of the conspiracy involved therein. . . .

(emphasis added).  In *Jones*, 451 F.Supp. at 83, Judge Huvelle similarly held that the government may continue to use the wiretap even after some evidence had been obtained linking the defendant to a crime because "[t]he necessity requirement is not meant to work as an impediment to making a good case better, or a strong case airtight."

The government sought the extensions to the Glover wiretap and authority to intercept conversations in Glover's truck because it had not yet identified the location(s) where defendant Glover stored his drugs, an important part of his operation and a fruitful place from which to recover compelling physical evidence. Although the defendants in *Suggs* argued that "[i]t is difficult to see how the wiretap would provide much help in this regard," the wiretap extensions produced exactly this result. On March 27, 2007, during the second extension of the wiretap, the government learned through the wiretap that defendant Suggs used his girlfriend/co-conspirator's residence at 4000 10th Street, N.W., to store his supply of PCP. Specifically, at 6:28 p.m., the government intercepted a conversation in which Ngozi Joy informed defendant Suggs that, "I could smell that stuff when I pulled up - when I got out of the car" and that a police officer rode by the house on a bicycle. Joy also stated that, "I knew what it was when I walked up." This wiretap interception ultimately led law enforcement officers to obtain a search warrant at that location and to recover approximately 2 ½ gallons of PCP, rubber glovers, masks, funnels, and $7000 in cash. Officers at the scene overheard defendant Suggs tell defendant Joy, "it's mine, I'll take my weight." In addition, on March 28, 2007, law enforcement intercepted a phone call in which defendant Suggs and defendant Joy discussed the drugs found in her home, and defendant Suggs declared, "I'm taking the motherfuckin beef." (Meaning that Suggs will take responsibility for the 2 ½ gallons of PCP found in defendant Joy's residence). This information and evidence would not have been possible without the extensions to the wiretap.[21]

---

[21] In addition, the government applied for the extensions to the wiretap because other important aspects of defendant Sugg's operation had not yet been revealed, including: the methods of laundering or investing the proceeds of the illegal drug sales.

Second, the wiretaps and extensions were properly authorized even though other investigative means might have been available. The "necessity requirement" – that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c) – is the "keystone of congressional regulation of electronic eavesdropping." *Carter*, 449 F.3d at 1292. However, "the statute does not require the literal exhaustion of all other possible investigative approaches. Instead, in a case involving a wide-ranging conspiracy, the government must simply provide an adequate basis for the court to make a practical, common sense determination that other methods would likely prove inadequate to reveal the operation's 'full nature and scope.' " *Jones*, 451 F.Supp. at 81-82. In the original wiretap order and the several extensions, the Court found that this requirement had been met.

Defendants argue that the extensions should have been denied because the government could have and to some extent did employ other investigative techniques such as: surveillance, tracking devices, and cell site information to determine locations of criminal activity; and bank records and other financial transactions to determine the methods of money laundering. However, because the "necessity requirement" is NOT an "exhaustion requirement," defendants' argument is unavailing. In *Carter,* 449 F.3d at 1294, the Court made clear that "no authority indicates that the government must cease to request wiretaps as soon as it becomes clear that another technique, such as a search warrant, may prove useful in a limited way. The necessity requirement was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." (Internal quotations omitted). Such individual investigative techniques might be

productive in a discrete way, but they would fail to reveal the "full nature and scope" of the conspiracy. *Id*. As the Court found in approving the original wiretap and the two extensions, the wiretap was "necessary" to accomplish that end.

In sum, the Court properly found "necessity" in authorizing the original wiretaps and the several extensions to the wiretaps.

**WHEREFORE**, we respectfully submit that the defendants' several motions to suppress the fruits of court ordered electronic surveillance conducted in the investigation which lead to the defendants' indictment in this matter are without merit and should be denied.

Respectfully submitted,

JEFFREY A. TAYLOR
UNITED STATES ATTORNEY

BY: _____
WILLIAM J. O'MALLEY, JR.
Assistant United States Attorney

_____
ANTHONY SCARPELLI
Assistant United States Attorney

_____
JOHN K. HAN
Assistant United States Attorney

52

*Certificate of Service*

**I HEREBY** certify that I have caused a copy of the foregoing government's Response to Defendants' Several Motions to Suppress the Fruits of Court Ordered Electronic Surveillance and proposed Order to be served by ECF upon counsel for the defendants in this matter; this 25th day of August, 2008.

WILLIAM J. O'MALLEY, JR.
Assistant United States Attorney
D. C. Bar No. 166-991
555 4th Street, N.W., Fourth Floor
Washington, D.C.  20001
(202) 305-1749

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **Criminal No.  07-153 (TFH)** |
| | : | |
| **LONNELL GLOVER,** *et al.,* | : | |
| Defendants. | : | |

# ORDER

Upon the consideration of the defendants' several motions to suppress the fruits of court ordered electronic surveillance, the government's response to those motions and the entire record in this matter, it is, this _____ day of August, 2008,

**ORDERED** that defendants' several motions to suppress the fruits of court ordered electronic surveillance be, and hereby are, denuied.

_____
THOMAS F. HOGAN
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Criminal No.  07-153 (TFH) |
| | : | |
| LONNELL GLOVER, *et al.,* | : | |
| Defendants. | : | |

GOVERNMENT'S RESPONSE TO DEFENDANTS'
SEVERAL MOTIONS TO SUPPRESS THE RESULTS OF
<u>COURT ORDERED ELECTRONIC SURVEILLANCE</u>

# Attachment A

AO93(Rev.5/85)Search Warrant

# UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

## SEARCH WARRANT

CASE NUMBER:

TO: _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by _Detective_    who has reason to believe that
 (name, description and or location)

in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property)

☐ ☐ ☐

I am satisfied that the affidavits(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

**YOU ARE HEREBY COMMANDED** to search on or before _____
                                                                                            (Date)
(not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search ☐    (in the daytime - 6:00 A.M. to 10:00 P.M.)        (at any time in the day or night as I find reasonable cause has been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to the undersigned U.S. Judge/U.S. Magistrate Judge, as required by law.

_____    at Washington, D.C.
Date and Time Issued

_____    _____
Name and Title of Judicial Officer                     Signature of Judicial Officer

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **Criminal No.  07-153 (TFH)** |
| | : | |
| **LONNELL GLOVER,** *et al.,* | : | |
| Defendants. | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANTS'**
**SEVERAL MOTIONS TO SUPPRESS THE RESULTS OF**
**COURT ORDERED ELECTRONIC SURVEILLANCE**

# Attachment B

# Memorandum



*United States Attorney*
*District of Columbia*

| Subject: | Date: |
|---|---|
| Government's First Supplemental Report In the Matter of the Application of the United States of America for an Order Authorizing the Interception of Oral Communications Inside a 1998 Chevrolet Pickup Truck with District of Columbia Registration BZ0597 and Vehicle Identification Number 1GCGK29R0WE126375 | March 21, 2007 |

| To: | From: |
|---|---|
| The Honorable Rosemary M. Collyer, United States District Judge | William J. O'Malley, Jr. Anthony Scarpelli Assistant United States Attorneys |

On March 19, 2007 the Court signed an Order authorizing the interception of oral communications inside a 1998 Chevrolet pickup truck with District of Columbia registration BZ0597 and vehicle identification number 1GCGK29R0WE126375.  The Order permitted Special Agents of the Federal Bureau of Investigation (FBI) are permitted to make all necessary surreptitious and/or forcible entries to and temporary seizures of the target vehicle to effectuate the purposes of the Court's order, whether the target vehicle is located in the District of Columbia, the District of Maryland or the Eastern District of Virginia, including but not limited to entries to install, maintain and remove electronic listening devices within the 1998 Chevrolet pickup truck with District of Columbia registration BZ0597 and VIN 1GCGK29R0WE126375. Further, the Order required that On the first business day after any such surreptitious entry or seizure the United States will notify the Court of the entry or seizure.

On March 19, 2007, FBI agents attempted to move the truck from a parking lot at Thurgoog Marshall Baltimore Washington International Airport (BWI) where Lonnell George Glover had parked it while he flew to Chicago.  The agents discovered that the vehicle had an alarm system which might have thwarted their efforts to surreptitiously install the monitoring device and, aware that Glover was not scheduled to return to BWI until March 21st, determined to leave the vehicle and obtain the resources necessary to safely disarm the alarm system.  No entry or seizure was made on March 19th.

On March 20, 2007 agents returned to BWI, disarmed the alarm and entered the vehicle on  the parking lot at 2:57 p.m.  By 3:28 p.m installation of the monitoring device was completed.  It was then tested and deemed operable at 3:33 p.m.  The vehicle was then returned

to the its original state, locked and secured in the parking lot as Glover left it prior to the FBI's entry.

Interceptions pursuant to the Court's March 19, 2007 Order as amended on March 20, 2007 have not commenced for two reasons. First, Glover has not yet returned from Chicago as of this submission. Second, the signal from the monitoring device is not being intercepted because the necessary technical arrangements to record all interceptions have not yet been completed. Within one business day of the initiation of interceptions we will notify the Court that such interceptions have commenced.

## AUTHORIZATION

I have read and reviewed the government's First Supplemental Report in the Matter of the Application of the United States of America for an Order Authorizing the Interception of Oral Communications Inside a 1998 Chevrolet Pickup Truck with District of Columbia Registration BZ0597 and Vehicle Identification Number 1GCGK29R0WE126375. It is directed that pending review of the government's First Periodic Report monitoring may commence pursuant to the Court's March 19, 2007 Order as amended on March 20, 2007. The Government's First Periodic Report should be delivered to the Court by the close of business the day following fifteen days after interceptions commence. It is further directed that this First Supplemental Report be sealed.. It is further directed that three certified copies of this report be provided to the United States Attorney's Office.

Seen and approved this _____ day of March, 2007.


_____          _____
                                          ROSEMARY M. COLLYER
                                          United States District Judge


_____
Date

2